# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

CARY ANTHONY STAYNER,
Defendant and Appellant.

S112146

Santa Clara County Superior Court
210694

April 30, 2026

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, and Adams[*] concurred.

Justice Evans filed a concurring and dissenting opinion.

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. STAYNER

S112146

Opinion of the Court by Guerrero, C. J.

This case is an automatic appeal from a judgment of death. (Pen. Code,[1] § 1239, subd. (b).) Defendant Cary Anthony Stayner used a ruse to enter the motel room of Carole Sund, her 15-year-old daughter Juli Sund, and their 16-year-old family friend Silvina Pelosso.[2] Once inside the room, defendant brandished a gun and used duct tape to bind Carole and the girls. He murdered Carole by strangling her and murdered Silvina by strangling and suffocating her. Then, over the course of several hours, he repeatedly sexually assaulted Juli, after which he kidnapped her, sexually assaulted her again, and then murdered her by slitting her throat. About five months later, defendant kidnapped, murdered, and decapitated Joie Armstrong. Defendant confessed to his crimes in a detailed recorded interview. The facts of the Armstrong murder, which occurred inside Yosemite National Park (Yosemite) and was prosecuted by federal authorities, were presented during the penalty phase.

After a jury trial, defendant was convicted of the murders of Carole, Juli, and Silvina (§ 187, subd. (a)) and of kidnapping Juli (§ 207). As to the three murder counts, the jury found true allegations that defendant personally used a deadly and

---

[1]     Unspecified statutory references are to the Penal Code.

[2]     Because several victims and witnesses share the same last names, we occasionally refer to them by their first names.

1

dangerous weapon (former § 12022, subd. (b)(1)) and personally used a firearm in the commission of the crimes (former §§ 12022.5, subd. (a)(1), 12022.53, subd. (b)). The jury found true five special circumstances: Multiple murders (§ 190.2, subd. (a)(3)); kidnapping murder as to Juli (*id.*, subd. (a)(17)(B)); attempted rape murder as to Juli (*id.*, subd. (a)(17)(C)); forcible oral copulation murder as to Juli (*id.*, subd. (a)(17)(F)); and burglary murder (*id.*, subd. (a)(17)(G)). The jury found not true an alleged robbery-murder special circumstance. (*Id.*, subd. (a)(17)(A).)

In a separate sanity phase trial, the jury found defendant to be sane at the time of the offenses, and in a separate penalty phase trial, the jury set the penalty at death. The trial court denied defendant's motion for a new trial and his motion to modify the sentence and imposed a sentence of death with a consecutive prison term of 45 years.

We affirm the judgment in its entirety.

## I. FACTS

### A. Guilt Phase

1. *Prosecution case*

a. *The disappearance of Carole, Juli, and Silvina*

In February 1999, Carole Sund lived in Eureka with her husband Jens, their 15-year-old daughter Juli, and their three younger children. Carole planned a vacation with Juli and Silvina, a 16-year-old family friend from Argentina who was staying with them.

On February 12, 1999, Carole, Juli, and Silvina flew to San Francisco, and Carole rented a red Pontiac Grand Prix from Avis Car Rental. They planned to attend Juli's cheerleading

competition in Stockton, drive to Yosemite for a two-night stay at the Cedar Lodge, and return to San Francisco to meet up with Jens and the other children for a trip to Arizona.

On February 14, 1999, Carole, Juli, and Silvina checked into room 509 at the Cedar Lodge in El Portal.  Juli and Silvina rented a VCR and some VCR tapes.  The clerk recalled discussing the movie Jerry Maguire (Tristar Pictures 1996) with them.  Defendant was a maintenance worker at the Cedar Lodge and lived in an apartment above the restaurant and bar.

Tracy M. was also staying at the Cedar Lodge with family and friends, including Tracy M.'s 15- and 12-year-old daughters and their two friends.  On February 14, the four girls went to the motel's indoor pool and spa and saw defendant hanging out in the spa area.

On the morning of February 16, a Cedar Lodge manager called room 509 because the guests had not checked out.  No one answered.  Later, a housekeeper looked inside the room and saw wet towels on the bathroom floor and beds that looked "almost like [they were] made up" but appeared to be "in a tiny bit of disarray."  A pink blanket and a pillow were missing from the closet.

When Carole and the girls were not at the San Francisco International Airport on February 16 for their planned meetup, Jens was not surprised because his plane had arrived four hours late.  He caught the next plane to Phoenix, Arizona.  When he did not hear from Carole by February 17, he filed a missing person report.

### b. *Investigation of Sund-Pelosso murders*

### i. *Initial investigation*

A Mariposa County Sheriff's Deputy received the missing person report and went to Cedar Lodge. She examined room 509 and did not see any damage to the door or windows. The curtains were closed, and one bed sheet was missing. There were some Danish pastry rolls, an apple, and tomato juice in the room. Wet towels were heaped on the bathroom floor.

On February 19, a middle school student discovered a wallet while walking to school in Modesto. The wallet contained Carole's driver's license and credit cards.

On February 20, another Mariposa County Sheriff's Deputy processed room 509 for evidence and collected latent fingerprints. One pillow was missing a pillowcase, and one bed was missing its top sheet. On the floor, there were small pieces of cloth and what appeared to be a garment label.

On March 3, 1999, FBI Special Agent Anthony Alston interviewed defendant at Cedar Lodge. Defendant said he returned to Cedar Lodge on Valentine's Day weekend after going out of town to visit friends. He said he had not seen the missing individuals or their car.

### ii. *Discovery of Carole and Silvina's bodies*

The afternoon of March 18, 1999, a witness saw a thoroughly burnt car on a remote dirt road. He could not tell the color of the car but saw that it was red near the front license plate, which had fallen off. He took the license plate home and called police.

The next morning, FBI Special Agent Chris Hopkins went to the scene and discovered the bodies of Carole and Silvina in

the trunk of the car. A pathologist testified that the victims died before the fire began. The victims' bones were damaged by heat and showed no damage from a bullet or a cutting tool. Strangulation could not be ruled out as the possible cause of death.

Agents investigated the burnt car and surrounding areas and found a rope, a black purse, a green fanny pack, a camera case with a camera, an Avis Car Rental key, and Juli's shoes. Inside the purse was Carole's credit card, a second camera, and a receipt from Cedar Lodge. Photographs developed from the cameras showed the victims at a cheerleading contest and in Yosemite. Arson expert FBI Agent Timothy Huff determined the fire was intentionally set weeks before its discovery on March 18.

### iii. *Discovery of Juli's body*

On March 24, 1999, Special Agent Alston, who had interviewed defendant at Cedar Lodge, received a letter at the FBI's Modesto field office. The letter included a map of the Vista Point area on the Don Pedro Reservoir and included the words "We had fun with this one," "Vista Point," and "Don Pedro." Defendant's right thumbprint was found on the stamp. An FBI document examiner discovered indentations on the letter that depicted a heart and the words "Victor," "Johnny," "Forever," and several X's.

On March 25, 1999, FBI agents searched the area depicted on the map and discovered Juli's body. There was a piece of duct tape attached to her left ankle. An autopsy revealed the cause of death was a six-and-a-quarter-inch incision to her neck. The pathologist testified that Juli's vulva was shaved but that she

could not determine whether Juli had been sexually assaulted because her body was decomposed.

### c. *Defendant's statement*

On July 24, 1999, FBI agents, thinking defendant might have some information about the murder of Joie Armstrong, located him at a resort in Wilton. Defendant agreed to be interviewed at the FBI office in Sacramento, waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and was interviewed in Sacramento. Defendant's interview was audio recorded and relevant portions were played for the jury.

Defendant said he had always had obsessive-compulsive sexual feelings but that in late 1998, it "just got to the point" where he decided to act on them. He began fantasizing about killing his girlfriend, raping and killing her eight- and 11-year-old daughters, and burning their house to avoid detection. He had considered acting on this fantasy as recently as two days before the interview, even going over to his girlfriend's house but discovering that her daughters were away.

On the weekend of February 13 to 14, 1999, defendant put together a crime "kit" including a roll of black duct tape, a knife, and some rope. On February 14, he saw four girls at the Cedar Lodge pool who would have been his victims, but a man was staying with them. The next day, defendant visited his girlfriend and her daughters but decided not to kill them in part because there was a man staying on the property. At 9:00 p.m., he returned to Cedar Lodge and peered into a room next to where a red Pontiac Grand Prix was parked. He saw a woman (Carole) and two girls (Juli and Silvina). He "didn't see a man in the room, so they were vulnerable. Easy prey." He got his crime "kit," gloves, and a gun from his room.

On the "[s]pur of the moment," he thought of a plan — to knock on the doors of several empty nearby rooms, loudly say "[m]aintenance," walk in, wait a few seconds, and slam the door, "to just kinda desensitize them to the knock on their door." When he knocked on the victims' door, Carole looked out the window. Defendant told her he needed to check inside for a possible water leak. Carole did not want to let him in. He said, "[O]kay, no problem ma'am I'll just . . . go get the manager," and told her they would have to move to another room. Carole asked why they had to move, and defendant said they would not have to if he could check inside. Carole let him in.

Defendant went into the bathroom and pretended to check for a leak. As he came out of the bathroom, he pulled out the gun. The girls were watching the movie Jerry Maguire. Defendant pointed the gun at Carole and said he needed money and the keys to the car. Then he bound everyone, covered their mouths with duct tape, and led Juli and Silvina into the bathroom. Defendant wet some towels, "[t]ryin' to make it look like they had been there all night [¶] . . . [¶] [a]nd into the morning."

Defendant then cut a piece of rope, sat on Carole's back, and "nonchalantly strangled her to death." He "had no feeling" as he "just performed the task." He wrapped Carole's body in a sheet and put her in the trunk of the Pontiac.

Defendant returned to the room and removed the girls' clothes, cutting their shirts off with his knife, causing bits of cloth to fall on the carpet. Defendant orally copulated Juli, made her orally copulate him, and attempted to rape her. He took Silvina into the bathroom and strangled and suffocated her. Then he continued his sexual assault of Juli for several hours.

7

At one point, Juli asked to go to the bathroom. Defendant did not want Juli to see Silvina and "freak out," so he took her next door to room 510. Defendant forced Juli to shave her pubic area because he wanted to fulfill his fantasy of having sex with a prepubescent girl. He then orally copulated her again. As it got closer to morning, he knew he had to leave. He tied Juli up, left her in room 510 with the phone disconnected, and returned to room 509. Wearing gloves, he packed the victims' belongings in their suitcases and put the suitcases, Carole's purse, and Silvina's body in the Pontiac. He left behind some Danish pastries and tomato juice.

Defendant returned to room 510 with a pink blanket from room 509, put it around Juli's shoulders, walked her out to the Pontiac, and had her sit in the passenger seat. He drove to the front office to drop off the motel keys and was "amaz[ed]" to find Juli still sitting in the car when he returned.

As defendant drove away from Cedar Lodge, he wished he "had a place to take [Juli]" and "keep her" because he "liked her a lot." But he also "knew . . . all the time" that he was going to kill her. He pulled into the Vista Point parking lot at the Don Pedro Reservoir and carried Juli down a path "like a groom carrying a bride over the threshold." He kissed and hugged her, told her he wished he could keep her, and made her orally copulate him again. He also told her that back in the room, she had a good chance to get away because there were no bullets in his gun. Then, defendant told her he loved her and slit her throat with a knife three times. He cut the duct tape off her hands and covered her body with branches and loose brush.

Defendant went back to the car, opened the trunk, cut the bindings off Carole and Silvina, and took their clothes off to

prevent authorities from learning they were killed in their nightclothes. He put the bedsheet, clothing, and duct tape into a pillowcase and closed the trunk. He threw the knife and the roll of duct tape down the hill and drove away. He saw a vehicle driving into the parking lot and tried to hide his face. He drove around and threw the pillowcase containing the sheet, clothes, and duct tape in a dumpster. He parked the car and wiped it down to remove fingerprints. He threw away Carole's purse, the rope, a cosmetic bag, and some shoes in various places.

Defendant walked toward Sierra Village but returned to the car after realizing he forgot to wipe down one part of the car. He missed the bus because of the delay, so he used $180 of the $200 he had taken from Carole's purse to take a taxi to Yosemite. He then caught a bus to Cedar Lodge. That night, he returned to room 509 and replaced a pillowcase that had some blood on it, made up the beds with clean sheets (but forgot one sheet), and cleaned some blood spots from the bathtub.

On February 18, defendant returned to the Pontiac late at night to burn it. He scratched the message "we have Sarah" into the car (Juli had told defendant that her name was Sarah) because he wanted authorities to think that more than one person committed the crimes, and that "Sarah" was still alive. Defendant also took Carole's wallet from her purse. He poured gasoline over the back seat, threw a match on it, ran up the hill, and heard an explosion. He then drove to Modesto and threw Carole's wallet out the window as "another ploy to throw them off."

At some point after he burned the Pontiac, defendant returned to the Don Pedro Reservoir where he had left Juli's body and retrieved the pink blanket. He put the blanket in a

plastic bag, drove to Coulterville, and threw the bag down a hill. He wrote the letter with the map showing the location of Juli's body and left an imprint on the letter of the following words, "just another ploy to throw you guys off," because he wanted Juli's body to be found. Defendant said he was ready to speak to the FBI agents because it was "time for the killing to stop."

#### d. *Further investigation*

On July 25, the day after his confession, defendant accompanied the agents to several locations and told them what they would find. For example, he directed them to the white bag containing the pink blanket and to Vista Point, where he had thrown the duct tape and knife. No knife was found at Vista Point at that time (it was found later), but the end of the duct tape roll that was found matched a piece of tape that was recovered from Juli's ankle.

About the same time, a taxi driver called the FBI to report that she recognized defendant's photograph on television because she had driven him from Sierra Village to Yosemite on February 16. According to the taxi driver, defendant refused to give his name or workplace at the park entrance. He paid the park entrance fee and cab fare with cash he took from a backpack he was carrying.

#### 2. *Defense case*

##### a. *Forensic evidence*

FBI Agent Jacob Holmes testified that latent fingerprints he found on items recovered from the site of Juli's murder and in room 509 did not belong to defendant. An FBI document examiner testified there was not enough of a sample to determine whether the handwriting on the letter and envelope sent to the FBI belonged to defendant.

b. *Character evidence*

Several Cedar Lodge employees testified they did not believe defendant was a violent person or the kind of person who would prey on women or children.  The owners of a glass shop at which defendant worked from 1993 to 1995, a glass shop employee, and the employee's fiancée all testified that defendant was not violent or aggressive toward women.

c. *Evidence of defendant's inability to form the*
*requisite mental state for murder*

One morning in July 1995, one of the glass shop owners took defendant to the county hospital after defendant was found red-faced and teary-eyed, with bloody knuckles from punching plywood.  A few weeks before this incident, defendant was agitated and shaking as he told a fellow employee's fiancée that he had always had dreams involving blood, women, and murder, but had recently become incapable of controlling his feelings and could not distinguish his dreams from reality.  Shortly before the murders, a guest at the Cedar Lodge saw defendant walking around mumbling to himself.

On March 3, 1999, when Special Agent Alston interviewed defendant as part of the investigation, the conversation ended with a brief discussion of defendant's brother Steven.  Defendant was "solemn" as he talked about how Steven was abducted as a child, subsequently reunited with his family, and later died in a motor vehicle accident.

On July 25, 1999, when defendant went with FBI agents to the crime scenes, he was cooperative and did not try to negotiate any benefit in exchange.  At one point, Special Agent Kenneth Hittmeier noticed defendant wipe tears or sweat from the side of his face.

11

Dr. Jose Arturo Silva, a forensic psychiatrist, testified that defendant's father had a history of pedophilia and exhibitionism and that his mother had a history of depression and mild autism. His extended family had various psychotic illnesses and disorders. There was evidence that defendant may have suffered a perinatal injury to his brain. According to Dr. Silva, defendant had low emotional intelligence and poor social judgment, consistent with autism, as evidenced by his attempt to negotiate with FBI agents for a monetary award and access to child pornography in prison. Defendant lacked empathy, tended to see others as inanimate objects, had recurrent dreams of disembodied heads, a preoccupation with Bigfoot and the prophecies of Nostradamus, and he had a feeling that his actions were in fulfillment of a special personal destiny. These symptoms supported a diagnosis of personality disorder not otherwise specified with schizoid, schizotypal, antisocial, and narcissistic features. Dr. Silva also diagnosed defendant with pedophilia, voyeurism, hebephilia with features of sexual sadism, and paraphilia not otherwise specified, and anxiety disorder not otherwise specified, with obsessive-compulsive features. He believed defendant was suffering from severe mental disorders at the time of the crimes.

Dr. Ruben Gur, a neuropsychologist who oversaw defendant's brain MRI, observed abnormalities that reflected defendant's poor emotional processing and difficulty distinguishing between thoughts and reality. Dr. Joseph Wu, who performed a PET scan of defendant's brain, testified that his findings suggested a traumatic brain injury, consistent with schizophrenia, bipolar depression, or obsessive-compulsive disorder, and psychotic symptoms. Dr. Monte Buchsbaum agreed with Dr. Wu's findings.

### 3. *Prosecution case in rebuttal*

Dr. Alan Waxman questioned the reliability of Dr. Wu's PET scan machine and criticized the various methodology used by Drs. Wu and Buchsbaum. Based on his own evaluation, Dr. Waxman opined that defendant's scan showed no abnormalities.

### 4. *Defense surrebuttal*

Dr. Frank Wood, an expert in PET scan technology, disagreed with Dr. Waxman that there were no abnormalities in defendant's brain. He testified that Dr. Wu's methodology was reliable, and he questioned Dr. Waxman's qualifications to testify as an expert.

### 5. *Verdict*

Having heard the foregoing evidence, the jury returned a verdict convicting defendant of three murders and one kidnapping, with true findings on enhancement allegations and five special circumstance allegations.

## B. Sanity Phase

### 1. *Defense case*

#### a. *Evidence of hallucinations and headaches*

Cedar Lodge coworker Elvia D., who knew defendant since 1997, testified about defendant telling her he had visions. Becky T., a former neighbor who saw defendant almost every day between 1979 and 1986, testified that defendant told her about his headaches. Both witnesses testified that they believed defendant was not the type of person who would sexually or violently assault someone.

b. *Expert psychiatric evidence*

Dr. Lynn Alison McInnes, a psychiatry and human genetics expert, testified that at the time of the crimes, defendant was suffering from intrusive, uncontrollable thoughts and psychosis, making him unable to unambiguously know the nature and quality of his acts. She explained that various disorders ran in defendant's family and that his dysfunctional family life and early childhood traumas — including the abduction of his brother Steven, a threatened suicide by defendant's father, an uncle's molestation of defendant, Steven's return to the family home and his untimely death caused by a drunk driver, defendant's father's molestation of defendant's sisters — likely contributed to his mental disorders. In addition, when defendant was 29 years old, an uncle with whom he was living was murdered. Defendant attempted suicide on the first anniversary of his uncle's death. In the months leading up to the crimes, defendant believed he was receiving messages about an upcoming apocalypse. This, along with the fact that defendant was walking around mumbling to himself at Cedar Lodge the day before the murders, showed he was in a psychotic state.

2. *Prosecution case*

Forensic psychiatrist Dr. Park Dietz opined that at the time of his crimes, defendant understood the nature and quality of his acts and knew his acts were wrong. Dr. Dietz based his conclusion on defendant's methodical and careful actions, including preparing a crime kit, concealing his fingerprints, choosing victims with no male companion, using a ruse to enter the victims' room, cleaning the crime scene, killing Juli in a remote location, burning the Pontiac, and misleading investigators. Dr. Dietz opined "[t]here [was] nothing about

14

what [defendant] was doing that he didn't understand." Indeed, defendant expressly admitted to Dr. Dietz that he knew at the time of his crimes that his actions were both illegal and wrong.

Having heard the foregoing evidence, the jury returned a verdict finding that defendant was sane at the time of the offenses.

## C. Penalty Phase

### 1. *Prosecution case*

The prosecution relied on two aggravating factors: (1) the nature and circumstances of the crime, including evidence regarding the impact the crime had on the victims and their families; and (2) defendant's other violent criminal activity, including, most particularly, the murder of Joie Armstrong.

### a. *Victim impact evidence*

Raquel, Silvina's mother, testified that she met Carole when Carole was an exchange student in Argentina in 1973. They were like sisters and remained friends over the years. The Sunds visited them in Argentina when Juli was one year old. Silvina did well in school, loved the outdoors, was a competitive roller-skater, and had a great relationship with her family. Silvina went to visit the Sunds in December 1998 and planned to return to Argentina in March 1999.

When Raquel and her husband learned of Silvina's disappearance, they flew to the United States and remained there until the FBI found Silvina's remains. Raquel had counseling, but the murder was hard on her marriage, and they also lost their business because they were emotionally unable to handle the work. Raquel missed playing, reading, and telling jokes with Silvina.

Silvina's father, Jose, testified that Silvina was tenacious and adventurous. She earned good grades to convince him to give his permission for her to go to the United States to visit the Sunds. It was the first time he and Raquel had let Silvina go anywhere by herself. When he learned about Silvina's disappearance, he felt a heavy pain in his chest. When he learned the FBI had discovered her body, he decided to throw himself in front of a train, but his other daughter called, interrupting his plan. He believed that Silvina, despite being dead, had caused his other daughter to call him at that moment, saving his life. Losing Silvina hurt him "down to [his] soul."

Carole C., Carole Sund's mother, testified that Carole was outgoing and was the family organizer for gatherings. They lived near one another and were very close. Carole, who adopted three children after she had Juli, taught parenting classes, was active in adoption organizations, and was a court-appointed special advocate for abused and neglected children. Juli, who was Carol C.'s first grandchild, was outgoing, kind, and thoughtful.

After Carole and the girls disappeared, Carol C. waited by the phone while her husband was in Yosemite. The discovery of Carole and Silvina's charred bodies was "devastating" — "[y]ou don't know how you're going to survive." For the next 10 days, they were "desperately hoping" that Juli might still be alive, but when they found Juli's body, "You give up. This big hole is going to be in your life forever."

Francis C., Carole Sund's father, testified that he went to Yosemite to help with the search after hearing about the disappearance of Carole and the girls. He broke down after the burned car was found, but they held out hope that Juli was alive,

until Juli's body was found. Carole was very special to him. She was a daredevil who loved the outdoors, and Juli was a lot like Carole. Juli had two wishes, to own and drive a car and to have a boyfriend; she would never have either.

b. *Murder of Joie Armstrong*

i. *Investigation of the Armstrong murder*

In July 1999, Joie Armstrong, who worked as an instructor at the Yosemite Institute, was murdered in the Foresta area of Yosemite.

On July 21, at around 6:30 p.m., Armstrong called her boss's wife, Suzanna M., and said she was going to bring over some equipment. Suzanna M. waited about an hour, but Armstrong never arrived, so she went to Armstrong's cabin in Foresta to pick up the equipment. Armstrong's white pickup truck was there, and the two front doors to the cabin were open. Suzanna M. knocked, then poked her head in and called for Armstrong but got no answer. Suzanna M. thought this was odd, but she did not think anything was wrong and went home. The next day, Suzanna M.'s husband told her Armstrong did not show up to work.

On July 21, Armstrong was supposed to visit her friend in Marin County at about 10:00 p.m. Armstrong never arrived, and her friend called the police at about midnight.

At 7:20 p.m. on July 21, a witness saw a blue-and-white International Scout near Foresta. The next morning, he saw the same vehicle parked nearby, this time with a man near it.

Between 10:00 and 10:30 p.m. on July 21, Yosemite Park Ranger Don Ramsey was driving toward El Portal when he saw defendant standing next to a blue-and-white International

Scout with his thumb out. Ramsey stopped and defendant said he was having car trouble. Ramsey drove defendant to his Cedar Lodge home. Defendant seemed normal during the drive and carried on a "lucid and cogent" conversation.

The next morning, Yosemite Park Ranger Mark Harvey received a missing person report concerning Armstrong. He took two trips to Armstrong's cabin and saw Armstrong's truck parked out front both times. On his first trip, he found both front doors to the cabin open. He knocked on the doors and called inside, but there was no answer. On his second trip, he examined the truck and noticed luggage in the back. He checked inside the house and saw signs that someone had been packing a day pack. Harvey sought assistance from Yosemite National Park's search and rescue office. On the afternoon of July 22, the search team discovered Armstrong's body in a nearby creek.

An FBI Special Agent who was called to the scene saw Armstrong's body near the bank of the creek, partially submerged and headless. An hour or two after the body was found, Armstrong's head was found about 40 feet away. The agent also found shoe prints and tire tracks in front of Armstrong's house and near Armstrong's truck. He and his team recorded the prints with plaster castings.

A pathologist who conducted an autopsy testified that there were abrasions and bruises all over Armstrong's body, incisions on her arm and hand that may have been defensive wounds, and a large abrasion on the left side of her face. The cause of death was exsanguination of most of the blood in the body after suffering a deep cut across the throat. The wounds to the neck were consistent with a person slitting Armstrong's throat and then decapitating her.

On July 22, the same evening Armstrong's body was found, a National Park Service special agent saw defendant driving a blue International Scout, hailed him, and told him he was investigating a missing person report. Defendant agreed to be interviewed at the station. During the interview, defendant mentioned his International Scout was unique and he was the only one in the Yosemite area who drove a vehicle like it. He said he had car trouble the previous night and a park ranger had given him a ride to Cedar Lodge where he worked. He denied his vehicle was in the Foresta area the night before.

A Cedar Lodge employee and resident testified that on the evening of July 22, defendant sold him a VCR and television for a very low price. He paid defendant only a portion of the price for the items, and he never saw defendant at Cedar Lodge again.

Defendant's supervisor testified that defendant did not usually miss work, but he did not show up on July 23 and never returned to work. On July 23, defendant also closed his credit union account.

ii. *Defendant's confession to the Armstrong murder*

As discussed above, FBI agents located defendant in Wilton on July 24, 1999, and interviewed him in Sacramento. The interview was audio recorded and transcribed, and the prosecution played the relevant portion of the recording for the jury. In defendant's statement, he admitted that on the day of the Armstrong murder, he went to Foresta carrying duct tape, a large knife, and a .22 caliber handgun in his backpack. He was walking near the creek because he had previously seen Bigfoot there.

Defendant saw Armstrong and "it clicked" when he discovered she was alone. He pointed his gun at her and forced her into the house, duct-taped her hands behind her back, and gagged her. He intended to take her to an isolated area and sexually assault her. He walked her outside and put her in his truck as she fought him. Defendant had driven only a few hundred yards when Armstrong jumped out through the window and ran. Defendant caught her and slit her throat twice. She went limp.

Defendant dragged Armstrong's body, left it on the bank of the creek, and returned to his truck but went back to decapitate her and hide her body under some dry reeds. He considered keeping the head as a trophy but, instead, placed it in the creek. He said: "I don't black out and do things, you know. [¶] . . . [¶] I know what's wrong, what's right." He said he "[m]ost definitely" knew what he did was wrong, but "it's kinda like just a job, it's something you have to do."

### iii. *Further investigation*

On July 25, 1999, the day after defendant gave the foregoing recorded audio statement, he accompanied FBI agents to the Armstrong crime scene and showed them where the knife was located. On July 28, agents searched defendant's vehicle and found a roll of duct tape and a backpack. Inside the backpack was a gun, a book about a serial killer, and a plastic package of sunflower seeds with the corner torn off. The end of the duct tape roll found in the car matched pieces of duct tape found at the crime scene. The torn part of the sunflower seed package matched a piece of plastic found at the crime scene.

The shoe prints found at the scene of the murder matched the sandals defendant was wearing at his July 24 interview.

The tire tracks found were consistent with the mismatched tires on defendant's International Scout.

### 2. *Defense case*

Defendant argued that his mental disorders, exacerbated by his difficult childhood, mitigated his crimes. He also presented evidence of his good character, his remorse, and the likelihood he would adjust to prison in a positive way.

### a. *Evidence of defendant's dysfunctional family background*

Defendant's paternal aunt and cousin testified about the stress in defendant's family after Steven was abducted and how upset defendant was after his uncle was murdered. The aunt testified she loved defendant and wanted him to live.

Sandra A., who used to interact daily with defendant's family, testified that defendant's mother neglected her children. Defendant's close friend testified that defendant was visibly emotional when he told her he had discovered his uncle's body.

Several witnesses testified about the effect Steven's abduction had on the family. One witness testified that defendant prayed for Steven and cried when he talked about him. After the abduction, defendant's parents were so focused on finding Steven that they neglected the other children.

According to several witnesses, defendant was excited when Steven came home, but the attention Steven received from the media and their parents was hard on defendant. When Steven died in a motor vehicle accident, defendant was heartbroken, cried, and seemed "absolutely numb."

Defendant's oldest sister testified she had mixed feelings about defendant but that he was very important to her parents.

Another sister testified that she loved defendant but they had a difficult family life. Defendant's youngest sister testified that they were a happy family, and that defendant played with her disabled son and made him happy. Defendant's parents testified that they loved defendant, visited him in jail frequently, and wanted him to live.

b. *Evidence of defendant's mental health problems*

Numerous witnesses testified about defendant's compulsive hair-pulling, troubling dreams, headaches, psychiatric problems, and obsession with Bigfoot.

Dr. Silva evaluated defendant's life history and testified in detail about the various stressors he faced at different periods in his life. He believed that, at the time of all four murders, defendant was suffering from pervasive developmental disorder, obsessive-compulsive disorder, various paraphilias, and a post-traumatic-type stress disorder, which had a significant impact on his ability to control himself. Dr. Silva did not think defendant lost his ability to distinguish right from wrong.

Dr. Fred Berlin, an expert on sexual disorders, believed that defendant was in recent years "beginning to lose touch with reality," that he was under extreme mental or emotional disturbance at the time of his crimes, and that he acted under extreme duress "pushing on him towards engaging in [criminal] activities."

c. *Character evidence*

Numerous witnesses, including relatives, church friends, school friends, teachers, and coworkers, described defendant, using terms such as quiet, nice, kind, good, fun, introverted, a loner, shy, respectful, a gentleman, honorable, well-mannered, considerate, and polite. Some witnesses testified about the ways

in which defendant was supportive and helpful. Others testified that defendant was a loner in school but was a talented cartoonist for the school newspaper and yearbook and was not violent or aggressive toward anyone.

### d. *Remorse*

During his interview in Sacramento on July 24, defendant made some statements suggesting he felt remorse about his crimes. The defense played the audio recording of these portions of the interview for the jury. Defendant was also cooperative and helpful during the walk-through of the crime scenes. He wrote an apology letter to Juli and cried when talking about her.

A federal public defender who met with defendant about the Armstrong murder testified that defendant cried as he discussed his crimes. Defendant pleaded guilty to the Armstrong murder and wrote a statement expressing remorse. At sentencing, defendant apologized to Armstrong's family members. He wrote to the woman who had turned him in to the authorities after recognizing his photograph on television, telling her he held nothing against her.

### e. *Positive prison adjustment*

Officers from the jails in Mariposa County, Fresno County, and Santa Clara County testified that defendant was a polite, respectful, and cooperative prisoner who caused no trouble when being transported to and from court.

Psychology professor Dr. Craig Haney testified as an expert on prison adjustment. He believed defendant's potential for positive prison adjustment was excellent due to various factors including his law-abiding behavior during much of his life, his artistic ability, his willingness to accept responsibility for his crimes, and his behavior while in jail.

Having heard the foregoing evidence, the jury returned a verdict of death.

## II. DISCUSSION

### A. Motion to Suppress Extrajudicial Statements

Before trial, defendant moved to suppress his extrajudicial statements, including the statements he made to the FBI on July 24 and 25, 1999. He argued the statements were obtained in violation of his *Miranda* rights and were coerced and therefore not voluntary.

At an evidentiary hearing, FBI Special Agent Rinek testified that he and his colleagues located defendant at a resort in Wilton on July 24, 1999. When they approached defendant, he stood up and put his hands on his head. The agents handcuffed defendant for safety reasons, told him he was not under arrest, and said they wanted to interview him about a recent, high-profile murder. Defendant agreed to be interviewed at the FBI office in Sacramento. Defendant was then placed in the front passenger seat of an FBI vehicle, with Rinek in the driver's seat. While Rinek was waiting for permission to depart, he advised defendant of his *Miranda* rights. Rinek recorded defendant's answer, "I prefer not to talk now."

During the 90-minute drive to Sacramento, Rinek and defendant engaged in casual conversation. They also talked about some of Rinek's past cases and about defendant's brother's abduction. They did not discuss any of the crimes under investigation. Once the group arrived in Sacramento, agents again advised defendant of his *Miranda* rights, and defendant waived those rights and gave a detailed confession. Defendant's confession was video recorded, and the recording was admitted as evidence and played at the suppression hearing.

1. Miranda *claim*

   a. *Trial court ruling*

The trial court denied defendant's motion to suppress. The court first found that because defendant was handcuffed and seated in an FBI vehicle, he was in custody for *Miranda* purposes when he spoke to Rinek in Wilton. Next, the court considered whether Rinek's conversation with defendant during the ride to Sacramento violated defendant's *Miranda* rights. The court noted that Rinek gave a *Miranda* advisement in the car and that defendant did not invoke his *Miranda* rights when he responded, "I prefer not to talk now." The court found that Rinek read from an advice-of-rights form and wrote down exactly what defendant said, including the word "now." "Consequently, because there is no evidence to the contrary, the court finds that [defendant] did say, 'I prefer not to talk now,' simply meaning that [he] did not want to be interviewed [in Wilton] but preferred to be interviewed at the FBI headquarters in Sacramento."

The court further found that Rinek — who testified he had no specific information about the Armstrong murder and did not know the facts of the Sund-Pelosso case — did not ask about the murders during the car ride. Instead, they talked about backpacking, hiking, movies, and other generic things. Rinek also spoke with defendant about the impact of his brother's abduction on the family. Because it appeared defendant had not dealt well with the issues surrounding his brother, Rinek offered him counseling services. The court ruled that this "simple give-and-take conversation" did not constitute an interrogation in violation of defendant's *Miranda* rights.

The court next considered whether defendant's *Miranda* rights were violated during the interview in Sacramento. The court summarized the circumstances, including the fact that agents reread defendant his *Miranda* rights and had him sign a waiver form, formally waiving those rights. After signing the waiver form, defendant said he wished to be interviewed by Rinek and proceeded to confess to his crimes.

The court found: "There is no evidence that he did not understand his *Miranda* rights. There is no evidence that Agent Rinek employed any coercive tactic to obtain incriminating statements. [¶] . . . [N]othing in the court's view occurred in the 90-minute car ride which would have tainted the defendant's waiver in Sacramento. The facts tend to show that [defendant] fully cooperated with the FBI agents from the outset and expressed his willingness to speak to them. In short, defendant waived his *Miranda* rights knowingly, voluntarily and intelligently at the FBI headquarters in Sacramento."

b. *Analysis*

Defendant contends the FBI violated his *Miranda* rights, and therefore the trial court should have suppressed the statements he made to the FBI.

i. *Defendant was in custody for purposes of* Miranda

Defendant first argues that, irrespective of the agents' assurances that he was not under arrest and was free to leave, he was effectively in custody when he was first handcuffed at the resort in Wilton. Notably, the trial court *agreed* with defendant (and the People conceded below) that at least as of the moment he was placed in handcuffs inside an FBI vehicle in Wilton, he was in custody for *Miranda* purposes.

On appeal, the People contest the trial court's in-custody determination, arguing that defendant was handcuffed solely for safety purposes and was told he could choose (1) whether he would be interviewed at all and (2) the location of the interview. We agree with the trial court that under the objective circumstances — which included telling defendant the FBI wanted to interview him about a high-profile murder, putting defendant in handcuffs, and placing him inside an FBI vehicle next to an FBI agent — a reasonable person would believe defendant was "deprived of his freedom of action in [a] significant way." (*Miranda*, *supra*, 384 U.S. at p. 444; see *Stansbury v. California* (1994) 511 U.S. 318, 323.) Thus, defendant was in custody while sitting in the FBI vehicle, during the ride to Sacramento, and while in Sacramento.

ii. *Asserted invocation of rights*

Defendant contends Rinek violated his *Miranda* rights by talking with him during the car ride because he invoked his *Miranda* rights and because the conversation tainted his subsequent waiver of rights in Sacramento.

In reviewing *Miranda* claims, we "accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained." (*People v. Boyer* (1989) 48 Cal.3d 247, 263 (*Boyer*); accord, *People v. Hoyt* (2020) 8 Cal.5th 892, 931.) We review *Miranda* claims under federal constitutional standards (*People v. Sims* (1993) 5 Cal.4th 405, 440) and assess any errors under the beyond a

reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

An invocation of *Miranda* rights must be unambiguous. (See *Berghuis v. Thompkins* (2010) 560 U.S. 370, 382.) Here, after first being read his *Miranda* rights, defendant responded, "I prefer not to talk *now*" (italics added).[3] This response, placed in context, left the door open to speaking with police *later*, after they arrived in Sacramento. (See *People v. Riva* (2003) 112 Cal.App.4th 981, 994 (*Riva*) [a defendant's "statement he did not want to talk anymore 'right now' clearly indicated he might be willing to talk in the future"].) In other words, if defendant invoked his *Miranda* rights at all, by its terms this invocation barred interrogation for no longer than the duration of the car ride to Sacramento.[4]

Yet we need not decide whether defendant's statement, "I prefer not to talk now," sufficed to foreclose any interrogation during that limited time frame. Even assuming it did,

_____

[3] Defendant argues that we should not rely on Rinek's "uncorroborated" testimony regarding his response to the *Miranda* advisement. Defendant's arguments essentially ask us to reweigh the evidence, which we cannot do. (See *People v. Lindberg* (2008) 45 Cal.4th 1, 27.) Further, the trial court's finding of what defendant said is supported by substantial evidence, that is, by Rinek's testimony and by a contemporaneous notation Rinek made on the advice-of-rights form.

[4] The People argue that "I prefer not to talk now" constituted defendant's *waiver* of his *Miranda* rights because those words are best interpreted as a reaffirmation of defendant's expressed willingness to be interviewed in Sacramento. We disagree. Defendant's apparent willingness to talk at a later time does not constitute a clear waiver of his *Miranda* rights at the time he entered the car with Rinek.

defendant made no incriminating statements to Rinek during the car ride. Indeed, Rinek did not ask defendant anything about the Sund-Pelosso murders. In short, the prosecution did not use anything defendant told Rinek during the car ride to Sacramento to establish defendant's guilt, and, notably, defendant does not point to any statement he made in the car to Rinek that prejudiced him.

Further, it does not appear that the conversation was part of a strategy designed to wear defendant down emotionally, thus making him more willing to confess. (See *People v. Gurule* (2002) 28 Cal.4th 557, 602 (*Gurule*) [no evidence the officers' "small talk overbore defendant's free will"]; cf. *Smith v. Illinois* (1984) 469 U.S. 91, 98 [noting the risk that authorities might "wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance"].)

*People v. Honeycutt* (1977) 20 Cal.3d 150 (*Honeycutt*), on which defendant relies, is distinguishable. There, the police detective had known the defendant for about 10 years. (*Id.* at p. 158.) Without giving *Miranda* warnings, the detective talked with the defendant about the homicide victim in the case the detective was investigating. (*Ibid*.) The detective observed the defendant " 'was softening up' " and continued the conversation until the defendant indicated a willingness to discuss the homicide. (*Ibid*.) Only at that point was the defendant advised of his *Miranda* rights. (*Id.* at p. 159.) On this record, we concluded (in dictum since we had already determined on unrelated grounds that the judgment must be reversed) that the officer employed a "conversation-warning-interrogation sequence . . . intended to elicit a confession" and that the

statements should have been suppressed. (*Ibid*.; see *id*. at p. 161.)

No analogous "clever softening-up of a defendant" was employed here. (*Honeycutt, supra*, 20 Cal.3d at p. 160.) First, unlike *Honeycutt*, defendant was read his *Miranda* rights before the conversation took place. Second, here, unlike *Honeycutt*, the casual conversation did not include a discussion of any of the crime victims. Finally, although discussing Steven's abduction may have made defendant emotional, there is no indication that Rinek was deliberately pursuing a "conversation-warning-interrogation sequence . . . intended to elicit a confession." (*Id*. at p. 159.) As Rinek testified, he did not expect to be conducting defendant's interview once the group arrived in Sacramento, and their conversation "was a friendly exchange between two people that were kind of thrust together."

Moreover, the conversation about Steven's abduction was just one of many things discussed during the long drive, it was unrelated to the four murders, and it was not likely to lead to an incriminating response (see *Rhode Island v. Innis* (1980) 446 U.S. 291, 301). Because of the widespread publicity surrounding the abduction, it was also a natural subject of discussion, as can be seen from the fact that the same subject came up when Special Agent Alston interviewed defendant as a potential witness, long before he was considered a suspect. There is no indication that Rinek's inquiry about the abduction was different from Alston's inquiry, or that it was part of a softening up strategy analogous to the facts of *Honeycutt*. Hence, the dictum in *Honeycutt* does not support defendant's argument.

Nor is this case like *Brewer v. Williams* (1977) 430 U.S. 387, where the defendant, who was a suspect in a child abduction, was given *Miranda* warnings and his lawyer assured him the police would not interrogate him while transporting him to the police station where the lawyer was waiting for him. (*Id.* at pp. 390–391.) While transporting the defendant, a detective urged the defendant to disclose the location of the victim's body so that the victim could have a " 'Christian burial.' " (*Id.* at p. 393.) The high court concluded the conversation was an interrogation in violation of the defendant's federal constitutional right to counsel. (*Id.* at pp. 401, 406.) Here, Rinek did not ask defendant about any of the victims, nor did he ask defendant to lead him to evidence related to those crimes. The comparison to *Brewer* is inapt.

For the foregoing reasons, even assuming an effective invocation, we find no prejudicial error. (*Chapman, supra,* 386 U.S. at p. 24.)

### iii. *Waiver of* Miranda *rights preceding questioning in Sacramento*

As noted, defendant's initial response after being read his *Miranda* rights was consistent with a preference to be interviewed in Sacramento. Therefore, after defendant arrived in Sacramento, the officers were permitted to ask again whether he would be willing to waive his rights and give a statement. (See *Riva, supra,* 112 Cal.App.4th at p. 994.) In Sacramento, and prior to any questioning about the crimes, defendant was again advised of his *Miranda* rights, and he voluntarily waived them and signed the waiver form. He then asked to speak alone with Rinek. Because the confession followed a voluntary waiver by defendant of his *Miranda* rights (see *People v. Combs* (2004)

34 Cal.4th 821, 845), we conclude the trial court did not err in denying defendant's *Miranda* claim.[5]

### 2. *Undue coercion*

#### a. *Trial court ruling*

Concerning the question of voluntariness, the trial court found no evidence that Rinek or any other agent "utilized any form of coercion, promises of leniency, or deception in order to obtain the statement from [defendant]." The court found that the fact that defendant was "on the verge of crying" in the interview room did not make his confession involuntary. The court watched the confession video and reviewed the transcript and found that although some interrogation techniques were used, "nothing occurred to negate the finding that the defendant's statement was a product of his free will and choice."

#### b. *Analysis*

Defendant argues his statement to the FBI was the product of coercive interrogation techniques. We disagree.

"It long has been held that the due process clause of the Fourteenth Amendment to the United States Constitution makes inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion." (*People v. Neal* (2003) 31 Cal.4th 63, 79.) "[T]he terms 'coerced' and 'involuntary' confessions . . . refer to confessions obtained by

---

[5] Defendant was also advised of his *Miranda* rights several times the next day, when accompanying FBI agents to the various crime scenes to locate evidence. Defendant does not raise a distinct claim regarding those advisements and the inculpatory extrajudicial statements that followed them. Instead, he argues the July 25 waivers were tainted by the events of July 24, 1999.

physical or psychological coercion, by promises of leniency or benefit, or when the 'totality of circumstances' indicates the confession was not a product of the defendant's 'free and rational choice.' " (*People v. Cahill* (1993) 5 Cal.4th 478, 482, fn. 1.) "Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.' " (*Neal*, at p. 79.) When a defendant challenges the voluntariness of a confession, the reviewing court applies an independent standard of review (*id.* at p. 80), but the trial court's factual findings regarding the circumstances surrounding the confession will be upheld if supported by substantial evidence (*People v. Massie* (1998) 19 Cal.4th 550, 576).

Defendant argues that the FBI agents — particularly, Rinek[6] — used subtle psychological techniques to wear him down and lure him into confessing, and that such techniques were so overbearing that his confession cannot be considered voluntary. Defendant notes that, even before they were in the FBI vehicle, Rinek asked him about his brother's abduction. Rinek continued to ask about the abduction during the ride to Sacramento and presented himself as being experienced in the field of child abduction offenses. Ultimately, defendant's eyes teared up. Rinek then used defendant's emotional reaction as an excuse for discussing the importance of "closure" for crime victims, and he offered counseling to defendant so he could have that "closure." Defendant argues that Rinek tried to present himself as an ally and set up an argument that defendant's

---

[6] Special Agent John Boles participated intermittently in defendant's interrogation.

victims also needed closure which only defendant's confession could provide.

When the FBI agents and defendant arrived in Sacramento, and after the second *Miranda* advisement, defendant told Rinek that he was the victim of sexual molestation when he was 11 years old. Rinek reassured defendant that he was fundamentally a good person whose actions were explainable based on all the problems he had faced. When defendant revealed that his internal mental world was "like a tennis match," constantly volleying between thoughts of "world peace" and thoughts of "kill[ing] every person on the face of the earth," Rinek told defendant that he has "taken control" and "[t]oday is the beginning of the rest of your life." He assured defendant that it was not his fault that he had been abused. Rinek added: "[D]on't you think it's time that we dealt with it now and get rid of these demons . . . ? Doesn't mean you're a bad person, it just means you're a troubled person. Now, if you've done bad things and you feel that society will ask you to pay for those bad things, maybe that'll happen, but in the end, . . . we'll both know we did what we thought was right, and we took control and that's the bottom line."

Defendant asserts Rinek also exploited his emotional vulnerability during the Sacramento interview by repeatedly urging him to disclose the details of his crimes, assuring him that doing so was the right thing to do and would make him feel better. For example, Rinek told defendant: "Do you realize that I don't think you're a bad person and that even after all that stuff you told me, I don't feel any differently about you." He added that defendant was "gonna feel a lot of relief" "when we're done." When defendant conceded that his chest hurt, Rinek

assured him that he was going to feel "good" and "peaceful, probably a feeling you haven't had in a long time."

Then, after defendant predicted he would be sentenced to death, Rinek reassured him, saying: "I'll be there for you as long as it goes, as far as it goes, because I believe in you. I'd like you to stop for a moment, Cary, and think about the fact that you're giving life, you're giving life back, and you appear to me to be a person that cares about that. You're going to restore life that's been taken." Defendant argues Rinek minimized the wrongfulness of defendant's actions, saying: "I don't think there's a person out there that can listen to what you've been through in your life and not have some feeling of sorrow and understanding for you. I personally believed when I met you and we were riding in the car that you were an explosive, pent-up ball of emotion, or you were a psychopath. I'm quite relieved to know you're not a psychopath and that you're a good person." Rinek said defendant was a "good person" who was made to do bad things by "things happening in you that you can't control," and that he was "doing the hardest, bravest thing in your life, and I'm honored that you trusted me to do this with."

Rinek also said, "We'll make sure that you're not living with Bubba," which defendant interprets as a promise of safe housing in prison in exchange for his confession. Rinek also said: "I'm gonna try and look after your family for ya. . . . You remember what I said about your family in the car? They were victims, too, and they're about to be victimized again, aren't they?"

Finally, Rinek said: "So do you realize here that you're holding the welfare of a lot of people in your hands, and when I told you you have a gift to give, that's the gift. If you give the

gift to me or me and [Special Agent Boles] and allow us to distribute what you've given us to bring people the closure and the peace that you've never had to experience, then you're doing — you're being a hero."  Rinek explained that a coward is someone who does the right thing out of fear or to gain a benefit, whereas a hero is someone who does the right thing simply because it is right.

Defendant asserts these statements, by placing extreme psychological pressure on him, led to an involuntary confession. We disagree.  "The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable."  (*People v. Ray* (1996) 13 Cal.4th 313, 340 (*Ray*).)  Urging a witness to confess by winning the witness's trust and appealing to the witness's sense of morality are not practices likely to produce an involuntary and unreliable confession.  Nor are investigators prohibited from expressing compassion for someone they are interrogating, and they are permitted to remind the subject of an interrogation of the emotional and psychological benefits of confessing.  " 'In terms of assessing inducements assertedly offered to a suspect, " '[w]hen the benefit pointed out by the police . . . is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made." ' "  (*People v. Tully* (2012) 54 Cal.4th 952, 993 (*Tully*).)

Defendant argues the FBI agents used promises of various rewards to coerce his confession.  Defendant focuses on Rinek's offer to obtain counseling for him and his assurance that defendant would not be housed with anyone who was hostile toward him.  These assurances do not establish the sort of

coercion that would render the confession involuntary. The offer to get counseling was not a promise made in exchange for a confession. Indeed, at the time Rinek made the offer during the car ride to Sacramento, defendant had not suggested he was involved in the crimes. Although the FBI agents believed defendant might be involved in the Armstrong murder and might be dangerous, Rinek did not know whether defendant was to be interviewed as a witness or as a suspect.

Likewise, any offer to obtain safe housing for defendant was not conditioned on defendant's confession or offered as a reward for his confession. Although an offer of benefits in exchange for a confession can be implied in some circumstances, nothing about the offers made here suggests that they induced defendant to confess. The other interrogation techniques — expressing interest in defendant's personal struggles, presenting themselves as an ally, appealing to defendant's sense of morality, and reminding defendant of the relief he would feel after confessing — did not render the confession involuntary or unreliable. Significantly, defendant said he was willing to be interviewed, the interview was not unduly prolonged or confrontational, he was assured he was not under arrest, he was offered food, drink, and breaks, and he declined treatment for his chest pain, implying the pain was emotional, not physical.

Defendant compares this case to *People v. Hogan* (1982) 31 Cal.3d 815, where this court condemned police questioning that "repeatedly suggested to [the defendant] that he was unquestionably guilty and that he suffered from mental illness." (*Id.* at p. 843.) In addition, the defendant in *Hogan* was "sobbing and crying" during the police interview, "vomiting at times," and police used "manufactured evidence of his guilt" to wear down his "will to resist." (*Id.* at p. 842.) Nothing like that occurred

here. Investigators in this case did not repeatedly accuse defendant of being guilty; rather, defendant readily admitted his guilt. The FBI agents merely encouraged defendant to tell the details of his crimes and thus to unburden his conscience, and defendant did so. In addition, Rinek never suggested to defendant that he was mentally ill; instead, he expressed understanding regarding defendant's difficult past and offered to obtain counseling for him.

In sum, the trial court did not err in finding defendant's confession to be voluntary and in denying defendant's suppression motion on that ground. Accordingly, we find no violation of defendant's state or federal constitutional rights.

### 3. *Exclusion of expert testimony regarding interrogation techniques*

In a related argument, defendant contends the trial court erred by refusing to hear the testimony of Dr. Richard A. Leo, an expert in interrogation techniques. The defense sought to offer Dr. Leo's testimony in support of its motion to suppress defendant's confession. At the hearing on the admissibility of this testimony, defendant argued the evidence rebutted Rinek's testimony that he did not employ any special interrogation techniques when interviewing defendant. The trial court determined the professor's expert opinion was not relevant and would not assist the court because the court had watched the video and read the transcript, and "[i]f somebody is simply going to tell me that this is an investigative technique [¶] . . . [¶] . . . th[at] type of testimony would not assist the court."

Defendant contends the trial court's ruling deprived him of a fair trial and a fair appeal, in violation of multiple constitutional provisions. We conclude the court acted within

its discretion in declining to hear defendant's expert evidence. (See *People v. McDowell* (2012) 54 Cal.4th 395, 425–426 (*McDowell*) [describing abuse of discretion standard of review].) The determination whether a recorded confession is voluntary or coerced is one that courts can, and often do, make without the assistance of expert testimony.

In condemning the trial court's adoption of what he characterizes as a "per se rule of exclusion," defendant relies on *People v. Linton* (2013) 56 Cal.4th 1146, but the case is not helpful for defendant's position. In *Linton*, the defendant sought to present Dr. Leo's testimony regarding interrogation techniques to a *jury* to assist it in evaluating the truthfulness of the defendant's admissions. (*Id.* at pp. 1179–1181.) This court held that the trial court did not abuse its discretion by excluding the evidence under Evidence Code section 352. (*Linton*, at pp. 1180–1182). In reaching this conclusion, we explained that "the trial court . . . did not exclude the testimony of Dr. Leo based on a conclusion that this type of expert testimony was inadmissible per se" and instead had simply regarded it as unhelpful in light of the specific facts before it. (*Id.* at p. 1183.)

Here, defendant sought to admit the testimony of Dr. Leo that he identified "a number of very well established interrogation ploys" that were used during defendant's interrogation. However, like the trial court in *Linton*, the court determined that Dr. Leo's opinion would not be helpful considering the evidence before it. Indeed, without the expert's testimony, the court found "that there were interrogation techniques employed during the course of [defendant's] interview." Thus, the trial court in the instant matter did not exercise a per se rule of exclusion. It merely determined that Dr. Leo's testimony would not be useful. And the court had

discretion to decide whether expert testimony would assist it in resolving the voluntariness question, and we defer to its exercise of that discretion. (See *McDowell, supra,* 54 Cal.4th at pp. 425–426.)

Moreover, despite the court's finding that interrogation techniques were used in interviewing defendant, it nevertheless concluded those techniques did not render defendant's confession involuntary.

Accordingly, the trial court did not abuse its discretion in refusing to hear the testimony of Dr. Leo, and for the same reason, the court did not violate defendant's state or federal constitutional rights.

### B. Arrest Without Probable Cause

Defendant also moved to suppress his confessions pursuant to section 1538.5, alleging that his arrest in Wilton was unsupported by probable cause, and that his subsequent confession was therefore the fruit of an unlawful arrest. The trial court denied the motion without holding an evidentiary hearing, relying on a stipulation by the parties to the facts stated in the parties' moving papers. These stipulated facts generally correspond to the facts described in part I.C.1.b.i., *ante,* regarding the evidence gathered during the investigation of the Armstrong murder. But the stipulated facts did not include the fact that defendant closed his credit union account. In addition, the stipulated facts noted that the tire treads on defendant's International Scout vehicle reflected two different tire brands and were consistent with the mixed-brand tire tracks found at Armstrong's house. Finally, the stipulated facts conceded that defendant was expressly told he was not under

arrest, a status that changed only after defendant gave his confession.

### 1. *Trial court ruling*

The trial court determined that defendant was not under arrest when he was detained in Wilton, and that he voluntarily agreed to travel to Sacramento with the FBI agents. The court also said that even *assuming* defendant was under de facto arrest, the stipulated facts constituted probable cause to arrest him in connection with the Armstrong murder. The court explained: "[T]he last contact that was had with Joie Armstrong was on July 21st at approximately 6:30 [p.m.] when apparently there was some contact with her in this area of Yosemite National Park, Foresta. [¶] . . . Now, on the same evening, July 21st, a park [employee] . . . told authorities that he had seen a white over light blue International Scout in the area of Armstrong's home at approximately 7:30, which would be approximately one hour after she was last heard from. [¶] Another park employee . . . told authorities he had picked up a hitchhiker on the same evening, July 21st, between approximately ten and 10:30 on Highway 140 outside the park and approximately three miles from the Foresta scene where Ms. Armstrong was found. [¶] The ranger told the investigators that the male hitchhiker was standing out by a white over light blue International Scout which he said had broken down, and that agent or ranger agreed to drive the unidentified hitchhiker to Cedar Lodge, where he lived.

"Now, the next evening was July 22nd. . . . [T]he defendant . . . then came to the Yosemite ranger station to be interviewed. [¶] And during the interview, the defendant denied that he was ever in the area of Foresta on July 21st, the

day before. But apparently he said he had had mechanical difficulties with his International Scout while traveling on Highway 140 several times that day, that he had owned that particular vehicle for approximately ten years, that it was somewhat unique. He was the only person who drove it. He admitted that his Scout had broken down coming out of Yosemite Valley on July 21st, and he admitted that he was given a ride by the ranger to his residence at the Cedar Lodge. And prior to leaving that interview on the 22nd, he told the authorities, 'If you have any further questions for me, you can contact me at Cedar Lodge on the 23rd,' which was the next day.

"Now, during the time that [defendant] was being interviewed on the 22nd at the ranger Yosemite station, agents took photographs of tires of his vehicle. And the next day on the 23rd they were compared to the tire sketches that were made of the four tire tracks located at the Foresta crime scene. The agent found that the defendant's tires, including the mixed set of [tire] brands on the vehicle, were consistent with the tracks found at Foresta. Based upon that, the agents from the FBI — and this is a reasonable conclusion — wanted to relocate and contact the defendant at Cedar Lodge to further interview him. And they were advised that he was not there, that he had failed to appear for work. [¶] The manager indicated that [defendant] had never failed to appear for work for at least a year and a half. Another employee they spoke to said he never failed to appear for work for at least three years, and they were also told that the night before, which is the night . . . of the interview at the ranger station wherein he spoke with the agents, that night he had been selling some of his personal property, to wit: a television set and a VCR.

"Now, based upon those facts, the issue is are those facts sufficient for a temporary detention, or are they sufficient for a detention which might be prolonged over and above a temporary detention by further investigation?  And are they sufficient[,] in fact probable cause[,] to issue an arrest warrant or to make an on-view arrest based on probable cause?  [¶] . . . [¶]  In the court's view this custody is akin at the very minimum to a detention for further investigation.  And this happens all the time in the field where people are detained for further investigation as to a robbery, a burglary, a murder, a rape, and they are brought from one location to another location for purposes of an in-field identification for purposes of an interview.  [¶] . . . [¶]  Now, it is true that a detention can become a de facto arrest.  I will say in this particular case that if I were a magistrate or a judge and the FBI or police officials had come to me with an affidavit in support of an arrest warrant, and the affidavit in question recited the facts that I recited for the record, in my view those facts would be sufficient probable cause to issue a warrant for his arrest.  [¶] . . . [¶]  The court finds that even if it would be held that this was more than a temporary detention for investigation, that in the court's view there was sufficient probable cause to arrest the defendant.  For that reason the motion to suppress his statement as a product of an illegal detention or arrest is ordered denied."

### 2. *Analysis*

#### a. *De facto arrest*

When defendant was first handcuffed in Wilton, and again while he was being interviewed, FBI agents told him he was not under arrest and was free to leave.  Defendant sat in the front seat of the FBI vehicle, not in the back seat where arrestees

would typically be placed. But defendant asserts that once he was handcuffed, he was under de facto arrest because he was not at liberty to go about his business. (See *Kaupp v. Texas* (2003) 538 U.S. 626, 629 ["A seizure of the person . . . occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business" ' "]; see also *Boyer*, *supra*, 48 Cal.3d at pp. 267–268.) Like the trial court, we need not decide whether defendant was under de facto arrest, because the stipulated facts provided probable cause for the FBI agents to arrest defendant as soon as they contacted him.

b. *Probable cause*

"When the seizure of a person amounts to an arrest, it must be supported by an arrest warrant or by probable cause. [Citation.] Probable cause exists when the facts known to the arresting officer would persuade someone of 'reasonable caution' that the person to be arrested has committed a crime. [Citation.] '[P]robable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts. . . .' [Citation.] It is incapable of precise definition. [Citation.] ' "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt," ' and that belief must be 'particularized with respect to the person to be . . . seized.' " (*People v. Celis* (2004) 33 Cal.4th 667, 673 (*Celis*).) The trial court's application of the law to the facts of the case is subject to independent review. (*People v. Woods* (1999) 21 Cal.4th 668, 673–674; *People v. Price* (1991) 1 Cal.4th 324, 409.)

We conclude the probable cause standard is met here in light of the following circumstances: (1) Armstrong was

murdered in a very remote location, in a small community of rustic cabins accessible only by a windy one-lane service road; (2) a witness saw a vehicle matching defendant's unique blue and white International Scout parked in the same area about an hour after the murder occurred; (3) defendant admitted to hitchhiking a few miles from where the murder occurred, about four hours after the murder; (4) the tire treads on defendant's International Scout came from two different tire brands and were consistent with the mixed-brand tire tracks found at the murder scene; (5) on the same evening defendant was interviewed by park rangers about Armstrong's murder, he sold valuable personal items at low prices; and (6) the day after this same interview, defendant did not show up for work despite reports that he had never before failed to do so.

Those facts are enough to provide a reasonable ground for believing that defendant was involved in the murder of Armstrong and guilty of a crime. They suggest he was parked at Armstrong's remote house near the time she was murdered and that he fled with no intent to return after being questioned by park rangers. (See *People v. Mims* (1992) 9 Cal.App.4th 1244, 1249 ["An inference that an individual is engaging or has just engaged in criminal conduct may be drawn where that individual, knowing that police are approaching, flees or engages in other activity indicative of an effort to avoid apprehension or police contact"]; *In re Rafael V.* (1982) 132 Cal.App.3d 977, 983 ["flight can constitute evidence of consciousness of guilt which can be coupled with other relevant facts in determining probable cause"].) Here, the pieces of circumstantial evidence implicating defendant are mutually reinforcing, and taken together, they are sufficient to give the FBI agents probable cause to arrest defendant as soon as they

contacted him in Wilton.**7**  And because the agents had probable cause to arrest defendant, doing so by way of a de facto arrest did not violate his state or federal constitutional rights.

All the cases defendant cites involved situations in which the police possessed less inculpatory evidence than the police possessed in this case.  (See *Hayes v. Florida* (1985) 470 U.S. 811, 812 [the defendant and 30 to 40 other men "generally fit the description of the assailant," and the pattern on the soles of his shoes matched shoe prints found near the victim's porch]; *Boyer*, *supra*, 48 Cal.3d at p. 263, fn. 6 ["police suspicions rested principally on the 'long shot' suggestion of [another suspect] that [the] defendant might be the killer because he had done gardening work for the [victims], owed them money, often carried a sheath knife, was violent when drunk, and had suddenly begun calling [the other suspect] after being out of touch for several months"]; *People v. Gonzalez* (1998) 64 Cal.App.4th 432, 438–440 [two men, one Black and one Hispanic, had robbed a liquor store; the defendant was

---

**7**  Defendant suggests that the three FBI agents who first contacted him in Wilton may not have been informed of the evidence implicating him and that those agents had no basis for making an arrest.  (See *Celis*, *supra*, 33 Cal.4th at p. 673 ["Probable cause exists when the facts *known to the arresting officer* would persuade" (italics added)].)  The stipulated facts suggest that at least Hittmeier, who was the supervisor, and probably Boles, were informed about the Armstrong murder and investigation.  Indeed, Boles, who handcuffed defendant, had requested assistance from the county sheriff's department, describing defendant as "a possible [section] 187 [murder] suspect."  Rinek, who drove to Wilton in a separate vehicle with defendant and testified he did not know whether defendant was to be interviewed as a witness or a suspect, may not have had the same information as the other agents.

Hispanic, and nine days after the robbery, he was riding as a passenger in a car linked to the robbery].)

## C. Jury Selection Issues

Defendant argues the court improperly granted prosecution challenges for cause and improperly denied defense challenges for cause. We disagree.

### 1. *Legal principles*

A criminal defendant has the right to an impartial jury. (Cal. Const., art. I, § 16; U.S. Const., 6th & 14th Amends.) But in a capital case, a prospective juror's abstract views about the death penalty, whether in support or opposition, do not necessarily indicate that the prospective juror is partial or biased, for a person might disagree with a particular law but still be able to put those views aside and apply the law in a specific case in an impartial manner. "A [person] who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror." (*Witherspoon v. Illinois* (1968) 391 U.S. 510, 519.) Accordingly, "[a] trial court should only dismiss a prospective juror for cause if the prospective juror's views on the death penalty would ' "prevent or substantially impair" ' that person from performing the duties of a juror." (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 246 (*Silveria and Travis*).) The prospective juror's bias "need not be demonstrated with unmistakable clarity"; rather, "the trial court need only be left with a definite impression that the prospective juror is unable or unwilling to faithfully and impartially follow the law." (*People v. Thompson* (2016) 1 Cal.5th 1043, 1066.)

"In reviewing the trial court's determination, we apply a 'rule of deference' [citation] based on the trial court's ability to assess the demeanor and credibility of the prospective witness." (*People v. Capistrano* (2014) 59 Cal.4th 830, 859 (*Capistrano*).) "During voir dire, jurors commonly supply conflicting or equivocal responses to questions directed at their potential bias or incapacity to serve. When such conflicting or equivocal answers are given, the trial court, through its observation of the juror's demeanor as well as through its evaluation of the juror's verbal responses, is best suited to reach a conclusion regarding the juror's actual state of mind. [Citation.] ' " 'There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror.' " ' [Citation.] . . . 'Thus, when there is ambiguity in the prospective juror's statements, "the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State." ' " (*People v. Jones* (2012) 54 Cal.4th 1, 41; see *People v. Mataele* (2022) 13 Cal.5th 372, 395 (*Mataele*).)[8] We affirm if substantial evidence supports the trial judge's determination. (*People v. Baker* (2021) 10 Cal.5th 1044, 1085–1086; *People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 906; *People v. Spencer* (2018) 5 Cal.5th 642, 660–661.)

---

[8] We decline defendant's request that we reconsider our holdings regarding appellate court deference to the trial court's determination.

2. *Prosecution challenges for cause*

a. *Prospective Juror Linda A.*

Prospective juror Linda A. indicated on her juror questionnaire that she was "[a]lways against" the death penalty and her religious beliefs might "[s]omewhat" impact her decision as a juror in a death case. The court asked her: "[I]n all cases where you might be asked to make that decision, death or life in prison without the possibility of parole, because of your religious beliefs [would you] automatically vote against the death penalty and vote to impose life in prison without the possibility of parole?" Linda A. answered: "I would vote that way." The court asked: "Would it be automatic?" Linda A. answered: "Yes." The court then asked: "[C]an you ever imagine yourself in a case of this type where somebody is charged with three counts of murder, with numerous special circumstances alleged to be true, can you ever imagine yourself voting for death?" Linda A. answered: "I don't believe so." The court continued: "Would that again be automatic that you would vote for life in prison without the possibility of parole?" Linda A. answered: "Yes." The court asked whether that was because of her religious belief, and she answered: "Yes."

Defense counsel asked Linda A. whether her personal beliefs were so strong that they would prevent her from following the law. Linda A. said: "The law, no." Defense counsel then said: "All we need is to know whether or not you could go into this case open to both penalties without committing yes, you'd always do this, you'd always do that." Linda A. answered: "I can't say absolutely that I would not or could not be swayed. . . . [¶] . . . [¶] I wouldn't want to. I'll put it that way."

During the prosecutor's questioning, Linda A. reiterated that she was against the death penalty and did "not have the moral right to take another person's life." She stated that "[t]aking a life is immoral and it's barbaric." When asked whether she could fairly consider the death penalty rather than life in prison without the possibility of parole, she said: "I can't honestly say I wouldn't go with the majority [¶] . . . [¶] . . . because I wouldn't want to be the only one on the jury to say 'no' if it turned out that they were all staring at me in the end." The prosecutor reminded her that the parties are entitled to her personal view without concern for the views of other jurors. She then said: "[S]ay, for instance, the evidence showed that he was totally guilty and that he did these crimes, having not been in that situation, having not seen that type of evidence, if it happened right this moment, I would probably say I don't believe in the death penalty. Having seen all the evidence later, I don't know."

The prosecutor challenged Linda A. for cause, and the court excused her, stating that "her state of mind" was that she would not consider the death penalty "based on biblical and moral reasons" and that the court was "convinced" based on its own questioning of Linda A. that "her views on capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with the instructions and her oath."

We conclude the court did not err in dismissing Linda A. for cause. Linda A. stated twice that she would automatically vote against the death penalty, in favor of life in prison, due to her religious beliefs. However, she also told defense counsel that she could "follow[] the law" despite her personal beliefs. Further, she told defense counsel that she "wouldn't want to" be

swayed by other jurors to vote for the death penalty. Later, Linda A. reiterated she was against the death penalty because "taking a life is immoral and it's barbaric." Considering the ambiguous responses Linda A. provided, the trial court was in the best situation to assess her credibility. (See *Mataele*, *supra*, 13 Cal.5th at p. 395; *People v. Jones*, *supra*, 54 Cal.4th at p. 41.) In such situations, when the prospective juror's comments are equivocal or conflicting, the trial court's determination of that person's state of mind is binding. (*People v. Clark* (2011) 52 Cal.4th 856, 895 (*Clark*).) Against this background, the record supports the court's decision to excuse Linda A. for cause.

b. *Prospective Juror Ellen R.*

Prospective juror Ellen R. indicated on her juror questionnaire that she was opposed to the death penalty. In response to defense counsel's questioning, she stated she was 90 percent against the death penalty but would be open to it in an "extreme case" such as "Hitler" or a person who "committed continual murders." She said she would "keep[] [her] mind open to both death and life until after [she had] heard all the evidence."

The court asked Ellen R. if she would automatically vote for life in prison, and she responded: "That's a hard one. I don't know. I would — I would say I would tend to go for life versus death [¶] . . . [¶] as a general rule." Ellen R. said she was inclined not to vote for death for someone like defendant on the ground that he was insane. The court asked if she could see herself voting for death in a case like this, and she answered, "No." She added: "Given the information or the circumstances of the deaths, I would, in my personal opinion, . . . feel that if this person did these things, he would not be legally of sound

51

mind. I don't think anyone could commit those crimes and be sane." The court then asked: "[B]ased upon your state of mind, your background, your philosophy, your feelings about the penalty, in a case of this type . . . , [suppose] you found the defendant is guilty, you found him to be legally sane at the time, you've heard the evidence presented to you by the defense, by the People as it bears upon this issue of penalty or punishment, could you, as an individual, vote death?" Ellen R. answered: "Yes."

Next, when questioned by the prosecution, Ellen R. agreed that based on the crimes alleged in this case, she would not want the case to reach the penalty phase, and she would "have a tendency to want to find [defendant] insane in the sanity phase of trial." In addition, when asked whether, aside from extreme cases like that of Hitler, she could envision the type of crime that would warrant the death penalty, she said: "No. . . . [I]f someone kills someone, I don't think justice is to kill the person in return."

The prosecution challenged Ellen R. for cause, and the court excused her, stating "she's been fairly unequivocal in the sense that she strongly opposes the death penalty. . . . [¶] I think she's committed to a position almost to the point where she doesn't almost want to even face the prospect and where she might in fact consider penalty or punishment in the sanity phase just to preclude her from having to make that decision. . . . I think she is substantially impaired as to this penalty issue. So, . . . the challenge for cause will be granted."

We conclude the court did not err in excusing Ellen R. for cause. Ellen R. was consistent in saying that she was 90 percent opposed to the death penalty and would vote for it only in an

"extreme case" such as "Hitler" or a person who "committed continual murders." She also said she would be inclined to find defendant insane at the sanity phase in part to avoid voting in favor of death. Although Ellen R. also said that if she "found the defendant is guilty, [and if she] found him to be legally sane at the time," she "could" "vote death," her answer must be placed in the context of her statements that (1) she would find defendant to be insane in order to avoid having to vote for death, and (2) she would only vote for death in an "extreme case" such as "Hitler" or a person who "committed continual murders." At best, Ellen R.'s responses were equivocal and conflicting, much like Linda A.'s responses. In such circumstances, we defer to the trial court's determination of that potential juror's state of mind. (See *Clark*, *supra*, 52 Cal.4th at p. 895.) Thus, we conclude the record supports the court's decision to excuse Ellen R. for cause.

### c. *Prospective Juror Rebecca M.*

On her juror questionnaire, prospective juror Rebecca M. said: "I believe I don't have the right to take someone's life." She also checked the box saying she was "[a]lways against" the death penalty and "will advocate for life without possibility of parole in the case of multiple murders." During questioning by the court, Rebecca M. said that "for personal reasons and for religious reasons" she didn't "believe in the death penalty." When asked if she "would . . . automatically vote against the death penalty," she said: "I would vote for [the] death penalty as a last resort. I think I would automatically vote for life without parole." The court then reviewed the basic structure of a capital trial and asked her whether she "would . . . automatically vote against the death penalty and really not listen to what the People might offer." She responded: "I think

53

I may be inclined to vote for life without parole." When asked the same question yet again, she said: "I would go by the evidence and what the court and what the law says." The court then told her the penalty would be her decision, not the court's, to make, and she said: "I think that based on the evidence and everything, I would vote for . . . life without parole." She added: "I do not think I have the right to take anybody's life."

When questioned by defense counsel, Rebecca M. confirmed she preferred life imprisonment and "would consider [the] death penalty as a last resort." When counsel asked if that meant she could consider the death penalty, she said: "I could consider it, yes." When questioned by the prosecution, she said: "If I vote [for] death, I will have to — it will take a toll on me emotionally — [a] long-term effect on me."

The prosecution challenged Rebecca M. for cause, and the court excused her, stating, "I don't even think this is close." The court believed it was "clear . . . that she has an inability emotionally, and perhaps religiously, to ever consider realistically imposing the death penalty. And consequently, I think she is impaired. The challenge for cause is granted."

We conclude the court did not err. Rebecca M. could "consider" imposing the death penalty and would be willing to vote for it as a "last resort," but she was (1) "[a]lways against" it, (2) would suffer a long-term, emotional toll from casting a vote for death, and (3) thought she "would automatically vote for life without parole." It is apparent from these responses that Rebecca M. would not be able to put aside her personal views and decide the penalty question based solely on the evidence presented in court. The record supports the court's decision to excuse Rebecca M. for cause.

d. *Prospective Juror Paul S.*

Prospective juror Paul S. indicated on his juror questionnaire that he was "[a]lways against" the death penalty and that the death penalty was imposed "[t]oo often," but he also wrote: "I'm completely capable of following the laws of the State of California and render[ing] any verdict appropriate." In response to the court's questioning, he said he was not in favor of the death penalty "[a]s an abstract notion." He added: "I haven't got to a point in my life yet where I could be party to killing somebody for anything. I mean, punishment is one thing; but in my mind, I look at it as vindictive, not so much as punishment. You know, I understand there [are] bad people in this world, and I want them kept away from me, but I don't feel it's necessary to kill them." Paul S. said he would not make a decision "automatically," but when asked whether he "could . . . ever envision [himself] . . . saying, 'I vote death,' " he answered: "I don't think I can envision myself saying that." He reiterated that he "could follow the law," and when asked whether he could "vote death" after hearing the evidence and concluding that "this case merits the most serious penalty that can be imposed," he answered: "Yes."

In response to defense counsel's questions, Paul S. said: "I think I can . . . listen to evidence and testimony and make a decision that is impartial." In response to questioning by the prosecution, Paul S. said: "The judge earlier said that if all these scenarios take place, and [if] you get to the end and you determine that the most stiffest penalty is determined, and the death penalty is the most — that's the legal determination." The prosecution asked, "[W]ouldn't you always want to go L-WOP [life without parole] if it's merely your choice?" Paul S. answered: "I guess to answer your question, I am not sure. I

55

know that my beliefs are anti death penalty." Asked whether his beliefs would interfere with his "ability to realistically consider [the] death penalty in a case like this," Paul. S. responded: "I would hope that they wouldn't, but I cannot answer that question, honestly."

The court described the case and asked: "In a case of this type, would you always vote against the death penalty?" Paul S. answered: "You know, my gut reaction is I would, yes." After the court again explained what it needed to know, Paul S. said: "As I sit here today, knowing what I know about this case, that the case proceeds to the penalty phase, I can't envision myself voting for the death penalty."

The prosecution challenged Paul S. for cause, and the court excused him, stating, "Now, there is a classic example as to the fact you don't [make] any headway. We could be with him all afternoon, and we wouldn't make any headway. The last answer he gave is good enough for me under the law that is a disqualifying answer, and under the law he was substantially impaired." After further discussion, the court stated that it believed, based on Paul S.'s responses as a whole, that he was "impaired" in that he "would not in any circumstance impose the death penalty."

The court did not err in dismissing Paul S. for cause. Paul S. made a few statements that, taken in isolation, suggested he could put his views in opposition to the death penalty aside and evaluate defendant's case based on the evidence and the law. However, he also made clear that he strongly favored a penalty of life in prison over death, and although he "hope[d]" his beliefs would not interfere in his ability to consider the death penalty, he said he could "honestly"

not "answer that question." He twice said he could not see himself voting for death. Even defense counsel commented: "[U]pon further questioning, I could probably get him to say he didn't really mean what he said to the court in the last answer. We could go on and on." In this sense, Paul S.'s responses coincide with the high court's observation that "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." (*Wainwright v. Witt* (1985) 469 U.S. 412, 424–425.) "Even when the record contains equivocal or ambiguous responses, 'there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.'" (*People v. Erskine* (2019) 7 Cal.5th 279, 299, quoting *Witt*, at pp. 425–426.) Paul S. was just such a prospective juror, and the record supports the court's decision to excuse him for cause.

### 3. *Defense challenges for cause*

Before we address defendant's arguments that the trial court erred in denying his challenges for cause to jurors and prospective jurors, we note a recurring feature in these for-cause challenges. Specifically, defense counsel asked prospective jurors to assume they had found defendant guilty of the charges at issue in this case, and — without knowledge of mitigating facts or instruction on the law — to state whether they would lean in favor of the death penalty. When asked to opine in the abstract about the appropriateness of the death penalty for someone who committed three murders — with two of the victims being children, including one child who was repeatedly

sexually assaulted and kidnapped — many prospective jurors responded they would lean in favor of death. The defense challenges for cause were all based, at least in part, on the prospective juror's response to this standard line of questioning, with defense counsel arguing that defendant could not have a fair penalty phase trial if the members of the jury leaned in favor of death before the trial even began.

If we were to accept defendant's argument that jurors are disqualified in such circumstances, it could have incongruous consequences: the more shocking the facts the jurors are asked to assume in a capital case, the more likely they would be to lean toward the death penalty — particularly when they are presented with no mitigating facts or instructions to guide them.

As discussed below, rather than placing undue weight on the prospective jurors' initial responses to defense counsel's question alone, the trial court properly considered the entire context of the voir dire process and each prospective juror's response to a variety of questions before deciding whether to grant a request to strike someone for cause.

a. *Juror No. 2*

On his juror questionnaire, Juror No. 2 stated that he moderately favored the death penalty and could vote for it in a case like this one, but he would first have to consider the facts. During questioning by the court, Juror No. 2 confirmed that he "believe[d] in certain cases there is a valid reason for the death penalty." The court then summarized the specific charges against defendant and asked whether Juror No. 2 would "automatically" vote for death. Juror No. 2 responded that he would want to hear the evidence before deciding. He would consider evidence offered by the defense in mitigation and could

"possibly" "vote either way." He explained: "I would be [leaning] towards a death penalty based upon what I've heard. But, again, there could be evidence or something presented to me that could possibly change my mind."

Juror No. 2 had checked the box for "Yes" in response to the juror questionnaire question whether, in a case with general facts like those present here, he would "always vote for or against the death penalty without regard to the strength or weakness of the aggravating and mitigating circumstances." When the court inquired about that response, Juror No. 2 said that the response was incorrect. He did not agree with that statement; he said, "I would not always vote for the death penalty on this."

In response to defense counsel's questioning, Juror No. 2 said he did not have a religious belief about the death penalty and would make his penalty decision based on "whether I think in my own heart whether he deserved it or whether he did not deserve it." Based solely on what he had heard so far about the case, he was "leaning a lot" toward the death penalty, but he noted he had not yet heard any evidence. He could not easily erase from his mind his sense that the death penalty was appropriate, but he added: "I think the main thing in my mind is to take what's given to us in the court and kind of try and decide from what evidence is presented . . . ." He conceded that if everything alleged about defendant turned out to be true, the defense would "kind of have to convince [him] not to impose the death penalty." He added, however, that it was possible for him to be convinced. If the charges against defendant were all true, Juror No. 2 was leaning "pretty far" toward the death penalty, but he "wouldn't be able to say right now that [defendant] should have the death penalty for sure."

In response to questioning by the prosecution, Juror No. 2 said he would listen to the defense's mitigating evidence and would not "hesitate" to impose the penalty of life in prison if the evidence persuaded him that the death penalty was not appropriate. When asked by the court whether he would respond so emotionally to victim impact evidence that he would lose his objectivity, he said he "would take that into consideration" but did not think his emotions would prevent him from evaluating all the evidence.

The court rejected the defense's challenge for cause, stating that although Juror No. 2 strongly favored the death penalty in general and in this case, "he indicated that he could, in fact, be receptive to the evidence, listen to both sides, listen to the evidence as it pertains to both penalties, evaluate it, give it due consideration. He indicated in the case of this type he could vote for life in prison without the possibility of parole if he felt it was appropriate" and would not automatically vote for the death penalty.

We conclude the court did not err. Given the charges in this case, it not surprising, nor by itself disqualifying, that a prospective juror who supported the use of the death penalty in the abstract, who had been asked to assume that the charges in the present case were all true, and who had not heard any mitigating evidence or instructions regarding the law, would at least preliminarily lean in favor of death. Importantly, the trial court did not believe Juror No. 2's preliminary leaning, which many people might have had considering the nature of the crimes at issue, disqualified Juror No. 2 in light of his representation that he had the ability to remain open minded and to decide the case based on the evidence and the law. When pressed by the defense, Juror No. 2 confirmed that he could be

convinced to vote in favor of life in prison if the mitigating evidence presented by the defense persuaded him. Thus, the record supports the court's ruling.

Defendant contends that Juror No. 2 should have been excused based on *People v. Boyette* (2002) 29 Cal.4th 381, 418 (*Boyette*), where we held the court erred in denying a for-cause challenge. The prospective juror in that case "admitted he would not follow [the court's] instruction to assume that a sentence of life in prison with no possibility of parole meant the prisoner would never be released." (*Ibid.*) Nothing like that occurred here. Therefore, defendant's comparison of this case to *Boyette* is unpersuasive.

b. *Juror No. 5*

In response to questioning by the court, Juror No. 5 said that, depending on the evidence, he was capable of voting either for death or for life in prison without the possibility of parole, and that he could keep an open mind until he had heard all the evidence. The court asked about his seemingly contradictory answers on his juror questionnaire. There, he indicated he was "[a]lways against" the death penalty in a case involving special circumstances like those alleged here, but he also indicated that the death penalty "should be allowed" and was imposed "[t]oo seldom." Juror No. 5 explained that he had misunderstood the question and should instead have checked the box indicating he "[s]trongly favor[ed]" the death penalty. However, he said he would not automatically vote for the death penalty and would consider all evidence relevant to the penalty decision.

During questioning by defense counsel, Juror No. 5 conceded that in a case involving multiple murders, he would have to be shown evidence that convinced him to vote for life in

prison over death; however, he also said he would not make up his mind until after hearing all the evidence.

Juror No. 5's responses in court also suggested that some of his juror questionnaire responses were inaccurate because he was confused about the questions; for example, he understood the term "special circumstances" in the colloquial sense, meaning he thought the insanity of a defendant was a "special circumstance." When he stated in the questionnaire that his "mind would be made up" after the guilt and sanity phases, it appears he was unaware that the defense would present additional mitigating evidence after the guilt and sanity trials. In response to questioning by the prosecution, Juror No. 5 reiterated that he would consider all the evidence before making up his mind as to the appropriate penalty, and that he would not automatically vote for either penalty.

The court sought to clarify Juror No. 5's answer to defense counsel's questioning. The court asked Juror No. 5 to imagine a situation in which, after a trial, he had found defendant guilty of all the charges and allegations, and, after another trial, he had found defendant to be sane. The court then asked Juror No. 5 whether, in that situation, he would say, "I'm voting for death," or whether he would consider the evidence offered at the penalty phase trial before deciding the question of penalty. Juror No. 5 responded that he would consider the evidence and would consider voting for either penalty.

The defense challenged Juror No. 5 for cause, and the court rejected the challenge. The court noted that Juror No. 5, who indicated that he was born overseas on his juror questionnaire, had worked in highly technical jobs in the United States for 18 years, and his English language skills were

adequate to allow him to serve as a juror. The court then said: "I think there was a question as to whether or not he fully understood some of these questions when he answered the questionnaire, which I find not to be unusual. It's common with a lot of our prospective jurors. I think that he does strongly favor the death penalty. That, again, does not mean there is a valid basis for a challenge for legal cause. It simply is telling you his state of mind that he does strongly favor the death penalty in a case of this type. But he reiterated more than once that he would consider the evidence as it might pertain to life in prison without the possibility of parole, will listen to it, consider it, evaluate it; if he felt it was appropriate, he could vote for it, and he would not make a decision in this case until he heard all the evidence. [¶] For that reason, the challenge for cause is denied."

We conclude the court did not err. Juror No. 5 strongly favored the death penalty in a case like the present one, but as we have explained, it is neither surprising, nor is it, by itself, disqualifying, for a prospective juror to preliminarily lean in favor of the death penalty when asked, in the abstract, about the appropriateness of the death penalty for a person who committed three murders, two of the victims being children, including one child he repeatedly sexually assaulted and kidnapped. Importantly, Juror No. 5 made clear he would not decide the question of penalty until he had heard all the evidence.

Juror No. 5 said he would have to be shown evidence that convinced him to vote for life in prison over death, but he said this in the context of a discussion of a case where there were three murders, and without having heard any mitigating evidence or instruction on the law. In fact, he apparently had not understood that the defense would present additional

mitigating evidence after the guilt and sanity trials. Although Juror No. 5 gave some inconsistent answers on the questionnaire and during voir dire, he clarified those inconsistences when asked to do so, making clear he would decide the penalty issue only after hearing the evidence, and that he was willing to consider both penalties. As such, the record supports the court's decision to deny the defense's challenge.

c. *Defense challenge to Juror No. 12*

Before individual voir dire began, the court admonished all the prospective jurors that they should not discuss the case even with their immediate family. Juror No. 12, however, acknowledged to her husband — a sergeant in the San Jose Police Department, specializing in violent crimes — that she was being considered for the jury in the present case. Her husband reacted with concern about Juror No. 12's health (she had been diagnosed with lupus and suffered from occasional migraine headaches). Juror No. 12 informed the court clerk that her husband asked her what case she was on and expressed concern that she was not healthy enough to be a juror in the case.

During voir dire, the court asked Juror No. 12 how she felt about her husband's concerns, and she said she wanted to continue as a prospective juror. The court admonished her again, saying: "Okay, that's fine. I will caution you, however, you did talk to your husband and tell him the case. And if you are selected and you remain with us after today, you can't talk about anything we did here today, the questions I might ask or counsel's. You can't talk to him about it, or [to] anybody else." Juror No. 12 responded: "That's correct; I understand." She

also assured the court that she could set aside what she knew about the case from news sources and personal conversations, and reach a verdict based solely on the evidence presented in the courtroom and the court's instructions on the law.

Defendant asked that Juror No. 12 be excused for cause, asserting the conversation violated the court's admonition not to discuss the case with anyone, and further asserting that Juror No. 12 would be tempted to discuss the case with her husband because of his profession. The court denied defendant's request, stating Juror No. 12 was conscientious and objective. The court said that Juror No. 12's husband had most probably been the one who raised the subject, knowing about this case from his work and wondering whether she was being considered for the case. His inquiry would have put her in the position of either lying (by answering "no") or remaining silent (which would have been taken as a "yes"). Instead, she admitted she was being considered for this case. The court added that Juror No. 12 did not technically violate the court's admonition because she did not discuss the case; rather, she only confirmed the identity of the case. The court concluded: "I think she can be objective, fair, and impartial to both the People and the defendant." Therefore, the court denied defendant's for-cause challenge, and Juror No. 12 served on defendant's jury.

Defendant argues the court erred by not excusing Juror No. 12, and he further argues he was unable to use a peremptory challenge to remove the juror because he had exhausted his peremptory challenges, and the court had denied his request for more. He also asserts the error infringed upon several of his state and federal constitutional rights.

We find no error. The fact that Juror No. 12 acknowledged to her husband that she was being considered for the jury in this case did not establish a violation of the court's admonition, nor did it establish that she was biased. Juror No. 12 did not consult her husband regarding any details of the case. Rather, she merely revealed to him what case she had been assigned to as a potential juror. In addition, the court questioned her about the conversation and about her knowledge of the case from other sources and confirmed she would not discuss the case with anyone. And the court expressly determined that Juror No. 12 could impartially perform her duties as a juror. Accordingly, defendant's claim of error is without merit, including his claim that the court should have granted the defense more peremptory challenges, thus enabling the defense to remove Juror No. 12. For the same reason, the ruling did not violate his state or federal constitutional rights.

d. *Jurors who ultimately did not sit on the jury*

Defendant argues the court erred in denying the defense's challenge for cause as to eight other prospective jurors, including one alternate juror, but these jurors, unlike Jurors Nos. 2, 5, and 12, ultimately did not sit on defendant's jury. Thus, with respect to these eight prospective jurors, even if the court erred in denying the defense's challenge for cause, defendant still needs to establish prejudice. (*Boyette, supra,* 29 Cal.4th at p. 419.) Defendant attempts to do so by arguing he was forced to use peremptory challenges to remove these jurors, causing him to exhaust his peremptory challenges, and he further argues the court denied his request for additional peremptory challenges. But even if the court's rulings forced defendant to exhaust his peremptory challenges, he must still show that any error resulted in a jury that was not impartial.

Hence, he must show that one of the sitting jurors should have been removed for cause. (See *People v. Black* (2014) 58 Cal.4th 912, 921 ["the fact that defendant requested additional peremptory challenges that the court did not grant him does not support his claim, because he has failed to show that an incompetent juror sat on his case" (italics omitted)].)

As we have explained, defendant's for-cause challenges to Jurors Nos. 2, 5, and 12 are without merit. Accordingly, as to each of the eight prospective jurors who did not sit on the jury, even assuming, without deciding, that the court erred in denying the defense's for-cause challenges, any error would be harmless. However, in light of defendant's claim that the trial court was biased during voir dire, we address the merits of defendant's claims of error regarding defendant's denied for-cause challenges of the eight prospective jurors.

### i. *Prospective Juror Mary N.*

Prospective juror Mary N. indicated on her juror questionnaire that she was in favor of the death penalty, although not in a case in which there was lingering doubt about the defendant's guilt. She thought the death penalty was appropriate for premeditated violent murders, especially with child victims, and she "would probably consider the death penalty to be appropriate" in a case involving multiple murders with special circumstances. She checked the box saying she "[s]trongly favor[ed]" the death penalty in a case involving the specific special circumstances alleged here, but she also indicated that in a case involving charges like those alleged here, she would not "always" vote one way or the other. She wrote: "It would depend on circumstances such as mental health and pre-meditation."

In response to questioning by the court, Mary N. agreed that she strongly favored the death penalty in an appropriate case but would "not automatically" vote for death. She would listen to the evidence presented at the penalty phase and keep an open mind. If defendant was found guilty and all the special circumstances were found to be true, then going into the penalty phase, her preliminary view would be that the death penalty was appropriate. But the penalty trial would still be needed because she would not vote for the death penalty until she had heard all the evidence.

The court asked Mary N. about her comment on the juror questionnaire that she was "for" the death penalty "if there [was] absolutely no question of guilt." She confirmed she believed this but also said she would still listen to and consider, with an open mind, the evidence the defense had to offer in favor of life in prison, perhaps being persuaded by it. She affirmed she could vote for either death or life in prison, depending on what the evidence showed and could give defendant a fair trial.

Defense counsel asked Mary N. whether she truly felt she could give defendant a "fair shot" assuming she had already found him guilty. Mary N. said she thought she could but was not sure until she heard the evidence. When asked whether a sex crime committed against her mother would influence her, Mary N. said she did not know but thought she could "keep it separate . . . because they're separate people." Asked if she had doubts whether she could keep them separate, she said "sitting here" she did not doubt it, but she did not know how the evidence would affect her.

Defense counsel then asked about evidence of childhood trauma, and Mary N. confirmed her juror questionnaire

comment that she would not give such evidence any weight at all. In her questionnaire answers, she explained: "Because I know of people who had terribly abusive childhoods that grew up to be wonderful, responsible people." In response to counsel's questioning, she said: "To me, you are responsible for your actions, and you are accountable for them, and your childhood isn't any excuse." When asked if she would, at least, consider childhood trauma evidence, she clarified that such evidence "wouldn't weigh heavily," and she said: "I would consider anything I heard, but I don't think it would . . . sway me that much one way or another." Asked if she would "really" consider it in the sense of "evaluating it," she said: "I believe I would honestly, you know, consider anything I heard. But I, in general, I could not believe that a bad childhood absolves somebody for their actions."

Mary N. next reaffirmed her questionnaire answer in which she said that she strongly favored the death penalty in a murder case involving the special circumstances alleged here, and although she said that she would make her decision based on the evidence presented at the penalty phase, the "burden of proof" (her phrase) would fall on the defense to persuade her that death was not the appropriate penalty.

The prosecutor explained that neither party has the burden of proof at the penalty phase and explained the weighing of aggravating and mitigating factors. Mary N. said she understood and could follow the law, that she had an open mind, and she would give the defense a "fair shake."

The trial court rejected the defense's challenge of Mary N. for cause, stating: "[Th]e juror must evidence a willingness to consider the evidence presented . . . , whatever it might be,

factors in aggravation, the factors in mitigation, . . . and give it whatever weight they find it to be entitled, keep an open mind. The law is not such where the defense has a right to inquire if we present this mitigation, would you consider it, if we present that mitigation, would you consider it, et cetera, et cetera. All the law requires is that the juror maintain an open mind and be willing to listen to the evidence presented and give it whatever weight they find it to be entitled." "So I don't believe under the law that this gives rise to a challenge for legal cause. . . . [I]t's denied."

The court did not err. It is neither surprising nor, by itself, disqualifying that a prospective juror who supports the death penalty in the abstract would strongly favor the death penalty in a case involving multiple murders, sex crimes against children, kidnapping, and burglary — especially if the prospective juror is asked to give an opinion without having heard any specific evidence, including mitigating evidence, and without any instruction on the law. Nor is it disqualifying for a prospective juror to report, again without instruction on the law, that certain categories of evidence would not weigh heavily in the juror's consideration. The parties to a criminal case are not entitled as a matter of legal right to have only those jurors who are likely to be impressed by their evidence. Here, the most relevant points are that (1) Mary N. would not "automatically" vote for death or for life without the possibility of parole, (2) she was willing to keep an open mind until she had heard and considered all the evidence, (3) she was willing to follow the law, and (4) she was able to be fair and impartial. These answers, taken together, adequately support the trial court's determination as to Mary N.'s state of mind. The court did not err in denying the challenge for cause.

ii. *Prospective Juror G.O.*

On her juror questionnaire, prospective juror G.O. indicated she "believe[d] in the death penalty when warranted" and "[s]trongly favor[ed]" the death penalty in a case involving special circumstances like those alleged here, but that "all evidence must be weighed before coming to any conclusions," including evidence related to "the defendant's background, upbringing, and mental health issues." The court asked G.O. about her views on the death penalty, and she answered that she strongly favored the death penalty "if it's warranted." She explained: "It depends on the crime. It depends on the circumstances. It depends on the person. It depends on their state of mind." The court asked her to clarify her comment on the juror questionnaire in which she said: "I feel that a person who is convicted of a capital crime should receive the death penalty." She stated those were her "general feelings" but that she would not "automatically vote" for the death penalty, and she would not decide the question of penalty until she had heard all the evidence.

Defense counsel questioned G.O. about a juror questionnaire comment in which she indicated that for a remorseful person, the penalty of life without the possibility of parole was appropriate because such a person would be "alive in prison thinking about the crime they committed for the rest of their life." In response to defense counsel's questioning, she explained that the death penalty was more appropriate for "someone who will never ever change." When asked how she felt about the death penalty in a case like the one before the court, assuming all the charges turned out to be true, G.O. said that she could not answer because she would have to hear the penalty phase evidence before deciding. When asked about her

questionnaire answer in which she stated that she strongly favored the death penalty in a murder case involving special circumstances like those alleged here, she said: "I would say most of the time, yes, I do favor the death penalty. But there always may be that one or two times, or few times, where maybe it's not warranted. And that's why you have to listen to the information that's presented to you and then make that judgment." She said she would not enter the penalty phase with a presumption in favor of the death penalty. Instead, she would want to hear the evidence and would be able to vote for life in prison without the possibility of parole "if warranted."

The defense challenged G.O. for cause, based on the fact that she checked the box on her juror questionnaire saying she "[s]trongly favor[ed]" the death penalty in a case like this one. The court rejected the challenge, saying: "I believe based upon the examination of Miss [O.] and her answers to the questions, her explanation as to why she answered in the fashion she did, indicates to the court, in the court's discretion as to her state of mind, that she could be . . . completely objective, fair and impartial to the People and to the defendant; that she could consider both penalties if the matter were ever to get into a penalty phase trial; and that she would keep an open mind about that, consider the evidence that is presented, and in that fashion attempt to reach what she feels is an appropriate and just verdict."

We conclude the court did not err. G.O. made clear she would remain open minded until she had heard all the evidence presented at the penalty phase. She rejected defense counsel's suggestion that she would enter the penalty phase with a presumption in favor of the death penalty. She said: "No. I know nothing about [defendant], so I would be making a

judgment against him or about him where I have no information to make that judgment on." She did concede that, in a case like this one, she favored the death penalty, but as already explained, that is neither surprising nor, by itself, disqualifying. In addition, she made equally clear that she might vote for life in prison and that she would make that decision based on the evidence. Here, the critical point is that the trial court evaluated G.O.'s state of mind and determined "she could be . . . completely objective, fair and impartial to the People and to the defendant," and that she could "consider the evidence that is presented, and in that fashion attempt to reach what she feels is an appropriate and just verdict" as to penalty. The record supports that determination. Accordingly, the court did not err in denying the defense's challenge.

### iii. *Prospective Juror Joseph R.*

Prospective juror Joseph R. strongly favored the death penalty in a case involving multiple murders with the special circumstances charged in this case. He would not automatically vote for one penalty or the other, but he commented that "they would have to be pretty convincing circumstances." It appears he meant that the mitigating circumstances would have to be "pretty convincing" to warrant a vote for life in prison given the facts of the case as revealed in voir dire.

In response to questioning by the court, Joseph R. assured the court that he would be able to listen to the evidence offered by the defense and consider it, although he added: "It's really hard for me now, without hearing anything, to imagine circumstances that I would consider extenuating; the nature of the crime is pretty powerful." The court asked about Joseph R.'s answer to a question that asked whether he "would . . . be

willing to consider the defendant's background, upbringing, and mental health issues." In his answer, Joseph R. said he could consider such evidence "up to a point," adding: "I still believe in free will though." For example, if the defendant had "other options or other outs, they have a choice as to which way they want to go," in which case he "would like to see a real strong reason" why the defendant should be considered less blameworthy. He added that although his leaning was in favor of death, if he "heard a convincing argument," he "could consider it." When asked whether his mind was set in favor of death, he said: "I don't know how firmly it's set, but I'd say there is a bias that way," adding, "I don't know if bias is the right word to use."

The court asked whether Joseph R. could keep an open mind and decide the issues based on the evidence, the law, and deliberations with other jurors, and Joseph R. replied: "I think I could go either way. I think it's fair to say that I favor the death penalty based on the cases I've heard until now, but I believe I could listen to the testimony, the evidence, and the mitigating-aggravating factors, and make some decision on that."

Defense counsel asked Joseph R. about his juror questionnaire comment that in a case involving multiple murders with special circumstances like those charged here, the penalty of life in prison was "pointless without some attempt to redeem the person." He added: "I don't think we are an enlightened enough society to use this approach." When asked about those comments, Joseph R. said: "[A]t the time I answered that, it may have been a little bit stronger than upon further reflection." He explained that in a case involving a "really heinous" crime, the possibility of rehabilitation was one of the few reasons to choose life in prison over death, but he did

not think our prison system offered significant opportunities for rehabilitation.  He added that he favored the death penalty in a case like the present one and there would need to be a "convincing reason" to persuade him to vote for life in prison.

When asked by the prosecutor where on a continuum he stood in terms of favoring or disfavoring the death penalty, Joseph R. said: "I think it's a case-by-case sort of situation.  But I think, you know, if you think about horrible things done by sane people, I think I'm more [of the view] that you have to show me why something very severe shouldn't be done.  I'm more in that climate."  Nonetheless, he said he would have an open mind and consider mitigating evidence and could return a verdict of life in prison if the evidence warranted that verdict.  He did not feel that his views were so strong that he was unable to fairly consider the evidence and reach a decision.

The court rejected the defense's challenge of Joseph R. for cause, stating:  "I think one of the problems is basically this. . . . And that is, if they make the findings required to get the matter into a penalty phase trial, [then] they would feel that death might very well be appropriate.  Well, it might be appropriate. . . .  That's how you get to a penalty phase trial.  Otherwise, there is no penalty phase trial.  So [if] a juror were to say:  'Yes, if I were to be a juror and make those findings and find the defendant legally sane, and this gets into a penalty phase trial, yes, I believe that death may be appropriate.'  Well, that's the point of the law.  When you get into a penalty phase trial, it only gets there if they make those findings.  And in a penalty phase trial, death may be appropriate.  And life in prison without the possibility of parole may be appropriate.  [¶] And he indicated, when he concluded, that he could consider both and give them both due weight and make that

75

consideration only and that decision.  Clearly, he favors the death penalty, but that does not mean under the law that there is a legal challenge for cause.  He certainly has given you information you can use in your process by way of peremptory challenges, even though this process isn't deemed to be designed to aid in that specific area. . . .  [¶]  But under the law, there is no case that says if somebody believes that they are in favor of the death penalty or strongly favors it, that they should be excused as a juror.  Because if that be the case in California, the majority of people could not sit, because a majority of people in California . . . are, in fact, in favor of the death penalty."

We conclude the court did not err.  As we have already explained, it is neither surprising nor, by itself, disqualifying that a prospective juror who supports the death penalty in the abstract would strongly favor the death penalty in a case like this.  In addition, we have noted that it is not disqualifying for a prospective juror to report, again in the abstract, that certain categories of evidence would not weigh heavily in the juror's penalty consideration.  Thus, the fact that Joseph R., assuming the charges to be true, strongly favored the death penalty, is not a basis for granting a challenge for cause.  Likewise, the fact that Joseph R. thought that "defendant's background, upbringing, and mental health issues" were only relevant "up to a point" is not a basis for granting a challenge for cause.  The record here shows that Joseph R. would not "automatically" vote for death or for life without the possibility of parole, he was willing to keep an open mind until he had heard and considered all the evidence, he could return a verdict of life in prison if appropriate, as his opinion about the penalties "may have been a little bit stronger" than it was "upon further reflection," and he was able to be fair.  These answers, together, adequately

support the court's determination as to Joseph R.'s state of mind. Accordingly, the court did not err in denying the challenge for cause.

iv. *Prospective Juror Wayne G.*

In his juror questionnaire, prospective juror Wayne G. indicated he strongly favored the death penalty in a case like the present one but said he would need to hear the facts before deciding. When asked by the court whether he would "automatically vote" for one penalty or the other, Wayne G. answered: "I thought I . . . was more pro death penalty. But . . . it's something that I'd really have to think about during the trial." He then explained he was "kind of leaning" in favor of the death penalty but did not "know all the circumstances." He said he could vote for life in prison without the possibility of parole if, after hearing the evidence, he thought that penalty was appropriate. When asked if he could consider the evidence offered by either side and vote one way or the other, he said: "I could go either way. I'd have to hear the arguments and everything." He added: "I don't favor one over the other necessarily."

Defense counsel asked Wayne G. about his juror questionnaire comment that he could consider evidence of childhood trauma but would "have to be totally convinced." Wayne G. said that a person who faced childhood trauma and who has a continuing problem in adulthood should seek help. He agreed with defense counsel that he would want to see evidence that the childhood trauma was disabling. Wayne G. said that the experience of actually being considered for a jury in a capital case and facing the possibility of having someone's life in his hands had changed his views. He had been a "strong

believer" in the death penalty but now felt, "I've got to be convinced that it's really necessary." Defense counsel asked him about his comment on his juror questionnaire in which he said the death penalty should be imposed "only if it's <u>proven without a doubt</u> that the suspect committed a 'planned' & cruel murder and shows no remorse whatsoever." He said he might consider the death penalty in other situations so long as "it was proven to [him] without a doubt." Defense counsel next asked about a case with charges like those in the present case, and the following colloquy occurred:

"[Defense counsel]: . . . The question is: Would you in that situation . . . only vote to impose death because of your views on the death penalty?

"[Wayne G.]: I want to say in my mind I would, but I know, you know, I don't want to be so closed-minded. I've got other jurors, and I haven't heard any of the case or anything. [¶] . . . [¶] . . . But, you know, just off the top of my head, I would say yes."

During questioning by the prosecutor, Wayne G. stated that he still believed in the death penalty, and although he had come to question the strength of his conviction, he could "still do it." But he would not vote for death in all cases, because he "would want to listen to everything," and his desire to hear the evidence applied even in a case like the present case, having multiple murder counts and special circumstances. He said he "would be very heavily leaning towards the death penalty" if the defendant in such a case was "proven guilty," but if appropriate, he could return a verdict of life in prison, and his vote would depend on the evidence.

The defense challenged Wayne G. for cause. The court expressed doubts about the utility of asking prospective jurors to imagine that defendant is guilty of the charges, with the special circumstances true, and then asking for an abstract opinion about whether they favored the death penalty. The court called back Wayne G. and asked whether he was committed to one penalty or the other based solely on the charges and alleged special circumstances, without having heard any evidence and without having found defendant guilty. Wayne G. answered: "I'd want to hear the evidence." The court denied the challenge for cause, finding Wayne G.'s views would not prevent or substantially impair his ability to be a juror.

We determine that the court did not err. Wayne G.'s answers were, at times, inconsistent, and he may not always have understood what he was being asked, which is not surprising considering the complexity of the legal issues involved in selecting a capital jury. He favored the death penalty for a case like the present one. But the reality that he might become a juror in a capital case was a sobering experience for him that led him to feel less strongly in favor of the death penalty than he previously did. On the one hand, he stated without ambiguity that he could vote for death if, after hearing the evidence and deliberating with the other jurors, he felt death was the appropriate penalty. On the other hand, he said he could also vote for life in prison, and in choosing which penalty to vote for, he would want to hear all the evidence.

When defense counsel asked him whether "because of [his] views on the death penalty," he would "only vote to impose death," Wayne G. answered, "just off the top of my head, I would say yes." But he qualified that answer by saying: "I don't want to be so closed-minded. I've got other jurors, and I haven't heard

any of the case or anything." He also said: "I've got to be convinced that [the death penalty is] really necessary." And he repeatedly confirmed that he would base his decision on the evidence, and that he could vote for either penalty depending on what the evidence showed.

Moreover, as the court noted, asking prospective jurors who have heard no evidence — in particular, no mitigating evidence — to assume the unusually serious charges and allegations in this case are all true, and then asking them, based on that assumption and with no instruction on the law, whether they lean in favor of death is likely to evoke an affirmative response. In effect, Wayne G. was asked to give an abstract opinion about what he thought the law ought to be for a case like the present one. That is not a line of inquiry that is particularly informative regarding a prospective juror's qualification to sit on a jury, and we consider Wayne G.'s answers with that in mind.

For all these reasons, we conclude that Wayne G.'s voir dire answers adequately support the court's determination as to his state of mind. Accordingly, the court did not err in denying the challenge for cause.[9]

v. *Prospective Juror Jack. S.*

On his juror questionnaire, prospective juror Jack S. indicated that he strongly favored the death penalty, but that in a case like the present one, his vote would depend on the facts. He confirmed this answer in voir dire. The court asked him

---

[9] Notably, despite the trial court's denial of defense's request to strike him for cause, the prosecution ultimately exercised a peremptory challenge on Wayne G.

whether he would "automatically" vote for the death penalty without considering the evidence that might be offered by the defense at the penalty phase, and Jack S. said: "I would have to weigh the evidence at the time." He said he would also be able to vote for life in prison without the possibility of parole. The court asked Jack S. about the following comment he made on his juror questionnaire: "If he is convicted of the three murders, he should get the death penalty." Jack S. said he meant only "if the evidence weighed to that." He added: "I would vote one or the other [penalty] depending on . . . the testimony or — I don't know what you call it — the evidence." He then confirmed that he strongly favored the death penalty, assuming the charges in the present case were true. When asked about his questionnaire comment that a case like the present one "could be a good cause for the death penalty" "[a]fter hearing the facts," he assured the court that he had no "predisposition . . . that [he] would automatically vote for it." He affirmed he would keep an open mind, hear the evidence, deliberate with other jurors, and vote for one or the other penalty, as appropriate.

Defense counsel followed up on Jack S.'s questionnaire comment, and Jack S. explained: "I was thinking, well, if a person is convicted and all the evidence weighed that the person did it, you know, . . . cold-bloodedly, you know, I guess you could go for the death penalty." Defense counsel asked: "[A]re you meaning to say . . . that if you personally sat on the case and listened to the evidence and were convinced beyond a reasonable doubt that a guy committed three murders and that they were done maliciously or they were done in the course of a felony like rape . . . that you personally, because of your strong beliefs about the death penalty in that situation, would have to impose the death penalty just because of the way you feel?" When Jack S.

answered in the affirmative, the court reminded Jack S. that at a penalty phase trial, guilt would already be determined, and there would be additional evidence offered, some of it in favor of life in prison. Jack S. agreed he would listen to the evidence. When defense counsel again asked the same question, Jack S. said: "I would have to just weigh the facts." The court interrupted again, and Jack S. again confirmed that even if he found defendant guilty, he would be willing to consider the evidence offered in the penalty phase, and he would not always vote for death. Defense counsel then resumed questioning, and Jack S. answered "yes" to whether he would "be heavily leaning towards a sentence of death if [he] found somebody beyond a reasonable doubt had committed these three murders."

Next, the prosecutor confirmed that Jack S. would not vote for death in every case but instead would be "open to the facts and listen to both sides," and he would not be reluctant to vote for life in prison, if appropriate, after hearing all the evidence and applying the law.

The defense challenged Jack S. for cause, and the court rejected the challenge, stating, "I believe his state of mind is such where he prefers the death penalty in a case of this type. That does not disqualify him as a juror. [¶] I believe . . . he will listen to what's presented to him as it bears upon the other penalty, which is life in prison without the possibility of parole, and he will keep an open mind and not make that decision until he's heard all the evidence that bears upon the issue."

We find that the court did not err. Jack S. strongly favored the death penalty, assuming the charges in the present case were true. But as we have already explained, that conclusion is neither surprising nor, by itself, disqualifying in this case.

Although Jack S. said at one point that he "would have to impose the death penalty" if he found defendant guilty, when the court reminded him that additional evidence would be offered at the penalty phase, he stated he would listen to that evidence. More generally, Jack S. repeatedly affirmed he would not automatically vote in favor of one penalty or the other, that he would keep an open mind and base his vote on the facts and the evidence, and that he could, if appropriate, return a verdict of life in prison. These answers adequately support the court's determination as to Jack S.'s state of mind. Thus, the court did not err in denying the challenge for cause.

### vi. *Prospective Juror Cynthia Y.*

On her juror questionnaire, prospective juror Cynthia Y. indicated she strongly favored the death penalty in a case like the present one, but she also said she would listen to the evidence with an "open mind" and that childhood issues and mental health issues also needed to be considered. She wrote: "I have never been responsible for the fate of another human being and would have to hear every possible fact before I could make [the penalty] decision." She also wrote that a murder had to be "proven beyond any doubt" to warrant the death penalty.

In response to questioning by the court, Cynthia Y. felt that a person found guilty of murder should get the death penalty. The court explained there would be no penalty phase trial unless defendant had already been found guilty. Cynthia Y. said: "I believe that if a person is mentally sane and he is found guilty of the counts that he is accused of, that the death penalty should be applied." She also agreed it should be applied "automatically." After further explanation by the court, she said she did not understand "what types of things" would be

told to her at a penalty phase trial. After the court gave a general description, she said, "I have to claim ignorance here, since I've never gone through an entire case such as this and as serious as this. And I would definitely be willing to listen to both sides." She said that although she strongly favored the death penalty, she could listen to and evaluate the defense's evidence in favor of life in prison and could vote for that penalty, if appropriate, based on the evidence. She affirmed that she could give both the People and defendant a fair trial.

When defense counsel asked about her juror questionnaire comment in which she justified the death penalty based on concern for the murder victim and the victim's family, Cynthia Y. explained: "It's really hard, because you have to put yourself in both places. I mean, I have children. If it were my son on trial, I'd want somebody to be fair. On the other hand, if it were my son who was dead, I'd want closure." "So, you know, I'm willing to listen to all of this with an open heart [¶] . . . [¶] because both people have . . . a lot at stake." She confirmed, as she said in her questionnaire, that she believes life without the possibility of parole is "torture" for the victims' families, but when asked whether she would find it hard to return a verdict for life in prison, she said, "No, I don't think so. Because like I told you, on the other hand, if it were my son on trial, I'd want somebody to go listening with an open heart." She also said she would follow the law, and if the law asked her to take into consideration a particular point, she would do so even if it was not a point that previously interested her. She confirmed her belief that "what goes around comes around," but she said she would not apply the rule of "an eye for an eye" because "[t]hat's not something for me to judge. . . . That's a God-given thing." Defense counsel tried to determine how heavily Cynthia Y.

would weigh victim impact evidence, but the court cut counsel off, stating, "That is a question asking for prejudgment of evidence."

In response to questioning by the prosecution, Cynthia Y. confirmed that she had an open mind, would listen to the evidence on both sides before making a decision, would follow the law, and was capable of returning either verdict, depending on which was appropriate.

The court rejected the defense's challenge for cause, finding Cynthia Y. would keep an open mind, listen to both sides, and not automatically vote for one penalty or the other. The court noted that Cynthia Y.'s sympathy toward a victim's family may be a reason to exercise a peremptory challenge against her, but did not support a challenge for cause.

We conclude the court did not err. Cynthia Y. said she was open minded, would listen to the evidence on both sides before making a decision, would follow the law, and was capable of returning either verdict, depending on which was appropriate. She affirmed she could give both the People and defendant a fair trial. Although she stated in the abstract that she strongly favored the death penalty in a case like the present one, that fact is not disqualifying, especially considering the severity of the charges. At one point, she told the court that she would automatically vote for death if defendant was guilty of murder, but it was also clear that she did not fully understand the different phases of a capital trial; she immediately changed her response when the court provided further explanation. She rejected defense counsel's suggestion that she would not consider the penalty of life in prison, stating she would want others to be fair if her son were on trial, and that she was willing

to listen to the evidence "with an open heart" "because both people have . . . a lot at stake." These answers adequately support the court's determination as to Cynthia Y.'s state of mind. Accordingly, the court did not err in denying the challenge for cause.

Defendant argues the court improperly prevented defense counsel from conducting additional voir dire concerning how Cynthia Y. would weigh victim impact evidence. As noted above, the trial court allowed some questioning about victim impact evidence, and it ruled that further questioning would be asking Cynthia Y. to prejudge the evidence. (See *People v. Cash* (2002) 28 Cal.4th 703, 721–722.) The court did not err in its approach.

### vii. *Prospective Juror Suzanne M.*

On her juror questionnaire, prospective juror Suzanne M. said that based on what she had heard about the case, it was her opinion that the death penalty was the right sentence, assuming defendant was guilty and sane. She "[a]lways favor[ed]" the death penalty in a case like the present one, but she noted "this is a gut reaction — not an educated one," and that she "would need all the facts" and "would have to know [and] understand the details."

In response to questioning by the court, Suzanne M. said she would not automatically vote for the death penalty. She explained that she strongly supported the death penalty in a case like the present one, but she would not just "give lip service to life in prison." She affirmed she would consider both penalties and would remain undecided until she had heard the evidence and deliberated with the other jurors.

In response to questioning by defense counsel, Suzanne M. said she "would take . . . very seriously" the penalty of life in prison without the possibility of parole. Although she thought that life in prison could sometimes be "a bigger punishment" than the death penalty, she would follow the law, which deems the death penalty to be the more severe punishment. And although she thought the death penalty was warranted if defendant did what he was charged with doing, she added, "But again, I don't have all the information." After being reminded that the penalty phase of the trial would only occur if defendant had first been determined to be sane, Suzanne M. disavowed her juror questionnaire comment in which she said that life in prison without the possibility of parole might be appropriate "[i]f [defendant] was insane." Although she wrote on her questionnaire that her "snap call is to 'return the favor' to the murderer," she said she would not be guided by the principle of "an eye for an eye."

In response to the prosecution's questioning, Suzanne M. confirmed that she leaned toward the death penalty when considering the issue in the abstract, but in an actual case, she would weigh and consider all the factors and evidence before deciding and would follow the law regarding the weighing of aggravating and mitigating circumstances, keeping an open mind.

The defense challenged Suzanne M. for cause, and the court rejected the challenge. The court found that her responses were inconsistent at times but that "overall, based upon the answers she gave and the answers she gave to very pointed questions," "she can be objective, fair, and impartial." The court found she could consider both penalties and would not make that decision until she heard the evidence. "And in an

appropriate case she indicated she could impose the death penalty, and in an appropriate case she could impose life in prison without the possibility of parole. [¶] So, again this is not unusual to have some conflicting or equivocal responses, but it's my judgment based upon her responses that she can be fair and impartial to both the People and the defendant as it bears upon that issue of penalty or punishment."

We conclude the court did not err. As the court noted, Suzanne M. was inconsistent in some of her responses, particularly when her questionnaire responses are compared to her oral responses. In her juror questionnaire, she indicated strong support for the death penalty for a case like the present one, admitting that her "snap call" favored the death penalty, but on the same questionnaire, she also said that she "would need all the facts" and "would have to know [and] understand the details." Many of her questionnaire comments may have reflected an incomplete understanding of the phases of a capital trial. During voir dire, the court and the parties clarified the law for her, and in her responses, she made clear she would (1) keep an open mind, (2) listen to the evidence offered by both sides, (3) deliberate with the other jurors, and (4) decide either for or against the death penalty, as appropriate. These answers, taken together, adequately support the court's determination as to Suzanne M.'s state of mind. Thus, the court did not err in denying defendant's challenge for cause.

viii. *Prospective Juror Philipp W.*[10]

In his juror questionnaire, prospective juror Philipp W. stated he strongly favored the death penalty in a case like the present one, saying: "I think it would be the proper punishment." In response to questioning by the court, Philipp W. said that "if the crime was big enough, I guess [the] death penalty is justified." He clarified that he would not favor the death penalty for every case of murder with a special circumstance, saying: "I think not in all circumstances, but in some cases it should be." He also confirmed that he strongly favored the death penalty in a case like the present one but said that his vote would not be automatic; he could listen to and consider the defense evidence, and he could keep an open mind. He also said he was capable of voting for either penalty.

Upon questioning by defense counsel, Philipp W. clarified that although he thought the death penalty was appropriate for first degree murder, he did not extend that principle to all first degree murders. In the case of robbery murder, for example, he would not always vote for the death penalty: "I wouldn't say always. It depends on the circumstance."

When asked about a case like defendant's, involving multiple murders and sex crimes against a child, Philipp W. said the death penalty was not "the only appropriate" penalty

---

**10** Prospective juror Philipp W. was called as an *alternate* juror, and defendant exercised a peremptory challenge to remove him. Because each party receives additional peremptory challenges to use when the court is seating alternate jurors (Code Civ. Proc., § 234), and because defendant did not express dissatisfaction with the alternate jurors who ultimately served in his case, he cannot establish prejudice as regards the court's denial of his for-cause challenge to Philipp W.

"but it would be appropriate."  He confirmed his statements on the questionnaire that death would be the "proper" punishment for a case like defendant's and he "strongly favor[ed]" the death penalty for such a case.  He gave as a reason that "we still have the death penalty" and should use it for the worst cases. Counsel asked whether Philipp W. would vote for death if all allegations were true and defendant was found to be sane, and Philipp W. answered that the defense "would have to come forward with some sort of evidence not to."

The prosecutor then asked Philipp W. whether he could impose one penalty or the other, as appropriate, depending on the evidence, and Philipp W. said that he could.  Next, in response to a question from the court, Philipp W. said that his feelings were not so strong that he would automatically vote for death and not listen to the evidence the defense might present.

The defense challenged prospective juror Philipp W. for cause, and the court rejected the challenge.  The court noted Philipp W. was inconsistent, but stated:  "I know by my perception of him there might be a little bit of a language issue here; not severe or disabling, but I sense that.  [¶]  I asked the last question myself because, to be quite frank, it appeared to me at one point in time that he was under the impression that in a case of this type, with multiple murder, with these specials, the law would require that he vote for death.  I think that was cleared up.  And he strongly favors the death penalty.  But I asked him the bottom-line question, and all I can do is judge my sense as to his credibility and his state of mind, and I believe he was honest when he said he strongly favors it, but he'd be willing to listen to what the defense had to offer.  He wouldn't make a decision automatically.  He would consider both penalties.  For

that reason, the challenge for cause under the law has to be denied."

We conclude the court did not err. It was clear that Philipp W. favored the death penalty in the abstract. It is also clear that his answers to some extent reflected what he thought the law was, not what he would do if properly instructed. Philipp W.'s comment that he would want the defense to present evidence to persuade him against death might suggest that he was inclined to improperly place the burden of proof on defendant, but it is not clear that Philipp W. understood the legal implications of his answer. Significantly, he made clear that his vote would depend on the circumstances and that he would not automatically vote for the death penalty. And the court based its ruling directly on its assessment of Philipp W.'s credibility and state of mind. Philipp W.'s answers support the court's determination. Accordingly, the court did not err in denying the defense's for-cause challenge.

### 4. *Trial court bias*

Defendant argues that even if each of the trial court's individual rulings during voir dire is supported by the record and falls within the scope of the court's discretion, an overall review of the voir dire rulings shows the court was biased in favor of the prosecution.

Defendant's claim is, in substance, a claim of judicial misconduct (see *People v. Mills* (2010) 48 Cal.4th 158, 189 (*Mills*)), a claim he did not raise in the trial court.

Defendant asserts the court tended to grant the prosecution's for-cause challenges of prospective jurors who said they were strongly opposed to the death penalty but could consider both penalties; in contrast, it tended to deny the

defense's for-cause challenges of prospective jurors who said they were strongly in favor of the death penalty but could consider both penalties. He asserts the court's bias in this regard is "best exemplified" by its rejection of the defense's for-cause challenges of three prospective jurors. However, a simple comparison like this regarding the responses of several prospective jurors on one issue does not establish bias because the court's rulings are based not on specific individual answers, but on the entirety of voir dire, including the court's credibility determinations to which we must defer. (See *Capistrano*, *supra*, 59 Cal.4th at p. 859; *Mills*, *supra*, 48 Cal.4th at p. 189 [court has " 'broad discretion over the number and nature of questions about the death penalty' " during voir dire]; *People v. Martinez* (2009) 47 Cal.4th 399, 447 [examining a small number of prospective jurors "constitutes an extremely limited sample of the trial court's overall performance, thereby diminishing [its] probative value"].) Defendant fails to explain how the court's overall questioning of these various prospective jurors differed in a way that reflected a bias against the defense.[11]

For all these reasons, we conclude defendant's claim of trial court bias during jury selection lacks merit.

## D. Motions for a Change in Venue

Defendant's case was originally filed in Mariposa County, where Cedar Lodge was located. By stipulation, the trial court granted defendant's motion to change venue. After consulting

---

[11] Indeed, defendant's analysis of this point in his brief was rather cursory. While broadly asserting that the trial "court displayed its strong bias in favor of the prosecution," defendant did not provide any discussion supporting his view that bias can be shown on the record before us.

with the Administrative Office of the Courts (AOC)[12] and holding an evidentiary hearing, the court transferred the case to the Santa Clara County Superior Court. Later, during voir dire in Santa Clara County, defendant filed a second motion for a change in venue, which the court denied. Defendant argues the court erred both procedurally and substantively when it selected Santa Clara County as the venue, and he further argues the court erred in denying his second motion for a change in venue. He claims these errors violated his state and federal constitutional rights. We reject his claims.

### 1. *Facts and procedural background*

On October 29, 2001, the court granted defendant's motion to change venue from Mariposa County. At that time, California Rules of Court, rule 4.152 provided: "When the court in which the action is pending determines that it should be transferred . . . , it shall advise the Administrative Director of the Courts of the pending transfer. Upon being advised the Director shall, in order to expedite judicial business and equalize the work of the judges, suggest a court or courts that would not be unduly burdened by the trial of the case. Thereafter, the court in which the case is pending shall transfer the case to a proper court as it determines to be in the interest of justice." (Cal. Rules of Court, former rule 4.152.) In accordance with this rule, the court proposed that "the first step should be to suggest what counties you might request, and that the [AOC] inquire of those counties whether they are in a

---

[12] The AOC is the staff of the Judicial Council and is now referred to as the Judicial Council. (See Cal. Rules of Court, rule 10.81.) In this opinion, we refer to AOC and Judicial Council interchangeably.

position to accept this particular case." "[T]he next step, then, is to set an [e]videntiary [h]earing as to those counties that would be receptive," after which the court would decide, "based upon the interest of justice, as to which county should be selected for the venue of this particular case." Defense counsel agreed that "the [c]ourt's statement of the procedure that's required is correct."

The prosecution proposed that the case be transferred to Sacramento, Santa Clara, or Colusa County, and the defense proposed San Francisco or Los Angeles County. The court conferred with AOC staff, and the AOC sent a memo to the court summarizing the counties' responses: "Santa Clara: The court agreed to the change of venue request. Security and accommodation for the media are described as good." "Sacramento: The court gave a reserved yes to the request. They have security concerns and a shortage of clerks to assist with the case. However, they are willing to assist." "Colusa: The court gave two conditions under which it would accept the change of venue. The court stated one of their active judges would accept the case for trial, and the court stated that they would schedule it for no more than two weeks." "Los Angeles: After having recently accepted a San Francisco change of venue case with very high profile media and security concerns, the court expressed their preference not to accept the case. However, if ordered, they would accept the responsibility." "San Francisco: The court states that they are not able to accept the case, citing security and staffing problems." In a separate oral communication with the court, AOC staff clarified that San Francisco, Los Angeles, and Colusa Counties were *not* available to accept the case.

Based on these communications, the court informed the parties that in terms of administrative burden, only Santa Clara and Sacramento were available. "So in my view, this hearing should be limited to Sacramento and Santa Clara Counties. And then, I will conduct the *McGown* hearing. I will conduct the *Cooper* hearing.[13] And then, we will make a decision."

Defense counsel objected to the exclusion of the Los Angeles County Superior Court, arguing, based on the AOC's written memorandum, that the court in Sacramento County was "at least as tentative" about receiving the case as the court in Los Angeles County. The court informed the parties that the AOC staff had also communicated with the court orally and had notified the court that Los Angeles County was willing to accept the case only if ordered to do so. The court stated: "And I cannot order them to do so, only the Chief Justice through the [AOC] can make that order. . . . [¶] . . . [¶][14] Consequently, any

---

[13] In *McGown v. Superior Court* (1977) 75 Cal.App.3d 648 (*McGown*), the court held that the parties have a right to an evidentiary hearing to address (1) the "presence or absence of prejudicial publicity" in any new venue under consideration (*id.* at p. 653) and (2) the "relative hardship involved in trying the case in various locations" (*id.* at p. 652, fn. 5). We affirmed this holding in *People v. Cooper* (1991) 53 Cal.3d 771 (*Cooper*), clarifying that "the conservation of judicial resources and public funds," and the "convenien[ce of] witnesses, attorneys, and others, including interested citizens of . . . the county of the crime" are relevant factors. (*Id.* at p. 805.)

[14] Defendant argues that the trial court, not the Chief Justice, could have issued this order, although the defense argued the opposite in the trial court. Defendant's argument on appeal misses the mark, and his trial court argument was correct. Under rule 4.152 of the California Rules of Court, the

95

polling will be limited to Santa Clara County and Sacramento County."

At an evidentiary hearing, on the issue of pretrial publicity, the defense referred to various community surveys for each county and renewed its request that the court consider the Los Angeles County Superior Court. The court denied the request, and later prohibited the defense from using the Los Angeles survey results as context for evaluating the survey results from other counties. The defense then presented the expert testimony of a specialist in public opinion surveys and, also, Dr. Craig Haney, an expert on the relationship between pretrial publicity and prejudice in criminal cases. Among other things, Dr. Haney summarized the survey results for Santa Clara and Sacramento Counties. Although the defense was not permitted to present the survey results for Los Angeles County, defendant included those results in his brief in this court, and we include them in the following chart for the sake of comparison.

---

AOC advises the trial court as to which counties are available. A trial court cannot overrule a decision of the AOC. Only an adopted motion of the Judicial Council or an express instruction from the Chief Justice can do so.

|  | **Los Angeles** | **Santa Clara** | **Sacramento** |
|---|---|---|---|
| *Recognized the case:* | 79% | 92% | 96% |
| *Thought that defendant was probably guilty:* | 47% | 69% | 76% |
| *Were aware defendant had been convicted of killing Joie Armstrong:* | 35% | 63% | 71% |
| *Believed defendant should receive the death penalty:* | 35% | 44% | 58% |

The trial court acknowledged that "[t]he presence or absence of prejudicial publicity" was one of the issues to be considered when selecting a venue (*McGown, supra*, 75 Cal.App.3d at p. 653), but it also noted that "once the decision is made as to the change of venue, that county, whatever it happens to be, is going to be deluged, if that's the proper word, with additional and more detailed prejudicial pretrial publicity." Therefore, the court doubted "the continuing validity" of the defense's survey results. The court further noted that because of the nature of the allegations in this case, most people have heard about the case, and that the only way to assess the effect of that pretrial publicity was through voir dire.

The court then turned to the question of hardship, stating it had "read the detailed statistical information . . . concerning the comparison of the two counties" with respect to various factors such as population, cost, transportation, among others,

and had found that "all of those factors almost balance out." The court noted that Santa Clara County was the only county with no reservations about accepting the case, and it concluded: "In the interest of justice, comparing all of these different factors under *Cooper*, the court now decides that this case is going to be transferred to Santa Clara County for trial."

On February 14, 2002, defendant filed a petition for writ of mandate challenging the trial court's decision. The Fifth District Court of Appeal summarily denied the petition in a three-page opinion, and we denied defendant's petition for review.

On July 11, 2002, while voir dire was proceeding in Santa Clara County, the defense filed its second motion to change venue, noting that after initial excusals, 215 prospective jurors remained in the venire pool, all of whom had filled out a juror questionnaire. Of this group, 96 percent had read or seen something about the case, 77 percent had heard of defendant and were able to state facts about the case, 46 percent believed defendant was guilty, 74 percent knew about the murder of Joie Armstrong, 56 percent believed defendant had killed Armstrong, 38 percent believed that the death penalty was the appropriate penalty in the case, and 27 percent knew defendant had confessed to his crimes. The defense also submitted a 100-page exhibit (compiling media articles about the case) and a computer disk (containing digital photographs depicting the extensive media presence outside the courthouse).

In ruling on the second motion, the court pointed out that during voir dire, the defense had made 45 challenges for cause, of which 24 were denied, and 21 were granted. Of the challenges the court denied, only four were based on concern about the

impact of pretrial publicity. The court noted that everyone on the panel was examined on the publicity issue and confirmed they would not allow what they had read, seen, or heard to affect their decision. The court stated it had made its independent judgment as to each juror's state of mind and found whether they were credible, honest, and would give both sides a fair trial. The court also cited *People v. Harris* (1981) 28 Cal.3d 935 (*Harris*), in which we said that in a high publicity case, no one can expect that " 'the jurors [will] be totally ignorant of the facts and issues' " (*id.* at p. 949, quoting *Irvin v. Dowd* (1961) 366 U.S. 717, 722), and " '[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court' " (*Harris*, at p. 950, quoting *Irvin*, at p. 723). Based on its reasoned conclusion that defendant could have a fair trial in Santa Clara County, the court denied defendant's second motion for a change of venue.

### 2. *Defendant's arguments on appeal*

#### a. *Initial selection of Santa Clara County*

Defendant argues the trial court erred both procedurally and substantively in choosing Santa Clara County as the venue for trial.

If the trial court finds "a reasonable likelihood that a fair and impartial trial cannot be had in the county" (§ 1033, subd. (a)), it must grant a change in venue, and then, in selecting a new county, various procedural requirements come into play. The court first must notify the Judicial Council, which presents to the trial court a list of courts that — based on the state's interest in expediting judicial business and equalizing the work of the judges — are available to take the case. (See Cal. Rules of Court, rule 4.152.) Then, "absent an agreement as

to the new venue, the parties have a right to an evidentiary hearing to determine where the case should be transferred." (*People v. Davis* (2009) 46 Cal.4th 539, 574 (*Davis*).)  At such a hearing — which is sometimes called a *"McGown* hearing" — the parties present evidence as to the suitability of the various courts that the Judicial Council has put forward, after which, the transferring court decides the question.  (See *McGown, supra*, 75 Cal.App.3d 648.)

Substantively, the selection of a new venue is governed by factual considerations, including pretrial publicity and hardship.  "The presence or absence of prejudicial publicity in [a successor county] is one of many facts and circumstances which should be considered by [the transferring] court in the exercise of its discretion to decide where the cause should be transferred." (*McGown, supra*, 75 Cal.App.3d at p. 653.)  "Even if the magnitude of pretrial publicity in a successor county [would] not . . . merit a change of venue *from* that county, it may still be large enough to persuade a court not to transfer the case *to* that county." (*Davis, supra*, 46 Cal.4th at p. 574, italics added, citing *Cooper, supra*, 53 Cal.3d at p. 804.) "[C]onsiderations of relative hardship, and the conservation of judicial resources and public funds, are important factors in deciding between various possible venue sites."  (*Cooper*, at p. 805; see *McGown*, at p. 652, fn. 5.)  Hardship considerations may, for example, support a choice of venue that is relatively near the county where the crime occurred, since such a county is "more convenient for witnesses, attorneys, and others, including interested citizens of . . . the county of the crime." (*Cooper*, at p. 805.)  "The decision of where to transfer the case lies within the discretion of the [trial] court, which must consider the 'interest of justice.' " (*Id.* at p. 804.)

i. *Procedural error*

As noted, defendant argues the court erred procedurally in choosing Santa Clara County. Specifically, he argues the court improperly eliminated Los Angeles County from consideration, and that it improperly prohibited him from presenting evidence regarding the scope and impact of pretrial publicity in Los Angeles County. Defendant asserts the court's rulings violated the holding of *McGown, supra*, 75 Cal.App.3d 648.

In *McGown*, the trial court granted a change of venue and then continued the matter for a hearing to determine which court would receive the transferred case. (*McGown, supra*, 75 Cal.App.3d at p. 650.) In preparation for the hearing, the court conferred with Judicial Council staff and was told "that Contra Costa, Sacramento and Stanislaus Counties were able to accept transfer of the cause." (*Ibid*.) Thereafter, the court conferred with each party ex parte, informing them separately that the case would probably be transferred to Stanislaus County. (*Ibid*.) After those ex parte communications, the court ordered that the case be transferred to Stanislaus County. The defense requested a continuance "to investigate the nature and extent of the pretrial publicity in Stanislaus County." (*Ibid*.) The court denied the continuance, expressing its " 'belief that [Stanislaus C]ounty is a forum where there would be no adverse feelings or prejudice because of any type of pre-trial statements or publicity against this defendant.' " (*Id*. at p. 651.) On those facts, the Court of Appeal held the court abused its discretion. The Court of Appeal stated that the factual issue of the nature and extent of pretrial publicity in Stanislaus County "should have been resolved by evidence received in open court rather

101

than by informal ex parte communications between respondent court and the parties." (*Id*. at p. 652.)

The present case is not similar to *McGown*. Here, the court did not confer ex parte with either party, and it permitted the defense to present evidence about the suitability of the two counties the AOC had determined to be available. Defendant complains about "ex parte communications between the court and [the staff] of the AOC," but there is no obligation that the parties be present when the court confers with AOC staff. (See Cal. Rules of Court, rule 4.152.) The AOC is part of the judicial branch of government, and its role, among other things, is to ensure that the judicial workload is allocated among courts in an appropriate manner. (*Ibid*.) That determination is administrative in nature, and contrary to defendant's argument on appeal, it is not a determination that can be litigated at a *McGown* hearing, nor can the parties call AOC staff as witnesses and litigate over the specific content of the AOC's communications to the court. *McGown* held that the parties can submit evidence regarding the suitability of the counties put forward by the AOC. *McGown* did not hold that the parties can object to the AOC's decision or dispute whether the court understood the AOC's decision accurately.[15]

---

[15] Defendant argues that section 190.9, subdivision (a)(1) obligated the trial court to conduct its consultation with the AOC "on the record." The court does not need to do so any more than it would need to conduct an administrative consultation with the court's presiding judge "on the record." The requirements of section 190.9 only extend to case "proceedings"; they do not apply to administrative communications among staff of the judicial branch.

Defendant next focuses on the specific wording of the memorandum the AOC sent to the court — that Los Angeles County was willing to accept the case if ordered to do so. But defendant's focus on the memorandum alone is too narrow. The court was entitled to rely on all its communications with AOC staff, not merely on the written memorandum. As the court informed the parties, AOC staff made clear in oral communications that Los Angeles County was *not* available. The fact that Los Angeles County Superior Court would have accepted defendant's case if an appropriate authority had ordered it to do so is beside the point. The law does not permit the defense to choose a county where, according to its survey, the case is least known, and then demand an order forcing that county to accept the case. Such a procedure would negate the AOC's role in allocating the state's judicial workload in an efficient manner. (See Cal. Rules of Court, rule 4.152; *People v. Green* (1980) 27 Cal.3d 1, 45, fn. 29 ["the courts that are available for [transfer of a case] are determined not by the parties but by the Administrative Director of the Courts"].) Therefore, the AOC was entitled to make an administrative determination that Los Angeles County was unavailable.

Defendant argues that even if Los Angeles was not available, the court should have considered the Los Angeles County survey results as contextual evidence demonstrating that Santa Clara County was unsuitable. But the only issue before the court at the *McGown* hearing was which county among the two available — Santa Clara and Sacramento — was the most suitable. (See *People v. Ng* (2022) 13 Cal.5th 448, 521–522 (*Ng*) [concluding a trial court cannot abuse its discretion by declining to select a county that was not provided by the Judicial

103

Council].) Los Angeles County survey results thus were irrelevant.

### ii. *Substantive error*

Defendant also asserts the court erred substantively in selecting Santa Clara over Sacramento County. In choosing between these two counties, however, the court appropriately considered both pretrial publicity and relative hardship. (See *McGown, supra*, 75 Cal.App.3d at pp. 652, fn. 5, 653; see also *Cooper*, *supra*, 53 Cal.3d at pp. 804–805.) Regarding pretrial publicity, the two counties were similar, a point conceded by the defense's own expert witness. Regarding hardship factors, the court noted that most such factors "balance[d] out." Santa Clara was slightly larger. It had the third largest city in California, and it also had an international airport with convenient public transportation to the courthouse and hotels. Sacramento County, however, had a slightly lower cost of living. Based on the evidence, the court chose Santa Clara County, and defendant fails to persuade us that the selection of Santa Clara County was an abuse of discretion. (See *Cooper*, at pp. 804–805 [abuse of discretion standard of review applies to selection of an alternative venue].)

Turning to defendant's claim of substantive error regarding the court's selection of Santa Clara County, we note that defendant frames the issue as if the court had denied a defense motion for a change of venue *from* Santa Clara County. Accordingly, defendant's briefing on appeal discusses whether "there [was] a reasonable likelihood that a fair and impartial trial [could not] be had" in Santa Clara County (§ 1033, subd. (a)), and he analyzes the factors that, according to settled case law, inform such a determination. Consistent with this

framing, defendant argues that this court should apply a de novo standard of review. Defendant's approach to this issue is flawed. It is true that defendant eventually moved for a change of venue from Santa Clara County (see pt. II.D.2.b., *post*), but at the time the court made its initial selection of Santa Clara County, no such motion was pending. Rather, the question before the court was which county to select from the two counties the AOC said were available, and, as noted, the court's selection is reviewed for abuse of discretion. (See *Cooper*, *supra*, 53 Cal.3d at pp. 804–805.)

Finally, defendant argues the court should have asked the AOC to suggest additional counties. The court declined to do so on the ground that it would delay the proceeding. This was not error. The defense had expressly agreed to a procedure in which each party proposed various counties as possible venues for the trial, so defendant cannot complain that more counties were not considered. More importantly, our case law makes clear that a defendant is entitled to venue in a county where he can receive a fair and impartial trial; he is not entitled to venue in a county of his own choosing. And, as discussed below, defendant does not show he was unable to receive a fair and impartial trial in Santa Clara County.

### b. *Second motion for a change of venue*

During voir dire in Santa Clara County, defendant again moved for a change of venue, asserting that voir dire had shown he could not receive a fair trial in that county. Defendant argues the court erred in denying his second motion.

As noted, a defendant in a criminal case is entitled to a change of venue "when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the

county."    (§ 1033, subd. (a).)    Factors relevant to this determination include:  (1) the nature and gravity of the offense or offenses charged; (2) the nature and extent of the publicity; (3) the size of the relevant community; (4) the defendant's status within the community; and (5) the popularity and prominence of the victim within the community.  (See *People v. Vieira* (2005) 35 Cal.4th 264, 279.)  "The same factors apply to a motion for a second change of venue, except that 'the fact that venue has already been changed once affects the analysis.' " (*Davis*, *supra*, 46 Cal.4th at p. 578, quoting *Cooper*, *supra*, 53 Cal.3d at p. 805.)

" 'A denial of a motion for change of venue will be upheld on appeal unless the record shows both that it was " 'reasonably likely [that] a fair trial could not be had at the time the motion was made,' " and that it was " 'reasonably likely a fair trial was not in fact had.' " ' [Citation.] 'Reasonably likely' in this context means something less than ' " 'more probable than not,' " ' but something more than 'merely possible.' " (*People v. Lewis* (2008) 43 Cal.4th 415, 447.)  The trial court's factual determinations are reviewed for substantial evidence, but its determination as to the reasonable likelihood of a fair trial in the venue in question is reviewed de novo.  (See *People v. Rountree* (2013) 56 Cal.4th 823, 837 (*Rountree*).)

Defendant argues it was reasonably likely he could not receive a fair trial in Santa Clara County, and therefore the court erred in denying his second motion, and he further argues that it was reasonably likely he did not *in fact* receive a fair trial in Santa Clara County, and therefore the error was prejudicial. Defendant, however, does not demonstrate that any of the relevant factors required the court to change venue from Santa Clara County.

Regarding the nature and gravity of the offenses, there is no question that defendant's crimes were brutal, factually shocking, and unusually grave. But the trial court considered defendant's "renewed motion" for a change of venue after having already once granted a change of venue, and after a new venue had been selected based on a *McGown* hearing. Initially, those considerations weigh against a second change of venue. (See *Davis*, *supra*, 46 Cal.4th at p. 578.) In addition, this case was not being tried in the county where the crimes occurred or where any of the victims resided or worked; thus, in all other counties, the jurors' reaction to the nature and gravity of defendant's crimes would likely be similar. (See *Davis*, at p. 578 [" 'Prospective jurors would sympathize with the girls' fate' no matter where the trial was held, and this sympathy stems from the nature of the crime, 'not the locale of trial' "].) Thus, this first factor did not support a change of venue from Santa Clara County.

As for the nature and extent of publicity regarding defendant's crimes, such publicity was likely to be significant in every county, and once a particular county was selected for the trial, publicity in that county would only increase. Thus, "a change of venue 'offered no solution to the publicity problem.' " (*Davis*, *supra*, 46 Cal.4th at p. 579.) In a case like the present one, the defendant cannot expect that " 'the jurors be totally ignorant of the facts and issues.' " (*Harris*, *supra*, 28 Cal.3d at p. 949.) Therefore, the focus must be placed instead on selecting jurors who can put aside whatever they may have heard about the case, keep an open mind, and decide the issues based on the evidence presented in the courtroom (*id*. at p. 950), which is how the court proceeded in this case. Because Santa Clara County was not the county where the crimes occurred or where any of

the victims had resided or worked, pretrial publicity, regardless of how pervasive it was in Santa Clara County, was less likely to have a prejudicial impact on jurors in that location. Therefore, this factor did not tip in favor of a change of venue away from Santa Clara County.

The next factor focuses on the size of the community where the trial is held. In a county like Santa Clara County that has a large and diverse population, "the suggestion that 12 impartial individuals [can]not be empaneled is hard to sustain." (*Skilling v. United States* (2010) 561 U.S. 358, 382; see *Davis*, *supra*, 46 Cal.4th at p. 579.) Moreover, that observation is certainly borne out by the trial court's experience in this case. After initial excusals, 215 prospective jurors remained in the venire pool. The court then questioned the individual members of that group, evaluated their demeanor, and excused prospective jurors who, in the court's assessment, had been prejudicially impacted by pretrial publicity or were disqualified to serve for other reasons. That process reduced the pool of prospective jurors to 67, all of whom had been determined, after a careful examination, to be impartial. Although there are a handful of counties in California that are more populous than Santa Clara County, it cannot be seriously argued that Santa Clara County was too small to permit the selection of an impartial jury, and the record suggests that the court was able to select such a jury.

The last two factors are defendant's status within the community and the popularity and prominence of the victim in that community. These factors focus on whether there is a connection between the location and the individuals involved in a defendant's crimes that might inflame the passion of jurors drawn from that location. Defendant does not assert that he or the victims had ever been residents of Santa Clara County or

108

had any special connection to that county. Hence, he does not explain how his status in Santa Clara County made that county an especially poor choice of venue, nor does he show that the victims were popular or prominent in the county. Of course, disclosure of the details of defendant's crimes was likely to undermine defendant's status in Santa Clara County and was likely to increase the popularity and prominence of the victims in that county, but the same would be true of any county that might be selected as a venue for the trial. Santa Clara County was not specially situated in that regard. (See *People v. Harris* (2013) 57 Cal.4th 804, 829 ["any features of the case that gave the victim prominence in the wake of the crimes would inevitably have become apparent no matter in which venue defendant was tried"].) Accordingly, the last two factors did not favor a change of venue away from Santa Clara County.

Because the relevant factors did not support a change of venue, the trial court did not err in denying defendant's motion.

### 3. *Conclusion*

After granting defendant's first change of venue motion, the trial court did not err either procedurally or substantively in selecting Santa Clara County as the venue for defendant's trial. Further, the court did not err in denying defendant's second motion for a change in venue. Because defendant was able to receive a fair and impartial trial in Santa Clara County, we also conclude the trial court's rulings did not violate defendant's state or federal constitutional rights.

### E. Guilt Phase Issues

### 1. *Requests for* Kelly *hearings*

Before trial, defendant sought and was denied a *Kelly* hearing regarding the prosecution's fingerprint evidence. (See

*People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*).)[16]   On appeal, defendant claims the court violated the *Kelly* rule by allowing the guilt phase testimony of the prosecution's fingerprint expert and its arson expert.  He also claims these errors violated his state and federal constitutional rights.  We conclude that with respect to each expert, the expert's testimony was not subject to the *Kelly* rule, and for the same reason, we also find the trial court did not violate defendant's state or federal constitutional rights.

"Under the *Kelly* rule, ' "when faced with a novel method of [scientific] proof, [we] have required a preliminary showing of general acceptance of the new technique in the relevant scientific community" before the scientific evidence may be admitted at trial.' (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 831, quoting *Kelly, supra,* 17 Cal.3d at p. 30.) *Kelly* 'renders inadmissible evidence derived from a "new scientific technique" unless the proponent shows that (1) "the technique is generally accepted as reliable in the relevant scientific community"; (2) "the witness testifying about the technique and its application is a properly qualified expert on the subject"; and (3) "the person performing the test in the particular case used correct scientific procedures." ' (*People v. Jackson* (2016) 1 Cal.5th 269, 315–316.)[17]  The party offering

---

[16]   The *Kelly* hearing was referred to as a "*Kelly-Frye* hearing" until revisions to the Federal Rules of Evidence superseded the holding of *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013.  (See *People v. Bolden* (2002) 29 Cal.4th 515, 545 (*Bolden*).)

[17]   The *Kelly* holding is sometimes described as a "three-pronged test." (*Bolden, supra,* 29 Cal.4th at p. 544.)  Most of

the evidence has the burden of proving its admissibility by a preponderance of the evidence. (*People v. Ashmus* (1991) 54 Cal.3d 932, 970.) We review de novo the trial court's evaluation regarding whether a new scientific technique is generally accepted as reliable in the relevant scientific community. (*Id.* at p. 971.)" (*People v. Nieves* (2021) 11 Cal.5th 404, 444 (*Nieves*).)

a. *Fingerprint evidence*

Before trial, defendant moved to exclude evidence that a latent fingerprint found on the stamp of the envelope that was sent to Special Agent Alston matched his right thumbprint, unless the prosecution first proved the reliability of the evidence at a *Kelly* hearing.

FBI Agent Holmes was the fingerprint examiner who matched the latent fingerprint on the stamp to defendant's right thumbprint. At the preliminary examination, Holmes described his methodology as follows: "Whenever any latent examiner looks at a print, they study that print for all the information that is there. So, whether it's conscious or unconscious, you're using all the information in that print when you're doing a comparison." "Whenever I make an identification, I study the detail of the prints in question. And at some point, I become

defendant's brief on appeal focuses on the first prong (general acceptance of the new scientific technique in the relevant scientific community). Defendant, however, also makes a one-sentence argument that the trial court should have held a third-prong *Kelly* hearing (a case-specific inquiry into whether correct scientific procedures were used here). In the context of a *Kelly* motion, however, both prongs depend on a threshold finding that a new scientific technique was employed. The discussion below focuses on the latter question.

confident that they are a match. In this particular case, I was asked to go back and count the number of characteristics that matched. I did so. And it's approximately 12 characteristics that match." Holmes conceded he did not generally apply a strict counting technique: "I don't separate . . . how many ending ridges, how many dividing ridges, and what other characteristics are. I don't divide them up into 'how many.' " Although he counted matching characteristics in this case, he claimed that many examiners do not do so.

Based upon this preliminary examination testimony, defendant asserted that Agent Holmes used a "holistic" "ridgeology" method for matching prints.[18] Building on his characterization of Agent Holmes' methodology, defendant's motion to exclude the thumbprint evidence argued that ridgeology was a new scientific technique that was not generally accepted in the scientific community. Specifically, defendant distinguished the so-called ridgeology method from the "point-counting" method, which entails counting Galton "ridge characteristics"[19] within a fingerprint and looking for at least eight to ten common characteristics before declaring that two prints match. By contrast, the ridgeology method examines three levels of detail in a fingerprint: "Level I (class characteristics such as loops[,] whorls, and arches), Level II (traditional 'Galton' ridge characteristics such as bifurcations, ridge endings, enclosures, etc.), and Level III (pores and ridge shapes)." Based on this three-level examination, the examiner reaches a subjective conclusion as to whether there is a match,

---

[18] Neither the term "holistic" nor the term "ridgeology" appears anywhere in the preliminary examination transcript.

[19] Named for Sir Francis Galton (1822–1911).

but the examiner does not count a minimum number of Level II details.

The court denied defendant's motion for a *Kelly* hearing, stating, "I have had it happen on hundreds of occasions where a latent fingerprint examiner has testified and they have used various different approaches. And in some cases the defense, in fact, has called an expert on their behalf to contest the testimony. And ultimately, it's a question of fact for the trier of fact . . . ." The court said there was "no authority for the proposition that a *Kelly* hearing is required for the admissibility of a latent fingerprint examiner's testimony."

In accordance with this ruling, during the guilt phase of defendant's trial, Agent Holmes testified as a prosecution expert in fingerprint lifting and comparison. He testified that, using a chemical process, he raised a latent fingerprint on the stamp that was attached to the envelope that had been mailed to the FBI and compared defendant's fingerprints to that latent fingerprint. He thus concluded the latent fingerprint matched defendant's right thumbprint. Agent Holmes was not questioned by either the prosecution or the defense about the process he used to determine the match.

Defendant argues the court erred when it did not require a *Kelly* hearing prior to the admission of Agent Holmes's testimony. He reiterates his theory that the "ridgeology" method employed by Holmes was a new scientific technique that was not generally accepted in the scientific community, and he also argues that it was an unreliable method. We reject defendant's argument.

First, it is far from clear that ridgeology qualifies as a new scientific technique. The scientific principles that underlie

fingerprint evidence are that each individual's fingerprints are unique and that the unique pattern does not change over time; those principles are hardly new. (See *U.S. v. Baines* (10th Cir. 2009) 573 F.3d 979, 982.) The method by which a fingerprint examiner, presented with two readily visible fingerprint images, might compare the images and declare them to be a match is not, itself, a scientific technique. (See *In re O.D.* (2013) 221 Cal.App.4th 1001, 1005–1010 [fingerprint examiner's use of analysis, comparison, evaluation, and verification (ACE-V) method of comparing fingerprints not subject to *Kelly*]; see also *People v. Cowan* (2010) 50 Cal.4th 401, 470 (*Cowan*) [ballistics and tool mark comparisons not subject to *Kelly*]; *People v. Pride* (1992) 3 Cal.4th 195, 238–239 [hair sample comparison not subject to *Kelly*]; *People v. Farmer* (1989) 47 Cal.3d 888, 912–913 [shoe print comparison not subject to *Kelly*]; but see *People v. Venegas* (1998) 18 Cal.4th 47, 81 (*Venegas*) ["DNA evidence is different. Unlike fingerprint, shoe track, bite mark, or ballistic comparisons, which jurors essentially can see for themselves, questions concerning whether a laboratory has adopted correct, scientifically accepted procedures for generating autorads or determining a match depend almost entirely on the technical interpretations of experts"].)

Second, it does not appear that Agent Holmes relied exclusively, if at all, on the ridgeology method. Rather, Holmes was asked to count the number of ridge characteristics that matched, and he found approximately 12, a number that exceeds the minimum number that defendant claimed was necessary.

Third, "*Kelly* was designed to insulate the jury from expert testimony premised on methods that 'carry [a] misleading aura of scientific infallibility' " (*People v. Eubanks* (2011) 53 Cal.4th 110, 141, quoting *People v. Stoll* (1989) 49 Cal.3d 1136, 1157; see

*People v. Lucas* (2014) 60 Cal.4th 153, 223), but no such concern was present here. In his testimony, Agent Holmes merely described his training and experience as a fingerprint examiner, then stated he found a match between the latent fingerprint on the stamp and defendant's thumbprint. Holmes did not mention his method of comparing the two prints, he did not discuss ridgeology or any other specific method of comparison, and he did not suggest that he had used a new fingerprint matching technique that was infallible or superior to traditional methods. Therefore, the concern that animated our holding in *Kelly* does not come into play here.

Fourth, even without a *Kelly* hearing addressing the validity of Agent Holmes's method, the defense was free to cross-examine Holmes about his method and to undermine Holmes's credibility by showing that Holmes's method was unreliable. (See *Cooper*, *supra*, 53 Cal.3d at p. 814 [" 'Careless testing affects the weight of the evidence and not its admissibility, and must be attacked on cross-examination or by other expert testimony' "].) Significantly, the defense used Agent Holmes as a witness in its own case-in-chief to testify that certain fingerprints found at the crime scene did not belong to defendant. Defendant does not suggest that Holmes's alleged use of the ridgeology method was a problem when Holmes was testifying in the defense's favor. Having chosen not to cross-examine Holmes regarding his method of comparison, defendant cannot credibly argue here that he suffered any prejudice from the failure of the trial court to hold a *Kelly* hearing.

Finally, defendant readily admitted in his detailed confession that he was the one who mailed the letter with the map to the FBI. It is true the fingerprint evidence helped to corroborate defendant's confession, but the confession was

corroborated on so many other points that this additional corroboration, through the testimony of Agent Holmes, could not possibly have made a significant difference.

Defendant also argues that the weakness of Agent Holmes's testimony rendered the evidence unreliable and lacking in relevance under Evidence Code section 801, which requires that expert testimony be of assistance to the jury, and under *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 753, which held that "the trial court has the duty to act as a 'gatekeeper' to exclude speculative expert testimony." We reject this argument, too. Agent Holmes testified regarding his significant expertise as a fingerprint examiner, and he further testified that it was his expert view that the latent fingerprint found on the stamp corresponded to defendant's thumbprint. Facially, Holmes's testimony was not weak, and if the defense believed that Holmes's methodology was somehow improper, making his testimony weak, then the defense was entitled to cross-examine Holmes regarding that methodology to expose any weakness. It did not do so.[20]

b. *Arson evidence*

During the guilt phase, FBI Agent Timothy Huff was qualified as an expert in arson investigations and testified for the prosecution. Prior to Agent Huff's testimony, the defense objected to its admissibility. In support of that objection, defense counsel quoted from the conclusion of a report Agent

---

[20] Defendant briefly argues the court abused its discretion by allowing Agent Holmes's testimony despite an objection under Evidence Code section 352 (probative value substantially outweighed by undue prejudice, etc.). However, defendant does not develop this argument, and we summarily reject it.

Huff had authored, as follows: "The fire to the Sund rental vehicle was deliberately set, not accidental, and occurred many days or several weeks before being examined by Mr. Huff. It was not a recent fire." Defense counsel argued that any testimony by Agent Huff along the lines of that report's conclusion was inadmissible "absent some sort of a *Kelly-Frye* admissibility showing that whatever techniques he is using to reach that conclusion is generally accepted by a relevant scientific community." Defendant also asserted that Agent Huff should not be allowed to testify because his testimony would not assist the jury (see Evid. Code, § 801), and that the comment that the fire was "not accidental" improperly addressed whether defendant had the mental state required for commission of the crimes charged, thus violating section 29.

The court overruled defendant's objections. Regarding the demand for a *Kelly* hearing, the court stated that testimony from an arson investigator as to whether the fire was set intentionally, "based upon his experience, his training, his background, his examination of the vehicle, the property, trees, whatever that might have been also burned . . . is not subject to a *Kelly* test. You can certainly put on competing evidence if you feel that the opinion has no value . . . . But I don't believe that this type of testimony is subject to a *Kelly* test."

Regarding Evidence Code section 801, the court commented that Agent Huff's testimony would be generally consistent with the theory that defendant burned the Pontiac to destroy evidence, and "in that context, it's certainly relevant." Regarding section 29, the court said: "I don't think we are talking about [a] Penal Code section 29 [problem] because he is not giving an opinion in this courtroom as to the defendant . . . and the examination he conducted of [defendant] and whether

or not he felt [defendant] had the intent or the capacity or whatever when he did what he did. He is simply saying, . . . whoever did this, in his opinion, did it deliberately and intentionally. And you can . . . cross-examine on it. . . . You [can] call your own competing expert. You can argue the opinion as to the weight to the trier of fact, the jury. But that does not mean it's not legally admissible."

Agent Huff testified that he examined the burned Pontiac in which the bodies of Carole and Silvina were found. Based on the extent of the damage to the car and the gasoline odor, he thought it was unlikely the fire was accidental. Because the soot on nearby tree branches did not rub off easily, and because scorched pine needles were no longer clinging to the saplings, he believed the fire had been started "some weeks prior to" his investigation, possibly on February 18, 1999.

Defendant argues that the court erred in failing to hold a *Kelly* hearing. We disagree. "The *Kelly* test is intended to forestall the jury's uncritical acceptance of scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate. [Citation.] In most other instances, the jurors are permitted to rely on their own common sense and good judgment in evaluating the weight of the evidence presented to them." (*Venegas, supra*, 18 Cal.4th at p. 80.) "Where . . . a procedure isolates physical evidence whose existence, appearance, nature, and meaning are obvious to the senses of a layperson, the reliability of the process in producing that result is equally apparent and need not be debated under the standards of *Kelly, supra*, 17 Cal.3d 24." (*People v. Webb* (1993) 6 Cal.4th 494, 524.)

Agent Huff did not use any new scientific technique and, instead, based his conclusions on logical deductions that were within the ordinary knowledge of a layperson. He believed that the extent of the damage to the Pontiac and the smell of gasoline suggested the fire was not accidental. The fact that soot did not rub off tree branches and that scorched pine needles were no longer clinging to saplings suggested the fire had occurred long enough before his investigation that any loose soot and pine needles had already been washed away. He also noted that the car's paint was gone and that the exposed metal had rusted, which reflected the intense heat of the fire. These deductions did not require application of any scientific technique that had a misleading aura of infallibility. Rather, they were deductions that a reasonable person could readily evaluate.

Defendant also argues that Agent Huff's testimony improperly addressed whether defendant had the mental state required for the crimes charged, thus violating section 29. Section 29 provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have *the required mental states*, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." (Italics added.) Agent Huff, however, was not an "expert testifying about a defendant's mental illness, mental disorder, or mental defect." (*Ibid*.) He never testified about defendant's mental state.

Instead, he testified that the fire that burned the car appeared to have been intentionally set. Thus, section 29 did not apply.[21]

### 2. *Motions for a continuance*

#### a. *Factual background*

On May 22, 2002, 19 days before jury selection began, defendant entered an additional plea of not guilty by reason of insanity. (§ 1026, subd. (a).) The court appointed Dr. Silva and Dr. Douglas Harper to examine defendant and testify at a possible sanity phase trial (§ 1027, subd. (a)). On June 24, during jury selection, defendant moved to continue the trial, stating he intended to use Dr. Silva as a witness at a possible penalty phase trial and needed more time for neuropsychological testing that Dr. Silva had recommended. The prosecution objected to the continuance, stating defendant did not enter his insanity plea until just 19 days before trial, and that the prosecution had already lined up its witnesses, who would be greatly inconvenienced by the delay. The prosecutor also asserted the defense had time to act on Dr. Silva's recommendations without a continuance because the parties were still selecting a jury.

The court expressed perplexity over the fact that the content of Dr. Silva's report and the additional testing he was recommending went "far beyond any [section] 1026 considerations." Nonetheless, the court recognized the tests

---

[21] Defendant also briefly argues that the court abused its discretion by allowing Agent Huff's testimony despite an objection under Evidence Code section 352 (probative value substantially outweighed by undue prejudice, etc.). Because defendant does not sufficiently develop this argument, we reject it without further discussion.

might lead to relevant penalty phase evidence. The court noted, however, that any penalty phase would not commence until September, and thus, there was "more than sufficient time" to do what needed to be done. The court added: "I'm willing to work with the defense with reference to the schedule to get this test done, whatever it might be. [¶] But . . . I think these things can still be done. I think there's time to do them. And if there's not, somebody has to come to the court by way of a showing as to why it can't be done." The court therefore denied the motion to continue.

About a month later, after trial had commenced, defendant filed a new motion to continue the trial, asserting that the prosecution's guilt phase case-in-chief was ending earlier than anticipated, that the defense's guilt phase expert was unavailable to testify within the existing time frame, and that more time was needed to complete Dr. Silva's follow-up tests.

The court conducted a hearing on the motion on July 25, 2002. Dr. George Woods who, according to defense counsel, was the defense's primary guilt phase expert, testified that he had a family emergency that was going to consume at least six weeks of his time and would preclude his participation in the case. Counsel added that the defense had expected the prosecution to complete its guilt phase case-in-chief in mid-August, but the prosecution had unexpectedly rested on July 24. The defense therefore sought a three-week continuance to allow it to hire a different expert witness and to allow Dr. Silva to complete his testing. Defense counsel conceded that one alternative was for

the defense to use Dr. Silva as a guilt phase witness, but "that is not our preference."[22]

The court noted that in previous communications, the defense had suggested that Dr. Woods had been retained only to oversee testing, and that Dr. McInnes would be the testifying witness for the defense at trial. The court then said: "To tell the court now after the jury has been sworn; we are in trial; we have a change of venue case with counsels from Santa Monica, San Francisco, Oakhurst, Mariposa County, Sacramento, Solano; we have witnesses who have actually moved to Santa Clara County from other portions of California; we have witnesses who have actually relocated from South America to Santa Clara County, to now stop the trial, which might mean we would have to declare a mistrial because of the trial schedule we gave to the jury, I think is asking too much." After commenting that the defense's mental health experts had been retained for a variety of reasons other than providing guilt phase testimony, the court continued: "Now, that being said, if you feel that you need a guilt phase witness, you have Dr. McInnes."

The court also denied the defendant's request for a continuance to allow Dr. Silva to complete his testing, noting Drs. Silva and Harper "were appointed pursuant to [section] 1026 by the court," not retained by the prosecution or defense.[23] "If you want to use them over and above what they were

---

[22] As related in part I.A.2.c., *ante*, Dr. Silva ended up being the defense's principal expert witness at the guilt phase.

[23] As noted, section 1026 governs insanity pleas. Technically, Dr. Silva and Dr. Harper were appointed under section 1027, subdivision (a), which instructs the court, in the case of an insanity plea, to appoint two experts to examine the defendant.

appointed for pursuant to [section] 1026, I certainly can't stop you from doing that. But that certainly is outside the scope of the court appointment. [¶] And if you want to retain Dr. Silva . . . as a guilt phase expert, you can certainly do that. . . . [¶] [But] again, it was never represented . . . that you needed time for these experts to testify in the guilt phase. . . . [¶] So if you need a guilt phase expert here, you have one in Dr. McInnes because she is your trial expert." The court also noted that obtaining a substitute for Dr. McInnes on short notice was unrealistic. The court denied the motion, finding no good cause had been shown.

A few weeks later, on August 13, 2002, the defense again sought a continuance based on the prosecution's asserted failure to timely provide Dr. Waxman's report. Dr. Waxman was scheduled to testify as a prosecution rebuttal witness on August 14, and the defense indicated it did not receive his report until August 12. Thus, the defense asked the court to exclude Dr. Waxman's testimony or, in the alternative, to continue the trial until August 19. The prosecutor explained Dr. Waxman's report was not completed until the night of August 11 because of the defense's delay in providing the "control" PET scans that Dr. Wu had used as his baseline for purposes of comparison.

The court commented that there is no requirement that an expert witness write a report, and regardless of whether Dr. Waxman wrote a report, defense counsel still needed to prepare for his cross-examination. The prosecutor said he asked Dr. Waxman to write a report only after defense counsel asked him for one, and that the prosecutor gave the report to the defense as soon as it was available.

The court found no discovery violation and denied the motion to continue, stating: "[T]his is not a surprise as far as Dr. Waxman testifying as a rebuttal witness. And the report that he did prepare at the request of the People, which wasn't required by law, they didn't have to do that. They could have called Dr. Waxman as [a] rebuttal witness and simply said: He's going to be a rebuttal witness, and we have no discovery to give to you; we have no report. He could have done that. They didn't. They got the report. They gave it to the defense, albeit you got it as soon as they did, which is a day or two ago, but that isn't a discovery violation."

The defense then reiterated its request for a continuance to allow time to prepare for cross-examination of Dr. Waxman and to retain a surrebuttal witness. The court denied that request, too, saying: "I can tell you that from what I've heard up to this point . . . if anybody is well versed to cross-examine on PET scan [testimony], . . . you are. [¶] . . . [¶] [As to obtaining a surrebuttal witness, t]hat's so speculative, it means nothing. You are telling me that you don't have one; you might find one. What are you going to do, go through the yellow pages? What's happening here? You either have one or you don't. You just don't get an expert witness in the PET-scan field overnight. . . . [T]o tell me you are looking to find an expert means nothing to me as far as a time frame. [¶] So, anyway, the request is denied."

b. *Applicable law*

"A trial court's exercise of its broad discretion when ruling on a continuance motion is accorded substantial deference on appeal." (*People v. Brown* (2023) 14 Cal.5th 530, 538.) "[T]he decision whether or not to grant a continuance of a matter rests

within the sound discretion of the trial court. [Citations.] The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked." (*People v. Beames* (2007) 40 Cal.4th 907, 920; Cal. Rules of Court, rule 4.113 ["Motions to continue the trial of a criminal case are disfavored"].) Moreover, "[a] midtrial continuance may be granted only for good cause," which " 'requires a demonstration that counsel and the defendant have prepared for trial with due diligence.' " (*People v. Winbush* (2017) 2 Cal.5th 402, 469–470.) "In determining whether a continuance was properly denied, the reviewing court examines the specific circumstances, including the benefits and burdens of postponing a trial that is already underway. [Citation.] In reality, such challenges rarely have merit or cause reversal of the judgment on appeal." (*People v. Garcia* (2011) 52 Cal.4th 706, 758 (*Garcia*).)

### c. *Analysis*

Here, the defense sought three separate continuances. In each instance, the trial court acted within the scope of its discretion in denying the continuance.

First, the defense sought a continuance to allow it to act on Dr. Silva's recommendation for additional testing. Dr. Silva had been brought into the case only a few weeks before the guilt trial began, when defendant entered an insanity plea and the court appointed Dr. Silva under section 1027, subdivision (a). Therefore, by the time Dr. Silva was appointed, the defense should already have lined up any guilt phase expert witnesses it intended to use. Significantly, the motion for a continuance did not suggest that the defense intended to use Dr. Silva as a witness at the guilt phase. Rather, it indicated an intent to use

him at a possible penalty phase trial. Given these facts, a continuance would have been disruptive, particularly for the guilt phase witnesses, and there was no apparent reason why Dr. Silva's recommended testing could not be done while the guilt and sanity phases were proceeding. Indeed, the court said it was willing to work with the defense to accommodate such tests by adjusting the trial schedule as needed. Therefore, the trial court did not abuse its discretion by denying the continuance.

Defendant argues the defense hoped to use the results of Dr. Silva's additional testing at the guilt phase to show defendant lacked the mental state to commit the charged offenses. That may be so, but the defense had ample time to prepare for the guilt trial. On the eve of trial, defendant added a plea of insanity, and Dr. Silva was retained by the court to address sanity phase issues. The fact that Dr. Silva proposed certain additional tests does not excuse the defense for its failure to pursue those tests on its own initiative at an earlier time. Against this background, it is clear that the trial court acted within its discretion.

Second, on July 23, 2002, the defense sought a continuance when it became clear that the prosecution's case-in-chief would finish earlier than expected and Dr. Woods announced he had to withdraw from the case. Defendant argues that these issues compounded the problem of completing Dr. Silva's testing, warranting a continuance. But neither the People nor the court ever made assurances to the defense regarding the length of the People's case-in-chief, nor did the defense show that Dr. Woods's unavailability prevented it from proceeding with Dr. McInnes who, as the designated expert witness, was already familiar with the case. Accordingly, the

court did not abuse its discretion in rejecting this second motion for a continuance. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1037 (*Jenkins*) [when seeking a continuance to secure the attendance of a witness, the defendant must show, among other things, that the facts to which the witness would testify could not otherwise be proven].)

Defendant argues he was deprived of the testimony of Dr. Woods and was forced instead to rely on the testimony of Dr. Silva, who "did not have the [same] experience, credentials, or familiarity with the case." Again, defendant does not explain why the defense could not use Dr. McInnes as a witness. Defendant also fails to explain how a few weeks' continuance would have allowed the defense to use Dr. Woods, who stated he could no longer participate in the case at all.

Third, the defense requested another continuance on August 13, 2002, shortly after receiving Dr. Waxman's report. As the court explained, the prosecution was under no obligation to obtain a written report from this expert witness to share with the defense. Thus, regardless of whether Dr. Waxman issued a report, the defense still needed to prepare for his cross-examination. The report changed nothing in that regard, and in fact, it helped the defense because it alerted the defense, two days in advance, as to the substance of Dr. Waxman's likely testimony. Consequently, we conclude the court did not abuse its discretion in denying this third request for a continuance.[24]

---

[24] For the same reasons (i.e., that the prosecution had no obligation to obtain a written report from Dr. Waxman, and that regardless of whether Dr. Waxman issued a report, the defense still needed to prepare a response to his testimony), the

Defendant argues that the court should have at least granted the "slight" "inconvenience" of a 24-hour delay "allowing defense counsel a better opportunity . . . to more thoroughly review Dr. Waxman's report." But Dr. Waxman was testifying in *rebuttal* to the defense's own evidence. Because Dr. Waxman's testimony concerned a subject that the defense had introduced into evidence, the defense should have been well prepared to cross-examine him or to make an offer of proof concerning the aspects of his proposed testimony that required additional preparation. Defendant failed to make a showing on either ground. Defendant does not adequately explain why the receipt of Dr. Waxman's report, which gave the defense a preview of the likely content of Dr. Waxman's testimony, entitled him to a continuance.

Defendant also argues that the court's denial of his three motions for a continuance violated his state and federal constitutional rights. Because we conclude that the trial court acted within its discretion in denying the continuances, we also find that the court did not violate his constitutional rights.

### 3. *Rulings admitting people's evidence*

Defendant argues that the court erroneously admitted certain prosecution evidence during the guilt phase. We conclude the court acted within its discretion in admitting the evidence. For the same reasons, we find the court did not violate defendant's state or federal constitutional rights.

---

defense's desire to retain a surrebuttal witness to respond to Dr. Waxman's testimony did not justify a continuance. Likewise, the court did not abuse its discretion in denying the defense's motion to exclude Dr. Waxman's testimony.

"Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has a 'tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (*Id.*, § 210.) 'The trial court has broad discretion to determine the relevance of evidence [citation], and we will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner.' (*People v. Jones* (2013) 57 Cal.4th 899, 947.) Evidence Code section 352 provides for the exclusion of evidence 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' We review a trial court's admission of evidence under the abuse of discretion standard. (*People v. Navarro* (2021) 12 Cal.5th 285, 339.) The 'undue prejudice' contemplated by Evidence Code section 352 ' "is that which ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " ' (*People v. Chhoun* (2021) 11 Cal.5th 1, 29, italics omitted.)" (*People v. Helzer* (2024) 15 Cal.5th 622, 667 (*Helzer*).)

a. *Photographs depicting victims alive*

Defendant contends the court erred in admitting testimony and photographs depicting the victims alive and at Cedar Lodge on the date of the murders. We disagree. The subject testimony and photographs were relevant and not unduly prejudicial.

Before Carole's husband, Jens, testified, the defense objected to his anticipated testimony regarding the activities and plans of Carole and the girls prior to their disappearance.

The defense also objected to the admission of any photographs depicting the victims while they were still alive, on the basis that the photographs had no probative value because defendant was willing to stipulate to the victims' identity, and because the photographs would be unduly prejudicial, outweighing any probative value they may have had. (Evid. Code, § 352.)

The court denied the motion, first stating that it could not imagine "what the prejudicial impact might be" of Jens's testimony. The court ruled "he will be allowed to testify," stating, "[H]e is a witness who would testify as to where his spouse and child and [Silvina] went," thus placing the victims at the location where the offenses occurred. As to the photographs, the court said: "Obviously, the witness who is the spouse and father of one of the victims has a right to identify by way of photographs who they were. Obviously, the fact that the photographs were taken at about the time of the events in question at Cedar Lodge and Yosemite is very relevant. The fact that one of the victims is wearing a pajama bottom which apparently was taken from her person and was torn or cut and portions were still found in the room is certainly relevant. [¶] . . . The People are not willing to accept the stipulation. The court finds it's not binding on the court to order the People to accept it. The court finds there is probative value. And the probative value far outweighs any possible perceived prejudicial impact it would have by having a witness identify his spouse and child as victims of a homicide."

Jens then testified about his relationship with Carole and Juli, how Carole, Juli, and Silvina left for San Francisco, Stockton, and Yosemite on February 12, 1999, how he and the younger children were scheduled to meet up with Carole, Juli, and Silvina in San Francisco on February 16, and how Carole

and the girls never arrived in San Francisco. Jens also testified about the photographic exhibits — exhibit No. 25, which depicted Carole and Silvina on a bed in a room that matched the décor of the rooms at Cedar Lodge; exhibit Nos. 26, 27, 30, 31, 32, and 33, which depicted the victims at various locations in the Yosemite area; exhibit Nos. 28 and 29, which depicted Silvina in the Cedar Lodge restaurant; exhibit Nos. 34 and 35, which depicted Juli doing a handstand and a backbend; and exhibit No. 35, which showed Juli's shoes in the foreground.

Defendant contends the testimony and the photographs were irrelevant because of his willingness to stipulate to the victims' identity. However, Jens's testimony was relevant to establish the victims' location at the Cedar Lodge at the time of the crimes and to explain what the victims were doing there. His testimony regarding his relationship with the victims established his credibility as a witness who could testify as to their intended journey, and the photographs, was relevant to corroborate his testimony, demonstrating that the victims arrived in Yosemite as planned and were staying at the Cedar Lodge. Because the photographs were developed from film found in the vicinity of the burned Pontiac, they corroborated other evidence that the burned bodies in the trunk of the Pontiac belonged to the victims.

Jens's testimony and the photographs also corroborated defendant's confession that he saw Carole and the girls at Cedar Lodge. One photograph showed Juli wearing a pajama bottom that matched cloth found at the crime scene, and thus corroborated defendant's statement that he had cut the victims' nightclothes off their bodies. The same photograph depicted Juli's shoes that were found near the burned Pontiac.

Defendant argues that his willingness to stipulate to the victims' identity made this evidence irrelevant, but "the prosecutor is not required 'to present its case in the manner preferred by the defense.' " (*Clark, supra*, 52 Cal.4th at p. 894.) "A trial court cannot compel a prosecutor to accept a stipulation that would deprive the state's case of its evidentiary persuasiveness or forcefulness." (*People v. Rogers* (2013) 57 Cal.4th 296, 329.) Further, a defendant " 'cannot prevent the admission of relevant evidence by claiming not to dispute a fact the prosecution is required to prove beyond a reasonable doubt. The jury was entitled to learn that the physical evidence . . . supports the prosecution's theory of the case.' " (*People v. Steskal* (2021) 11 Cal.5th 332, 356, quoting *Rountree, supra*, 56 Cal.4th at p. 852.) And a "defendant's not guilty plea put[s] in issue all of the elements of the charged offenses, including the elements he conceded." (*Cowan, supra*, 50 Cal.4th at p. 476.) Thus, by pleading not guilty and not guilty by reason of insanity, defendant put all elements of his charges at issue.

Defendant also argues that even if the testimony and the photographs were relevant, their relevance was outweighed by the danger of undue prejudice. (Evid. Code, § 352.) We disagree. Jens's testimony regarding his wife, daughter, and friend, and his description of their planned journey, were not likely to evoke an emotional bias against defendant that outweighed the probative value of the testimony. As for the photographs, we have "recognized that '[c]ourts should be cautious in the guilt phase about admitting photographs of murder victims while alive, given the risk that the photograph will merely generate sympathy for the victims. [Citation.] But the possibility that a photograph will generate sympathy does not compel its exclusion if it is otherwise relevant.' " (*People v. Rogers* (2009)

46 Cal.4th 1136, 1163.) Here, the photographs were the sort one would expect to be taken on a family vacation, and although they may have evoked some sympathy for the victims, they were also highly relevant to establish the general context of defendant's crimes. Even without the photographs, the jury was likely to feel significant sympathy for the victims. Further, the court properly instructed the jury not to be influenced by passion, sympathy, or prejudice, and to conscientiously consider and weigh the evidence in reaching its verdict.

For these reasons, we conclude that the trial court did not abuse its discretion in admitting the challenged evidence.

b. *Testimony of Jennifer S.*

Jennifer S. testified that she worked at Cedar Lodge and registered Carole Sund on February 14, 1999, for a two-night stay in room 509. During redirect examination, the court allowed the prosecutor to show Jennifer S. exhibit Nos. 25 and 32 — photographs of Carole and the girls that had been admitted into evidence during Jens's testimony — to confirm they were the ones who checked into room 509 that day.

Defendant argues the court erred in permitting the prosecutor to show Jennifer S. the photographs, asserting it was "a deliberate manipulation to ke[ep] alive and perpetuate the jury's passions that were already inflamed by the introduction of [Jens's] testimony." Significantly, the defense forfeited the issue by not objecting to Jennifer S.'s testimony about the photographs. (Evid. Code, § 353.) In addition, the testimony was relevant to show Jennifer S. registered the victims into room 509, and, as explained above (see pt. II.E.3.a., *ante*), the admission of the photographs was not unduly prejudicial.

### c. *Testimony of Tracy M. and her daughter*

The defense sought to exclude the testimony of Cedar Lodge guest Tracy M. and her daughter, basing its motion on the content of their testimony at the preliminary examination. The defense asserted that their anticipated testimony regarding defendant's presence at the pool with four teenage girls was improper character evidence under Evidence Code section 1101 and unduly prejudicial under Evidence Code section 352. The court allowed the testimony. Tracy M. testified that she and her family were staying at Cedar Lodge with some friends, and that, on the evening of February 14, 1999, her daughters (ages 15 and 12) and their two friends went to the indoor pool and spa. One of Tracy M.'s daughters testified that she was at the motel pool with her sister and two friends that evening when she saw defendant in the hot tub. She did not see him do anything unusual.

Evidence Code section 1101 states that "evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion," but such evidence is admissible "when relevant to prove some fact . . . other than his or her disposition to commit such an act." (Evid. Code, § 1101, subds. (a), (b); see *People v. Jones* (2013) 57 Cal.4th 899, 930 (*Jones*).) The testimony of Tracy M. and her daughter was not proof of defendant's disposition to commit the charged offenses. These witnesses did not suggest that defendant leered at the teenage girls, or that he even watched them. Instead, Tracy M.'s daughter testified that defendant did not do anything unusual. Thus, the testimony did not suggest anything about defendant's character or disposition. Moreover, the testimony had substantial probative value because it corroborated defendant's

confession in which he discussed the same incident at the pool. Therefore, admission of the testimony did not violate Evidence Code section 1101.

For the same reason, the court did not abuse its discretion in ruling that the testimony was not unduly prejudicial under Evidence Code section 352. Sitting in a hot tub at a motel pool is not inherently suspicious behavior that might evoke an emotional bias against defendant. The testimony had significant probative value, and the court acted within its discretion in allowing it.[25]

d. *Photographs of the burned Pontiac*

In anticipation of the testimony of FBI Agent Chris Hopkins, the defense objected to the admission of exhibit Nos. 63, 64, and 65 into evidence, photographs that depicted the contents of the trunk of the burned Pontiac. The defense argued the photographs were unduly prejudicial under Evidence Code section 352, but the court ruled the photographs were admissible. Hopkins later testified that he searched the trunk

---

[25] Defendant also argues the trial court erred by allowing Tracy M.'s daughter to testify about some photographs that had earlier been admitted into evidence, depicting Juli and Silvina at the Cedar Lodge. Defendant argues that this compounded the error the court had made in originally admitting the photographs. The defense raised no objection to Tracy M.'s daughter's testimony about the photographs and therefore forfeited the issue. (Evid. Code, § 353.) In addition, the testimony was relevant because it confirmed that Tracy M.'s daughter was at the Cedar Lodge at the same time as Juli and Silvina, and for the reasons stated above regarding the original admission of the photographs into evidence (see II.E.3.a., *ante*). The admission of the photographs through Tracy M.'s daughter's testimony was not unduly prejudicial.

area of the burned Pontiac and saw what appeared to be the charred skeletal remains of two people. He also identified exhibit Nos. 63, 64, and 65 as accurate depictions of the contents of the trunk, and he described those contents, identifying what appeared to him to be a skull and ribs.

Defendant argues that the court erred in allowing this photographic evidence, asserting that the prejudicial impact of the photographs outweighed their probative value. (Evid. Code, § 352.) The photographs, however, were relevant to prove the steps defendant took to conceal his crimes, including the effort to thoroughly destroy two of his victims' bodies. They also corroborated defendant's confession in which he described burning the Pontiac with the bodies in the trunk. The photographs, which depicted an incinerated mass that was difficult to identify, were not particularly gruesome, and Evidence Code section 352 does not override the prosecution's basic right to inform the jury of the details of a defendant's offense. The prosecution was entitled to present evidence showing the extent of defendant's effort to conceal his crimes even if such evidence was likely to place defendant in a negative light. (See *People v. Cortez* (2016) 63 Cal.4th 101, 128 ["For purposes of [Evidence Code section 352], 'prejudice' does not mean damage to a party's case that flows from relevant, probative evidence"]; *People v. Ramirez* (2006) 39 Cal.4th 398, 454 ["The photographs . . . did no more than accurately portray the shocking nature of the crimes"].) The court did not abuse its discretion in allowing this photographic evidence.

e. *Photograph of Juli's decomposed body*

Defendant objected under Evidence Code section 352 to the admission of exhibit no. 67, a photograph of Juli's

decomposed body, taken when the body was found about five weeks after her murder. Having viewed the photograph, the court overruled the objection, saying: "[P]hotograph 67 is the photograph of the victim['s body] when discovered before it was moved or altered. This is the position of the body when found. The People have made a contention that it has some evidentiary value as it might go to one of the special circumstances, or perhaps more because of the configuration of the body. [¶] And I can also tell you that, ordinarily, unless something is so gruesome that it completely desensitize[d] somebody where they could no longer be dispassionate and objective, again with that exception perhaps in mind, . . . a homicide victim, ordinarily, or a photo of the same, ordinarily, is routinely admitted in evidence for the trier of fact; especially one taken at the scene where the body was found." "This case involves a picture which, in my judgment, is not inflammatory. It is apparently a fair and accurate representation of a very unpleasant situation which happened to be brought on by the murderer's actions. This is how the crime was found." The trial court thus overruled the Evidence Code section 352 objection.

Defendant argues the court erred in admitting the photograph. The photograph was relevant to corroborate testimony from law enforcement officials and the medical examiner about the condition of Juli's body. In addition, the fact that the body was unclothed corroborated defendant's confession, in which he described sexually abusing Juli and then taking her, naked except for a blanket, to Vista Point, where he killed her. Although the photograph was disturbing due in part to the nature of the crime, a trial court has broad discretion over the admission of such evidence, and we routinely uphold the admission of such photographs. (See *People v. Parker* (2022)

13 Cal.5th 1, 42 (*Parker*).) Also, the prosecution is not limited to proving its case through live witnesses. (See *People v. Caro* (2019) 7 Cal.5th 463, 502; see also *People v. Michaels* (2002) 28 Cal.4th 486, 532 ["Although photographic evidence is often cumulative of testimonial evidence, that fact does not require its exclusion, '[b]ecause the photographic evidence could assist the jury in understanding and evaluating the testimony' "].) And the upsetting nature of the photograph is not materially different than the testimony and other evidence offered at trial regarding defendant's actions in this case. In short, we conclude that the probative value of the photograph was not clearly outweighed by its prejudicial effect. (*People v. Crittenden* (1994) 9 Cal.4th 83, 133–134.)[26] As such, the trial court did not abuse its discretion in admitting exhibit no. 67.

### 4. *Rulings excluding defense evidence*

Defendant argues the trial court erroneously excluded certain defense evidence during the guilt phase. We conclude the court acted within its discretion in excluding the evidence.

---

[26] The fact that the photograph was taken about five weeks after the victim was murdered was properly taken into consideration by the trial court. The trial court did not abuse its discretion in recognizing that the passage of time, and any prejudicial impact resulting therefrom, was due to defendant's own actions in concealing the body. Under the circumstances, the passage of time and resulting decomposed condition of the body does not establish that the trial court erred in admitting the photograph at issue. (See *People v. Thomas* (2023) 14 Cal.5th 327, 371–373 (*Thomas*) [rejecting the defendant's argument that various photographs, including ones depicting a victim's decomposed body in a field, were erroneously admitted].)

For the same reasons, we also find that the court did not violate defendant's state or federal constitutional rights.

### a. *Defendant's state of mind at the time of his confession*

Before defendant confessed to FBI agents on July 24, 1999, he attempted to negotiate for a monetary reward and housing advantages and access to child pornography during his anticipated incarceration. One FBI agent responded that it was "out of our hands" but that they would do what they could do. In its case-in-chief, the prosecution did not play the portion of the FBI interview in which this discussion took place. However, during Agent Rinek's cross-examination, the defense notified the court that it intended to ask Rinek about "certain portions of the tape in the very beginning where the agents are . . . offering inducements to [defendant]." The defense expressed concern that if it questioned Rinek about those inducements, the prosecution would then be permitted to present evidence of defendant's request for child pornography. Therefore, the defense wished the court to allow the defense to inform the jury of the inducements without informing the jury of the requests that led to those inducements. As the prosecutor explained: "They only want to tell half the story."

The court ruled the defense has the right to argue that defendant's statement is not credible because it was not voluntary, "[b]ut if you do that, you open the door to allowing the other concessions the defendant wanted to be admissible."

During the same cross-examination of Rinek, the defense also sought to admit excerpts from the video-recorded FBI interview (1) in which, during the crime scene walk-through, defendant described the locations where he hid certain items of

evidence, and (2) in which defendant agreed to write an apology letter to Juli. The defense argued this evidence was relevant to reveal defendant's state of mind at the time of his confession, but the court ruled the evidence went beyond the scope of the prosecution's direct examination, and that the defense therefore needed to offer it, if at all, as part of its case-in-chief.

Later, during the presentation of the defense case-in-chief, the defense called FBI Special Agent Hittmeier and asked him whether defendant cried or sobbed during the crime scene walk-through on July 25, 1999. Hittmeier recalled that defendant had wiped something from the side of his face, but it may have been sweat. He did not recall defendant sobbing. Defense counsel attempted to impeach Hittmeier with his preliminary hearing testimony. The prosecution objected, arguing that whether defendant was sobbing was irrelevant. The defense responded that the evidence was relevant to rebut the prosecution's evidence that defendant was sleepy and unemotional during the taxi ride from Sierra Village to Yosemite after he burned the Pontiac. The defense also noted that the evidence would rebut defendant's statement to the FBI that he was unemotional while committing the murders.

The court ruled that testimony regarding whether defendant was sobbing during the crime scene walk-through shed no light on his emotional state at the time of the crimes and was therefore inadmissible.

In its case-in-chief, the defense also sought to recall Rinek and present the video recording of the crime scene walk-through and of the portion of the FBI interview in which defendant agreed to write an apology letter to Juli. The defense argued this evidence contradicted the prosecution's evidence that

defendant was cold-blooded and unfeeling. The court ruled the evidence was irrelevant, again explaining that defendant's emotional state at the time of his confession had no relevance to his emotional state at the time of his crimes.

Defendant argues the court erred because, in his view, "Evidence that [his] confession was improperly induced on July 24th and that [he] was emotionally distraught and sobbing with remorse on July 24th and 25th would have countered the prosecution picture of [him] by showing his mental illness and tortured mental state, and his moral, mental and emotional conflict he was experiencing."

Contrary to defendant's argument, the court did not prohibit the defense from introducing evidence of inducements offered in exchange for his confession. Rather, the court ruled that if defendant offered evidence of inducements, the prosecution could offer evidence of the specific requests from defendant that gave rise to the asserted inducements. If the agents' assurances were presented outside their factual context, the jury would have had no basis for evaluating their meaning or evidentiary value. Thus, it was not error for the court to prohibit the defense from presenting a one-sided and piecemeal presentation of the facts. Defense counsel's strategic choice, following the court's ruling, not to present the evidence does not render the court's ruling erroneous.

As for the state of mind evidence the defense wished to present, the court reasonably determined that defendant's remorse at the time of his confession was irrelevant to any guilt phase issue. Evidence is relevant when it has a "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code,

§ 210.) Moreover, "The trial court has broad discretion to determine the relevance of evidence [citation], and we will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner." (*Jones*, *supra*, 57 Cal.4th at p. 947.) Evidence of defendant's remorse in July, when he confessed to his crimes, does not "tend[] in reason to prove or disprove" (Evid. Code, § 210) his emotional state five months earlier, when he committed his crimes. The court therefore acted within the scope of its discretion in ruling that the evidence was inadmissible. (Evid. Code, § 350.)

### b. *Eugene D.'s confession*

About a month after the Sund-Pelosso murders, investigators interviewed Eugene D., who was incarcerated at a state prison facility near Tracy, and may, at one point, have been a suspect in the murders.[27] In these interviews, Eugene D. provided information about the murders but his story changed multiple times, and he was unable to provide details that corroborated his claims, even asking at one point whether Juli had been shot. In the first five or six interviews, Eugene D. claimed he was not personally involved in the murders and instead implicated his half brother, Michael L., and an associate named Johnny N. In an interview on April 21, 1999, Eugene D. added that Michael L. may have been completing a contract "hit" for the Hells Angels motorcycle club.

---

[27] Investigators tried to find physical evidence to corroborate Eugene D.'s confession, focusing on fiber evidence and a ring Eugene D. had given to someone, and administering polygraph examinations that inconclusively suggested he may have had a connection to the murders.

On May 20, 1999, investigators transported Eugene D. to a command post that had been staged to make it appear he was the leading suspect. In that setting, Eugene D. radically changed his story, claiming that after using methamphetamine, he killed Carole and Johnny N. killed Silvina. He said that a man named Jeff K. sexually assaulted Juli and that Michael L. and a man named Larry U. killed her. This interview was not recorded, but a recording was made of an FBI agent summarizing the confession as Eugene D. agreed with the agent's statements.

The next day, May 21, Eugene D. recanted his confession. He denied involvement in the murders and said he had received all his information from news stories. Later the same day, however, Eugene D. offered two new versions of how the crimes occurred, again implicating Michael L., Johnny N., Larry U., and himself.

On June 15 and July 22, 1999, Eugene D. gave more versions of events surrounding the murders, again claiming to have been involved. Significantly, he changed his story when told there was physical evidence disproving his June 15 statement. Finally, in an interview on July 25, the day after defendant gave his detailed confession, Eugene D. conceded he had lied in his previous interviews.

At defendant's trial, the defense called Eugene D. to testify, and he invoked his Fifth Amendment right against self-incrimination. The defense sought to admit Eugene D.'s May 20 recorded confession into evidence, arguing that although it was hearsay, it was admissible as a declaration against the penal interest of the declarant (i.e., Eugene D.). (See Evid. Code, § 1230.) In the alternative, defendant sought to admit

Eugene D.'s confession for the nonhearsay purpose of impeaching the reliability of defendant's confession. First, Eugene D.'s confession would show defendant did not act alone despite his confession that he did. Second, the fact that both he and defendant used the word "nonchalantly" — Eugene D. said he "nonchalantly cut the victim's throat" and defendant said he "nonchalantly strangled the victim" — tended to show that neither confession was genuine and that both confessions were instead the product of suggestion.

The court rejected that theory, noting that defense counsel had already told the jury that defendant committed all three homicides and that the defense had, until that point, focused on defendant's mental state, not the overt circumstances of the crimes. The court did not see a connection between Eugene D.'s confession and the mental state defense.

The court then addressed the defense's theory regarding the use of the word "nonchalantly," finding that under Evidence Code section 352, "any relevancy is certainly outweighed by the impact it would have on the trier of fact, to wit: it would be confusing. It would be time consuming, and it would serve no legitimate purpose."

Defense counsel clarified that the defense would only introduce a few sentences of Eugene D.'s confession and the investigator's testimony regarding the circumstances of the confession. The court said it was "highly speculative" to "draw a connection of untoward investigative tactics or undue persuasion" based on both defendant's and Eugene D.'s use of the word "nonchalantly." The court also noted the evidence "would serve no purpose but to confuse the jury . . . and it would take an undue consumption of court economy and time." The

court ruled that Eugene D.'s confession was inadmissible, whether in whole or in part.

Defendant argues the court erred in excluding Eugene D.'s confession. We disagree. Eugene D.'s confession, which was not corroborated by physical evidence and which contradicted his many other statements, lacked credibility, particularly compared to defendant's confession, which was extremely detailed and thoroughly corroborated by physical evidence. In addition, the admission of Eugene D.'s confession into evidence would have led to considerable delay while the prosecution impeached Eugene D.'s character and demonstrated the improbability of his story. As the People argue: "There would [have been] a mini-trial on the [Eugene D.] investigation." Moreover, the defense's theories for why Eugene D.'s confession was relevant would likely have confused and misled the jury.

Defendant argues that Eugene D.'s confession was relevant as third party culpability evidence. "[T]hird party culpability evidence is admissible if it is 'capable of raising a reasonable doubt of [the] defendant's guilt.'" (*People v. Robinson* (2005) 37 Cal.4th 592, 625, quoting *People v. Hall* (1986) 41 Cal.3d 826, 833.) "[I]n making these assessments 'courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352).'" (*Robinson*, at p. 625.) We disagree with defendant that Eugene D.'s confession was admissible as third party culpability evidence. Nothing in Eugene D.'s confession referenced defendant's involvement in the murders. Instead, Eugene D. implicated Michael L., Johnny N., Larry U., and himself. The defense did not offer Eugene D.'s confession on a theory that

someone other than defendant had committed the murders. Rather, as defendant concedes, the defense wanted to show that the confession indirectly supported defendant's mental state defense by undermining his statement that he acted alone. This theory conceded defendant's culpability, and therefore for it to have any merit, Eugene D.'s version of the facts had to be evaluated and compared to defendant's version of the facts. Nothing in Eugene D.'s confession tracked the facts described by defendant and corroborated by physical evidence. Therefore, as the court concluded, there was no foundational credibility to the defense theory for why Eugene D.'s confession was admissible.[28]

c. *Video recording of lecture by Dr. Alan Waxman*

As stated in part I.A.3., *ante*, the People called Dr. Waxman in rebuttal to the defense case. Dr. Waxman criticized the "activation" method used by Dr. Wu and Dr. Buchsbaum, whereby the brain was in an active state when a PET scan was being administered. Dr. Waxman testified that a comparison of two brains in an active state might not reveal physiological differences between the brains. Dr. Waxman also said that the reliability of the activation method as a diagnostic tool was "investigational," and that the method was typically used only for research and not for diagnostic purposes.

---

[28] In support of its theory that defendant did not act alone, the defense also sought to admit evidence showing that a fingerprint of someone named Donald K. was on a beer can located near the burned Pontiac. The defense vaguely asserted that this individual had an association with "other people who confessed." The court did not allow the fingerprint evidence, and we conclude the court did not abuse its discretion in so ruling. The defense failed to lay a foundation for the admissibility of the evidence by, for example, demonstrating a connection between Donald K. and the people named in Eugene D.'s confession.

Dr. Waxman noted that he had once used the activation method when performing a study of a schizophrenic patient's brain function, but he considered it to be "research."

On cross-examination, defense counsel asked Dr. Waxman about the study he had performed of the schizophrenic patient — in particular, whether he had ever presented a lecture regarding that study. Dr. Waxman responded that he had presented on the study at least five times.

Defense counsel then sought to play for the jury a portion of a video of Dr. Waxman's lecture, to impeach his assertion that the use of the activation method was experimental. Outside the presence of the jury, the court listened to the three-minute recording in which Dr. Waxman described testing a schizophrenic patient using the activation method and finding that the patient did not activate his frontal lobe when asked to perform a complicated sorting test, which, in Dr. Waxman's opinion, was consistent with schizophrenia. But in the same lecture, Dr. Waxman qualified his conclusion, stating that "a lot of research has to be done to see the effect of any medication, a variety of other conditions in which this may happen from the personality disorders and so forth."

Defense counsel argued that Dr. Waxman's lecture was inconsistent with his trial testimony because he did not say in the lecture that the reliability of the activation method, as a diagnostic tool, was investigational, whereas in his trial testimony he repeatedly described it in those terms.

The court ruled the video recording was inadmissible, finding it was not inconsistent with Dr. Waxman's trial testimony. "The fact that there is now a claim that he gave a talk after the fact to one of five groups, apparently, and he did

not use the exact words that you claim that he used here in court as to the characterization of that PET scan, in my view is not inconsistent to the overall in-court testimony. And consequently, it's not admissible."

Defendant argues the court erred in excluding this impeachment evidence. A prior inconsistent statement is admissible for impeachment purposes under Evidence Code section 1235 if it is offered in compliance with Evidence Code section 770. But "[t]he 'fundamental requirement' of [Evidence Code] section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219.)

Here, the court reasonably determined that the video recording of Dr. Waxman's lecture was not inconsistent with his trial testimony. The recording did not suggest that the activation method was anything other than experimental, and Dr. Waxman made clear during the lecture that the technique was innovative and that "a lot of research has to be done." A fair interpretation of his lecture is that he believed the activation method to be worthy of further research and investigation, not that he believed it to be diagnostically reliable. Therefore, the recorded lecture was not inconsistent with his trial testimony, and the court did not err in excluding it.

Defendant argues that "the trial court permitted the prosecution to . . . hid[e] from the jury the fact that its own expert had employed the technology that Dr. Wu used." The record does not support defendant's contention. Defense counsel questioned Dr. Waxman extensively about his use of the activation method in his study of the schizophrenia patient. The only thing the jury did not hear was Dr. Waxman's recorded

lecture in which he made the same point he made during his testimony, i.e., that the technique was experimental and required more research. Therefore, we conclude the court did not abuse its discretion in excluding the video recording of Dr. Waxman's lecture.

### 5. *Guilt phase prosecutorial misconduct*

Defendant argues that the prosecutor committed misconduct at the guilt phase by improperly introducing victim impact evidence during his opening statement and disparaging a defense witness in front of the jury. We conclude that the prosecutor's statements did not constitute misconduct, and for the same reason, we also find the statements did not violate defendant's state or federal constitutional rights.

"Prosecutorial misbehavior 'violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." [Citation.] But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Rhoades* (2019) 8 Cal.5th 393, 418 (*Rhoades*).) The prosecutor's actions in the present case did not contravene these standards.

### a. *Improper victim impact evidence*

During his opening statement, the prosecutor said: "You see, back in January of 1999, Carole Sund, she's 42. She lived with her husband, Jens Sund, up in Northern California near the coast in Eureka, California. I don't know how many of you people are familiar with that Eureka-Arcata area. It's just

gorgeous. And life was great for them. Carole Sund was happy. She was active. She was active in her kids' lives. Wonderful kids. She had their own — her husband was Jens Sund. They lived together. They had a daughter Juli. She's 15 years old. She's a biological daughter. And they had three adopted kids, too. And you can imagine with four kids, mom was busy. Carole was active in the community, active with her kids. Life was great. [¶] Same thing for Juli. Healthy, happy, active 15-year-old girl. School cheerleading activities. Just a wonderful world. And this is back in January-February 1999. [¶] Silvina Pelosso, it's just an amazing story, she's from Argentina. The Sund family had known the Pelosso family for years. Literally, Silvina Pelosso, whose parents live in Argentina, she was one of Juli's lifetime best friends. Well, she is living her dream too, back in this time. She's over in the United States, staying at her best friend's house, and she's going to have the opportunity to even go to school in the United States of America. Life was just wonderful. [¶] And you know, as you sit there now, knowing what you know about the charges, that changed, and that changed dramatically at one point in time. And there is only one person that changed it, and that's this defendant." [29]

Defendant asserts the prosecutor committed misconduct by improperly introducing victim impact evidence. We reject his argument.

First, the defense never objected to the prosecutor's statement and therefore forfeited the issue. (See *People v. Dykes* (2009) 46 Cal.4th 731, 761 (*Dykes*).) Furthermore, the

---

[29] Defendant also cites the prosecutor's later comment that shortly before the murders, Juli and Silvina were happy, having fun, and feeling good.

prosecutor's statement was a summary of relevant evidence the People later introduced through the testimony of Jens and other witnesses. "[R]emarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor 'was "so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted." ' " (*People v. Wrest* (1992) 3 Cal.4th 1088, 1108; see *Dykes*, at p. 762.) It is true that the prosecutor's brief statement cast the lives of the victims in a charming light, but a prosecutor may make fair inferences from the evidence (see *Rhoades*, *supra*, 8 Cal.5th at p. 420), and the evidence supported the prosecutor's comments. Moreover, statements to the effect that the victims had done nothing to bring on defendant's attack was relevant to corroborate defendant's description of the victims in his confession. Additionally, the challenged comments were brief and not prejudicial in any event.

Defendant also argues the prosecutor committed misconduct by introducing, during the guilt phase, Jens's testimony and photographs of the victims while alive. We have already concluded above that the trial court acted within its discretion in ruling that such testimony was relevant and therefore admissible, and because it was admissible, the prosecutor did not commit misconduct by introducing it. (See *People v. Hawthorne* (2009) 46 Cal.4th 67, 94 (*Hawthorne*) ["because the trial court overruled defendant's objection, the prosecutor's questions, in accord with the ruling, were not misconduct"].)

b. *Disparaging a defense witness*

During direct examination of Dr. Silva during the defense case-in-chief, the following discussion took place:

"[The prosecutor]:  Can we take a break now, your honor, at this point?

"The Court:  You want to take a break?  All right.

"[The prosecutor]:  I am going brain dead listening to this.

"[Defense counsel]:  I am going to move for a mistrial based on that.  That's improper comment of counsel.  I would ask the court to admonish counsel not to make derogatory remarks about the defense.  That's totally improper.

"The Court:  No.  I agree.  The comment was not proper.  The motion for mistrial is denied.  [¶]  Ladies and gentlemen of the jury, just disregard that comment.  It wasn't a proper comment, and disregard it.  But it certainly doesn't form the basis for a mistrial."

Outside the presence of the jury, the defense asked for a stronger admonition, quoting from this court's decision in *Bolton*, a case in which the prosecutor insinuated to the jury that the defendant had a record of prior wrongful acts.  (*People v. Bolton* (1979) 23 Cal.3d 208, 215–216, fn. 5 (*Bolton*).)  The court declined to give a stronger admonition, noting that the prosecutor was not "insinuating anything about the defendant or about defense counsel," "wasn't describing the defendant or the witness or a defense counsel," and was instead commenting that he "needed a break."  The court stated it was "unfortunate[]" that the prosecutor said, " 'I am brain dead,' " but stated that the admonishment it gave "was the appropriate remedy."

Defendant argues that the prosecutor's comment was disparaging of Dr. Silva, and that the court erred by declining to give a stronger admonition or not declaring a mistrial.  But this case is nothing like *Bolton*, *supra*, 23 Cal.3d 208, a point the

court emphasized in making its ruling. Here, the prosecutor made the comment at the end of a long and technical direct examination, and the court immediately admonished the jury. The prosecutor's comment was not proper, but it did not suggest that Dr. Silva was wrong, unqualified, or lacked credibility. Instead, it suggested that the content of Dr. Silva's testimony was difficult to understand and perhaps overly long, and that listening to it was taxing the prosecutor's powers of concentration — something others in the courtroom also appeared to have been experiencing. For instance, shortly after the prosecutor made his comment, the court admonished defense counsel, saying: "I did indicate on several occasions that we should tighten this up. And I am saying this out of the presence of the jury. But I can observe from the jury's expressions and what is going on, that I think some of this is not assisting . . . [¶] . . . [I]t's very . . . technical. It's very difficult to listen to from the layperson's perspective. So, this has to be tightened up." Under these circumstances, a greater admonition than the one the court gave was not required. (See *People v. Tate* (2010) 49 Cal.4th 635, 688–689.)

As for the court's denial of the defense's request for a mistrial, "a motion for mistrial should be granted only when ' "a party's chances of receiving a fair trial have been irreparably damaged." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 282.) The prosecutor's brief comment did not irreparably damage defendant's chances of receiving a fair trial, and it was cured by the court's admonition, which we presume the jury followed. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1115 (*Guerra*).) Accordingly, the court did not abuse its discretion in denying the defense's request for a mistrial.

6. *Motion for judgment of acquittal*

The information alleged six special circumstances — one multiple-murder special circumstance (§ 190.2, subd. (a)(3)) and five different felony-murder special circumstances (*id.*, subd. (a)(17)(A) [robbery murder], (a)(17)(B) [kidnapping murder], (a)(17)(C) [rape murder], (a)(17)(F) [oral copulation murder], (a)(17)(G) [burglary murder]). At the close of the prosecution's case-in-chief, the defense moved, pursuant to section 1118.1, for a judgment of acquittal on the five felony-murder special-circumstance allegations, arguing that defendant intended murder and only incidentally committed the specified felonies. The defense asserted that defendant did not independently intend the felonies and commit murder in the course of committing the felonies. (See, e.g., *People v. Dement* (2011) 53 Cal.4th 1, 46 ["Generally, to prove a felony-murder special circumstance like murder in the commission of attempted oral copulation, ' "the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder" ' "].) The court denied the motion without comment. Defendant argues the court erred and emphasizes that murder was his primary motivation.

"In considering whether the trial court erred in failing to grant the motion for judgment of acquittal under section 1118.1 . . . , we ask whether 'there is any substantial evidence, including all reasonable inferences to be drawn from the evidence, of the existence of each element of the offense charged.' " (*People v. Watkins* (2012) 55 Cal.4th 999, 1019.) "When, as here, the motion under section 1118.1 was made 'at the close of the prosecution's case-in-chief, the sufficiency of the evidence is tested as it stood at that point' in the trial

[citation] — in other words, based on the prosecution's case alone, and without considering the evidence subsequently adduced during the presentation of the defense case or evidence produced by the prosecution on rebuttal." (*Ibid.*)

The jury found the robbery-murder special-circumstance allegation not true. Hence, any claim of error related to the court's refusal to dismiss that special circumstance is moot. As to the other felony-murder special circumstance allegations, the prosecution's case-in-chief presented substantial evidence to support a true finding on each of the allegations.

" ' "[A] jury deciding the truth of the special circumstance allegation is not required to assign a hierarchy to the defendant's motives in order to determine which of multiple concurrent intents was 'primary . . .' . . . ." ' [Citation.] Instead, to find true a felony-murder special circumstance, the jury need only determine that ' "the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder." ' [Citation.] 'Concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 345.)

Here, putting aside the robbery-murder special circumstance (§ 190.2, subd. (a)(17)(A)), the information alleged special circumstances based on kidnapping murder (*id.*, subd. (a)(17)(B)), rape murder (*id.*, subd. (a)(17)(C)), oral copulation murder (*id.*, subd. (a)(17)(F)), and burglary murder (*id.*, subd. (a)(17)(G)). We conclude defendant's confession provided substantial evidence that he had an independent felonious purpose to commit the offenses of kidnapping, rape, oral copulation, and burglary, and therefore that these felonies

were not merely incidental to his intended murders. Specifically, defendant admitted that when he entered the victims' room, he was motivated by a desire to have sex with young girls, and he quickly proceeded to force Juli to orally copulate him and attempted to rape her. Thus, the record provides substantial evidence from which the jury could infer that he entered an occupied room with intent to commit both oral copulation (former § 288a) and rape (§ 261), and derivatively that he intended first degree burglary (see §§ 459, 460). Although he also intended murder, the jury could reasonably infer from the evidence that defendant intended first to commit the sex crimes against at least the child victims, and therefore he had concurrent intents to commit the sex crimes and to commit murder.

As for the kidnapping-murder special circumstance, the jury could reasonably infer that when, shortly before dawn, defendant took Juli from the Cedar Lodge, he wanted to move to a private location so he could continue to sexually assault her, and therefore the jury could infer that the kidnapping (§§ 207, 208) was motivated by a purpose independent from the murder. In fact, when they arrived at Vista Point, defendant forced Juli to orally copulate him before he murdered her. Therefore, the jury could infer that he had concurrent intents to kidnap Juli for the purpose of sexual assault and for the purpose of murder.

Therefore, we determine that the trial court properly denied defendant's section 1118.1 motion. For the same reason,

we conclude the court did not violate defendant's state or federal constitutional rights.[30]

### 7. *Motion to discharge Juror No. 5*

On August 6, 2002, out of the presence of the jury, defense counsel moved for the discharge of Juror No. 5, asking for his replacement by an alternate juror. The defense argued that Juror No. 5 had been untruthful with the court during voir dire. Six days later, the defense filed a written motion to discharge Juror No. 5.

Question 47 of the voir dire questionnaire asked whether the prospective jurors had "ever been . . . accused . . . of a crime." Question 49 asked whether the prospective jurors had "ever sought the assistance of a . . . drug or alcohol counselor[] or other mental health professional." Juror No. 5 answered "[n]o" to both questions, but sometime in the summer of 2002, it came to the attention of defense counsel that in 1996, six years before defendant's trial, Juror No. 5 had been detained and cited for public intoxication and had refused an officer's instruction to reenter his home. Juror No. 5 had then attended Alcoholics Anonymous (AA) meetings, after which the public intoxication

---

[30] In a section heading of his brief, defendant asserts the court violated his rights by denying his motion under section 995 to dismiss the robbery-murder, kidnapping-murder, and burglary-murder special-circumstance allegations. His brief, however, does not develop this argument. The section 995 motion to dismiss, which was filed several months after the preliminary examination, was based on the same theory as the later section 1118.1 motion, seeking a judgment of acquittal, and for the same reasons, we conclude the trial court's ruling as to the robbery-murder special-circumstance allegation is moot, and its ruling as to the kidnapping-murder and burglary-murder special-circumstance allegations was not error.

citation was dismissed. Defendant argues this detention and citation constituted a criminal accusation, and that the AA meetings constituted the assistance of an alcohol counselor, and that Juror No. 5 should have therefore disclosed these events in response to questions 47 and 49.

On August 6, 2002, defendant orally moved for discharge of Juror No. 5, asserting juror misconduct and bias, then filed a written motion to the same effect. (Code Civ. Proc., § 233.) The court conducted an in camera hearing to protect the juror's privacy. Juror No. 5 told the court that he did not think he needed to disclose the citation because it had been dismissed. He also conceded he was "going a little too fast" and was "a little negligent" in filling out the questionnaire. He did not interpret his participation in AA to be the sort of counseling referred to in question 49. Instead, he thought the question referred to a residential or managed drug and alcohol rehabilitation program. He also stated that these events, which took place in 1996, had not biased him as to either party in the present case, and that he could be completely fair and impartial.

Defense counsel argued that Juror No. 5 either lacked candor or was unable to adequately comprehend English (Juror No. 5 was born overseas). Defense counsel also stated that Juror No. 5 had violated his oath and that his claim that he could be impartial was "predictable."

After considering the arguments of defense counsel in light of Juror No. 5's responses, the court stated it did not think that AA was the sort of counseling to which question 49 referred. The court further ruled that Juror No. 5's failure to disclose his citation was "unintentional and inadvertent" and would not affect his ability to be a fair and unbiased juror in this case.

Accordingly, the court denied the motion to discharge Juror No. 5.

Defendant asserts that the court erred and that the judgment must be reversed. He points to the following language in *In re Hitchings* (1993) 6 Cal.4th 97 (*Hitchings*) to support his argument: " 'The prosecution, the defense and the trial court rely on the voir dire responses in making their respective decisions, and if potential jurors do not respond candidly the jury selection process is rendered meaningless. Falsehood, or deliberate concealment or nondisclosure of facts and attitudes deprives both sides of the right to select an unbiased jury and erodes the basic integrity of the jury trial process.' " (*Id.* at p. 112, quoting *People v. Blackwell* (1987) 191 Cal.App.3d 925, 929.)

On the record before us, the trial court did not err. "Although intentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal [citations], mere inadvertent or unintentional failures to disclose are not accorded the same effect." (*People v. McPeters* (1992) 2 Cal.4th 1148, 1175 (*McPeters*).) Moreover, "Whether a failure to disclose is intentional or unintentional and whether a juror is biased in this regard are matters within the discretion of the trial court. Except where bias is clearly apparent from the record, the trial judge is in the best position to assess the state of mind of a juror or potential juror on voir dire examination." (*Ibid.*; see *People v. San Nicolas* (2004) 34 Cal.4th 614, 644; *In re Boyette* (2013) 56 Cal.4th 866, 890 [" 'an honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias' "].)

Here, the court held a hearing and ruled that the juror's omission of the citation he received was unintentional and that his attendance at AA meetings did not, "strictly speaking," constitute alcohol counseling. Last, the court found that Juror No. 5's ability to remain impartial was not affected. The record of the hearing supports the court's determination. Thus, there was no abuse of discretion. (*McPeters*, *supra*, 2 Cal.4th at p. 1175.) Moreover, the asserted inaccuracies at issue in this case — failure to disclose a misdemeanor citation and participation in AA meetings — were relatively minor and bore no material relationship to the facts of this case. (Cf. *Hitchings*, *supra*, 6 Cal.4th at p. 119 ["juror misconduct involving the concealment of *material* information on voir dire raises the presumption of prejudice" (italics added)].) Nothing suggests that Juror No. 5 hid the matters to conceal a bias against defendant, making the cases on which defendant relies — all of which involved deliberate concealment about material information — inapt. The court's decision to allow Juror No. 5 to remain on the jury was not error, and for the same reason the decision did not violate defendant's state or federal constitutional rights.

## F. Sanity Phase Issues

### 1. *Motion to exclude Dr. Park Dietz's testimony*

As noted, Dr. Dietz, a forensic psychiatrist, interviewed and evaluated defendant for the prosecution. He testified at the sanity phase that, in committing the charged crimes, defendant knew and understood the nature and quality of his actions and knew his actions were wrong. Before the sanity phase began, the defense moved to exclude Dr. Dietz's testimony, arguing Dr. Dietz was not licensed to practice medicine in California,

and his testimony would therefore violate Business and Professions Code section 2052.[31] The court denied the motion, saying: "There's no law in California that says you have to be licensed to testify as an expert witness. [¶] . . . [¶] The issue as to whether or not a person is qualified to testify as an expert witness is an issue for the court to decide, and that's based upon Evidence Code section 720." The court also explained, "I don't agree with the position that an expert witness in the context of this sanity phase trial, who is going to testify as to the issue as to legal sanity, is giving a legal diagnosis or a medical diagnosis. A diagnosis, in the court's view, that is prescribed by that Business and Professions Code section is a person who is actually acting as a medical practitioner . . . . You can't do that unless you're licensed. You can't give that kind of a diagnosis. That's against the law. [¶] This is not the same when an expert witness testifies as a psychiatrist or psychologist in a . . . sanity phase trial. . . . So, whether he has a license or not is not relevant to the admissibility of his testimony. [¶] . . . So, that request to disallow his testimony because he is not licensed is ordered denied."

---

[31] Business and Professions Code section 2052, subdivision (a) states in relevant part: "Notwithstanding Section 146, any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a public offense . . . ."

Defendant argues the trial court erred in concluding that licensure was not a precondition to being allowed to testify as an expert. We disagree. Business and Professions Code section 2052 regulates the practice of medicine. Expert witness testimony, by contrast, is governed by Evidence Code section 720, which sets forth a broader range of considerations in determining the circumstances under which a witness is allowed to give an expert opinion. Evidence Code section 720, subdivision (a) states that "[a] person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." Defendant does not contend that Dr. Dietz did not qualify as an expert under Evidence Code section 720. As noted by the court, Dr. Dietz was not treating defendant or giving a clinical diagnosis when he gave his opinion about defendant's mental state. Accordingly, we reject defendant's argument that Business and Professions Code section 2052 precluded Dr. Dietz from providing relevant expert testimony. The court did not err. (See *People v. Catlin* (2001) 26 Cal.4th 81, 132 (*Catlin*); *People v. Villarreal* (1985) 173 Cal.App.3d 1136, 1142.)

Defendant cites *In re Catherine S.* (1991) 230 Cal.App.3d 1253 in support of his view that Dr. Dietz's testimony should have been excluded. That case held that the expert opinion of one licensed psychologist and one unlicensed psychologist was insufficient to support a denial of parental reunification services under Welfare and Institutions Code section 361.5. But, as the *Catherine S.* court noted, the definition of " 'mental disability' " in Welfare and Institutions Code section 361.5 expressly incorporated the requirement of Civil Code former section 232 that the evidence of such disability come from "either a

physician, a surgeon, or a 'licensed psychologist.' " (*Catherine S.*, at p. 1255.) Thus, the holding in *Catherine S.* was based on an express statutory requirement. No such statutory requirement is present here, as defendant concedes.

Defendant argues, however, that allowing Dr. Dietz to testify despite being unlicensed in this state violated the Eighth Amendment guarantee of heightened reliability in death penalty cases. (See, e.g., *Simmons v. South Carolina* (1994) 512 U.S. 154, 172 (*Simmons*) (conc. opn. of Souter, J.); *People v. Bloom* (1989) 48 Cal.3d 1194, 1228.) We reject this argument. For purposes of protecting the reliability of defendant's trial, the critical question was whether Dr. Dietz was properly qualified as an expert under Evidence Code section 720, not whether he was licensed in the state of California to practice medicine. (See *Jenkins*, *supra*, 22 Cal.4th at p. 1044.) For the same reason, we find it does not violate the Eighth Amendment to execute a person whose sanity determination is based, in part, on the testimony of an unlicensed, but fully qualified, psychiatric expert.

## 2. *Exclusion of extrajudicial statements*

Defendant argues that the trial court erred in excluding certain testimony during the sanity phase. We disagree. The trial court correctly excluded the testimony and exclusion of the testimony did not violate defendant's state or federal constitutional rights.

### a. *Factual background*

Cedar Lodge coworker Elvia D. testified at the sanity phase as part of the defense's case-in-chief that defendant told her twice that he had visions, nightmares, and headaches. Defense counsel asked Elvia D. about the content of the visions

and nightmares, and the prosecution objected on hearsay grounds. The defense argued that defendant's statement to Elvia D. was admissible under Evidence Code section 1250 as "a statement of the declarant's then existing state of mind, emotion, or physical sensation." Outside the presence of the jury, defendant made an offer of proof that Elvia D. would testify that defendant thought he was "somehow responsible" for his uncle's death because he "dreamt something" and had a "premonition." Counsel explained this was relevant to defendant's state of mind because "Dr. Dietz and Dr. McInnes will testify that one of the symptoms of . . . schizotypal personality disorder is a preoccupation with thoughts or connections between what someone dreams about and what actually happens," and the testimony would support their opinion that defendant suffers from that disorder. Counsel also argued the statement was not hearsay because, "whether in fact the substance of what he said is true or not, he is expressing to her a symptom that again is being relied upon by the experts."

The court ruled the testimony was not admissible, stating: "I don't believe it comes within [Evidence Code] 1250 because it isn't a declaration at that time as to the present existing state of mind when he's recounting something that happened previously with respect to a dream he had about his uncle. And the terminology you use, to wit: that this is an obsession is a conclusion. [¶] Apparently, it's just a conversation he had at least up to this point in time. . . . And the nonhearsay offer of proof, that it's being offered for a nonhearsay purpose I think, to be quite frank, is just too confusing for the jury to understand."

Becky T. testified as part of the defense's sanity phase that she saw defendant almost every day between 1979 and 1986 and that defendant told her many times that he heard voices.

Defense counsel asked Becky T. if she had advised defendant to seek mental health treatment. The court sustained a relevance objection. Defense counsel also asked Becky T. whether defendant had ever expressed a wish that the voices in his head would stop, or whether he suggested that the voices were driving him crazy. The court sustained hearsay objections to both questions.

Outside the presence of the jury, defendant made an offer of proof regarding the proffered testimony of Amber B., who would testify that defendant told her he had dreams involving a man whose face he could not see. Once, when defendant told Amber B. that a voice in his head told him "to do that job now, right now," Amber B. suggested to him that it was the voice of the man in his dreams. Amber B. would also testify that defendant sometimes argued with the voice, saying: "Shut up."

The prosecutor objected to Amber B.'s testimony on hearsay grounds, and defense counsel again argued the statements were admissible as statements of defendant's "then existing state of mind, emotion, or physical sensation." (Evid. Code, § 1250, subd. (a).) The court sustained the prosecutor's objection. It did not think defendant's statements to Amber B. were statements of his then existing state of mind because he was telling her about things that had happened to him in the past. The court also ruled defendant's statements were not admissible as nonhearsay because it would confuse the jury if admitted for such a limited purpose. (Evid. Code, § 352.)

b. *Analysis*

Defendant argues that his statements to Elvia D., Becky T., and Amber B. were admissible under Evidence Code section 1250. That section creates an exception to the hearsay

rule allowing an extrajudicial statement to be admitted for its truth if the statement expresses the declarant's "then existing state of mind." (Evid. Code, § 1250, subd. (a).)[32] But here, the testimony concerned defendant's extrajudicial description of his *prior* dreams, hallucinations, and reactions to dreams and hallucinations. According to the defense's offer of proof, the witnesses would testify that defendant spoke to them about his *recollection* of these experiences. The offer of proof did not suggest that at the time defendant spoke to Elvia D., Becky T., or Amber B., he was *then* dreaming, hallucinating, or having an active mental reaction to such an experience. Therefore, defendant's statements were not descriptive of his "then existing state of mind," and they did not fall within the hearsay exception described in Evidence Code section 1250. (See *People v. Whitt* (1990) 51 Cal.3d 620, 642–643.)

Defendant argues that his extrajudicial statements to Elvia D., Becky T., and Amber B. were also admissible for the fact that they were uttered, not for their truth. The court ruled, however, that admission of the statements on that nonhearsay theory would be confusing to the jury, and therefore it excluded

---

[32] Evidence Code section 1250 provides in full: "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant. [¶] (b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

the statements under Evidence Code section 352. We review the court's application of Evidence Code section 352 for abuse of discretion. (*Helzer, supra,* 15 Cal.5th at p. 667.) The defense's nonhearsay theory supporting admission asked the jury to conclude that even if defendant had never had the dreams and hallucinations he described to Elvia D., Becky T., and Amber B., his extrajudicial statements to them showed a mental preoccupation that tended to prove he was suffering from psychiatric disorders prior to the murders, thus corroborating the conclusions of the defense's psychiatric evaluators.

We conclude that the probative value of such a limited use of defendant's extrajudicial statements was negligible, and, as the trial court determined, the jury was very likely to be confused and to misunderstand the limited use to which the evidence could be put. (See *People v. Sanchez* (2016) 63 Cal.4th 665, 684.) Accordingly, the court did not abuse its discretion in excluding the evidence under Evidence Code section 352. Further, for the same reason, we find the court did not violate defendant's state or federal constitutional rights. The application here of standard state rules of evidence did not unduly constrain defendant's constitutional right to present a defense. (Cf. *Rock v. Arkansas* (1987) 483 U.S. 44, 56–57 (*Rock*); *Chambers v. Mississippi* (1973) 410 U.S. 284, 302 (*Chambers*); see *People v. Lightsey* (2012) 54 Cal.4th 668, 717 (*Lightsey*) ["[T]he high court's decision in *Chambers* [citation] did not obligate the trial court to allow defendant to present evidence of his own hearsay statements as a means to, in effect, testify without subjecting himself to cross-examination"].)

### 3. *Sanity phase prosecutorial misconduct*

Defendant argues the trial court erred by allowing the prosecutor to cross-examine the defense's sanity phase expert witness regarding her view of the ultimate issue of defendant's legal sanity or insanity. Defendant further argues that the cross-examination constituted prosecutorial misconduct. We conclude defendant suffered no prejudice from the court's decision to allow the cross-examination, and since the cross-examination was permitted by the court, it was not prosecutorial misconduct.

### a. *Factual background*

Before the sanity phase trial began, the defense brought a motion arguing that "no expert should be permitted to express an opinion that [defendant] was sane or insane or that he was capable or incapable of knowing [and] understanding the nature and quality of his act, or of distinguishing right from wrong at the time of the commission of the crimes." The reasoning of the motion was that in a sanity phase trial, the ultimate issue of whether the defendant is legally sane or insane at the time of his or her criminal actions is for the trier of fact to decide, and therefore a psychiatric expert should not be allowed to testify to his or her view of that ultimate issue. The defense also took the position that the statutory elements of legal insanity were legal concepts, not medical concepts, and therefore a mental health expert should not give an opinion regarding the presence or absence of those statutory elements.

At the hearing on the motion, the People argued the law did not preclude psychiatric experts from testifying regarding the ultimate issue, but the prosecutor commented that the People's psychiatric expert, Dr. Dietz, would not do so, although

he *would* testify about the presence or absence of the statutory elements of the insanity defense. The prosecutor said that Dr. Dietz "has placed his own limitation based on ethical restrictions in his own industry, and he will not be addressing sanity." Thus, the limitation placed upon Dr. Dietz's testimony was due to his own ethical determination, not to any constraint imposed by the Evidence Code.

The court ruled that the expert witnesses were permitted to address the ultimate issue of legal sanity or insanity: "[I]n a sanity phase trial . . . , the fact that somebody has a mental illness in the abstract means nothing. It doesn't mean anything. It doesn't mean somebody's legally sane or legally insane. And the trier of fact has to have some assistance to make that determination, and that's where the expert witness, psychiatrist, psychologist comes into play. [¶] And . . . it comes into play to the point in the court's view wherein . . . an expert can actually say in his or her opinion . . . whether somebody is legally sane or insane at the time of the commission of the offense for which he or she was convicted. [¶] That being said, apparently if you feel that there's a conflict in Dr. Dietz and what he's doing and his interpretation of his code of ethics, so be it, but that's not something that goes to the legal admissibility of his testimony."

Based on the court's ruling, the defense called its psychiatric expert, Dr. McInnes, to testify about the statutory elements of the insanity defense set forth in section 25, subdivision (b). During cross-examination, the prosecutor clarified Dr. McInnes's testimony, also asking her about the ethical guidelines of the American Psychiatric Association (APA), the same guidelines that had apparently informed

Dr. Dietz's ethical conclusion.  The cross-examination proceeded as follows:

"Q.  . . . In your direct testimony, did you offer a bottom-line opinion on whether or not you thought the defendant was sane or insane?

"A.  Absolutely.

"Q.  Pardon me?

"A.  Yes, I did.

"Q.  Okay.  I don't want to misstate this, because if you didn't say in your opinion on direct examination [that] he was insane, and [if instead] you only testified on the prongs, that's a distinction.  [¶]  So, do you recall whether or not you offered a bottom-line opinion on direct examination that you thought this defendant was insane at the time of the crime?"

After an overruled objection, the cross-examination continued:

"Q.  . . . Well, are you of the opinion that he's insane at the time he committed this?

"A.  Yes, I am.

"Q.  Okay.  Now, obviously you are familiar with the [APA]'s ethical guidelines on the insanity defense, right?

"A.  Yes, I have them right here.

"Q.  I take it [that] counsel has provided them to you, right?

"A.  They did.

"Q.  Would you agree with me, at least as to the APA, that forensic — "

Defense counsel then interrupted and asked to approach the bench. Outside the presence of the jury, defense counsel argued: "We came in [before the sanity phase trial] with this objection to the court that these ethical guidelines prevented her from expressing an opinion on the ultimate issue. Our understanding of the court ruling was that those guidelines did not prevent . . . Dr. Dietz from rendering that opinion. We then advised her of the court's ruling. And I indicated on the record at the time the court ruled that, in light of the court's ruling, we would, in anticipation of Dr. Dietz giving his ultimate opinion, instruct this witness that, despite these guidelines, she was to express an opinion. [¶] So, . . . in order to address this fairly, we then have to bring out through her that the court had made a ruling, and [that] we had instructed her on this ethical issue. And I don't think that's really germane to the sanity issue, because it does get us sidetracked into legal issues and advice she was given by the attorneys in light of the court's ruling." Defense counsel later added: "[W]hatever the court's ruling, [we] understood it to mean that this expert was required by the court's ruling to give an opinion, and we informed her of that."

In response, the court noted that it had permitted expert witnesses to testify to the ultimate issue, but it had not *required* them to do so. After more discussion, that court said: "[Let's] handle it in this fashion. On redirect you can ask her directly what you said to her and why she has given this opinion, and that will clear it up. You can do that just by asking her. And I'll let you ask a leading question in that respect." Defense counsel agreed to that solution.

When the prosecutor's cross-examination of Dr. McInnes resumed, the prosecutor, as anticipated, asked whether the APA's guidelines advised forensic psychiatrists not to testify to

the ultimate issue of whether a defendant is legally sane or insane. Dr. McInnes agreed that the APA's guidelines advised against such testimony because legal insanity is a legal concept, not a medical concept. The prosecutor then asked whether Dr. McInnes saw any ethical problem with testifying to the ultimate issue, and she said: "I agree with the statement in the APA."

During redirect examination, defense counsel followed the suggestion of the trial court and brought out the legal background that underlay Dr. McInnes's testimony. The following exchange took place:

"Q. [Dr.] McInnes, before we broke we were talking about the APA guidelines. I want to ask you a question. Was it your understanding based on the court's ruling that you were going to be permitted to testify, to state an opinion as to whether [defendant] in fact met the three prongs that are a part of the test for legal insanity?

"A. For whatever reason, I thought that I had to.

"Q. All right. And that's what you did, correct?

"A. Yes.

"Q. And you address the three prongs in your direct testimony?

"A. Yes.

"Q. Rather than the ultimate issue, correct?

"A. Yes."

b. *Analysis*

Evidence Code section 870 provides that "[a] witness may state his opinion as to the sanity of a person when: [¶] . . . [¶]

(c) [t]he witness is qualified under Section 800 [lay opinion testimony] or 801 [expert testimony] to testify in the form of an opinion." Further, Evidence Code section 805 clarifies that "[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." Thus, it is clear that, in a sanity phase trial, a psychiatric expert may, as an evidentiary matter, give an opinion on the ultimate issue of whether the defendant was legally sane or insane at the time of their criminal actions. (See Pen. Code, § 29 [prohibiting expert testimony on the ultimate issue but limiting that rule to the guilt phase of a criminal trial]; *People v. Kelly* (1992) 1 Cal.4th 495, 539, fn. 10.) Thus, we see no error in the trial court's denial of defendant's motion to limit the testimony of the expert witnesses on the ultimate issue of sanity. That said, whether the impeachment of Dr. McInnes was proper is a different matter.

Here, Dr. McInnes testified that defendant was legally insane. She did so, it appears, because of two reasons. First, defense counsel believed that in denying defendant's motion to limit the testimony of the expert witnesses on the ultimate issue of sanity, the court was *requiring* the experts to opine on the ultimate issue. Second, defense counsel told her to opine on the ultimate issue. Indeed, on redirect examination, Dr. McInnes confirmed that she only offered her opinion of defendant's sanity because she believed she had to do so. Of course, once Dr. McInnes testified as to the ultimate issue, the prosecution could, for impeachment purposes, show she did so despite the prosecution's belief that the APA's guidelines advised her not to offer such an opinion.

Yet, we need not determine whether the trial court erred in allowing such impeachment during the cross-examination of Dr. McInnes. Significantly, the court allowed the defense to inform the jury, through leading questions during redirect examination, that it had expressly advised Dr. McInnes to testify to the ultimate issue, thus negating any suggestion that Dr. McInnes did not take the APA's ethical guidelines seriously. Thus, any prejudice from the misunderstanding about the court's ruling was abated by this clarification. We further note the prosecutor did not suggest during closing argument that Dr. McInnes's purported failure to follow the APA's guidelines called her opinions into question. Accordingly, it is not "reasonably probable" that without Dr. McInnes's brief testimony on the ultimate issue, and without her suggestion on cross-examination that such testimony violated the APA's guidelines, the jury would have returned a verdict of insanity. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)[33]

Next, quoting *People v. Bell* (1989) 49 Cal.3d 502, 532, defendant argues that " '[t]he deliberate asking of questions calling for inadmissible and prejudicial answers,' " as he alleges occurred here, "is [prosecutorial misconduct.' " We disagree.

---

[33] Defendant points out that the jury requested a readback of the portion of Dr. McInnes's testimony in which she discussed "her position on sanity as compared to Dr. Silva, Dr. Dietz, [and] Dr. Harper." In response to the jury's request, the court selected certain sections of the reporter's transcript and asked the court reporter to read those sections to the jury. But these sections that were read back to the jury did *not* include the prosecutor's use of the APA's guidelines to cross-examine Dr. McInnes. Thus, the readback request does not support defendant's argument that the prosecutor's use of the APA's guidelines was prejudicial.

The prosecutor's line of questioning was consistent with the court's ruling, and therefore it could not have been misconduct. (See *Hawthorne, supra,* 46 Cal.4th at p. 94.)

Defendant also argues that "[k]nowing that there was a dispute in the profession about the scope of the 'ethical' rules, the skilled prosecutor exploited that conflict by seeking to expand on Dr. McInnes's testimony on direct examination." The trial transcript suggests otherwise. The prosecutor merely asked Dr. McInnes to clarify whether she had earlier testified to the ultimate issue, and when she responded that she had done so, he asked her whether she was "of the opinion that he's insane at the time he committed" his crimes, to which she responded in the affirmative. She could have declined, on ethical grounds, to give an opinion, but she did not. It is true, as defendant argues, that defense counsel had previously advised Dr. McInnes to testify to the ultimate issue, but there is no evidence that the prosecutor, when questioning Dr. McInnes, knew of that fact and was intending to lay a trap for her or otherwise exploit the situation.

For all these reasons, we conclude that any error in the court's decision to permit the prosecutor's line of questioning was harmless, and that the prosecutor did not commit misconduct. Additionally, we find that the court did not violate defendant's state or federal constitutional rights.

### 4. *Cross-examination of Dr. Park Dietz*

Defendant argues that the court imposed improper limits on the scope of defense counsel's cross-examination of Dr. Dietz on two topics. We conclude that the limitations the court placed on the cross-examination of Dr. Dietz were appropriate, and

therefore that the court did not violate defendant's state or federal constitutional rights.

### a. *Hawaii case*

During cross-examination, defense counsel asked Dr. Dietz whether it was possible for a person to engage in methodical, goal-directed behavior and still be incapable of distinguishing right from wrong. Dr. Dietz stated he had seen two cases that matched that description, including the case of *State v. Uyesugi* (Hawaii 2002) 60 P.3d 843 (*Uyesugi*). Dr. Dietz described that case as one in which the defendant, who had a 10-year history of paranoid delusional symptoms known to his employer, went to his workplace and methodically shot and killed eight coworkers, contemplated a shootout with the police or suicide, and was eventually captured after a manhunt. Under Hawaii law, which "differs quite a bit from the California test," "it was the case that this man, because of his illness, could not emotionally appreciate how wrong his actions were."

Dr. Dietz said he examined the defendant in that case on behalf of the defense. Defense counsel asked: "And he told you that in reference to these people he killed at his job, that he previously considered beating up his co-workers; didn't he tell you that?" Dr. Dietz responded, "Yes." The prosecutor objected to "the details of that case" as irrelevant. The court said, "Well, we had a previous hearing about this as far as not getting into details of previous cases. Now we are getting into a lot of detail here about a previous case which is not relevant to this particular case. Did you intend to go further into the details of that case?" Counsel said he wished to explore Dr. Dietz's definition of " 'appreciate the nature and quality of the acts.' "

The court ruled that was irrelevant because Hawaii law is different from California law.

Defense counsel then sought to elicit from Dr. Dietz that in the Hawaii case, he had concluded the defendant could not "appreciate the wrongfulness of his conduct" despite having "goal-directed behavior." The prosecutor responded with a relevance objection, arguing that the term "appreciate" is not included in California's insanity standard. Defense counsel then attempted several times to question Dr. Dietz about the opinion he gave in the Hawaii case, and each time the court sustained objections based on the difference between the Hawaii and California insanity standards. Finally, the court told defense counsel: "[T]o ask if he's testified previously in another jurisdiction with a different standard and testified in a certain way is not relevant."

A few days later, defense counsel returned to the subject of Dr. Dietz' testimony by filing an offer of proof and a motion to strike Dr. Dietz's testimony. The offer of proof was a transcript from a Texas death penalty case in which Dr. Dietz was cross-examined concerning his testimony in the Hawaii case. The defense sought permission to pursue a similar line of questioning in the present case, thus showing the jury that Dr. Dietz's opinions varied depending upon which party hired him. The court explained that it did not permit the prior testimony because of the difference in Hawaii law and California law. The court then stated: "Now, with respect to the general subject matter of impeaching a witness by prior recorded testimony, if it's inconsistent with his in-court testimony, anybody certainly has the right to do that. [¶] . . . [¶] But, on the other hand, if the testimony which is alleged to be a prior inconsistent statement is a statement predicated upon a

different standard, if you will, of insanity, then in the court's view, it's not relevant. So . . . that's where I was coming from when I made the ruling I made." Defense counsel argued that the insanity standard was the same in California and Hawaii, asserting that the term "appreciate" is an implied component of the insanity standard set forth in section 25, subdivision (b). The court responded: "I'm not going to instruct the jury that 'appreciate' is included in CALJIC 4.00."

Defendant argues the court abused its discretion by precluding defense counsel from cross-examining Dr. Dietz regarding his prior testimony in the Hawaii case.

A party has broad latitude when cross-examining an expert witness, but the cross-examination must be aimed at producing relevant evidence (see *People v. DeHoyos* (2013) 57 Cal.4th 79, 123), and to be relevant, evidence must have a tendency in reason to prove or disprove a disputed fact (see Evid. Code, § 210). Defendant argues that Dr. Dietz's testimony in the Hawaii case "was critical evidence" "to impeach Dr. Dietz's contrary conclusion" in the present case. But as the court noted, Dr. Dietz's conclusion in the Hawaii case was irrelevant because a different legal standard governed the insanity issue in the Hawaii case, and Dr. Dietz's testimony in that case related specifically to an element of the Hawaii standard — the word "appreciate" — that is not included in the California standard. (See *Uyesugi, supra,* 60 P.3d at p. 853 [noting that Hawaii's insanity standard uses the phrase "appreciate the wrongfulness," a phrase that does not appear in § 25, subd. (b)]; *Uyesugi,* at p. 852 [describing Dr. Dietz's testimony that the phrase "appreciate [the] wrongfulness" requires something greater than a bare knowledge of the difference between right and wrong].)

The trial court correctly noted that the legal tests in California and Hawaii regarding insanity are different. In California, a defendant claiming insanity must prove "that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." (§ 25, subd. (b).) In Hawaii, a defendant must demonstrate that "at the time of the conduct as a result of physical or mental disease, disorder, or defect the person lacks substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform the person's conduct to the requirements of law." (*Uyesugi, supra,* 60 P.3d at p. 851, fn. 8, quoting Hawaii Rev. Stat. § 704-400(1).) There is a difference between understanding the nature of the act, as is required in California, and appreciating the wrongfulness of the act, as is required in Hawaii. The standards also differ in whether they require that the defendant be "incapable" (§ 25, subd. (b)) or merely "lack[] substantial capacity" (Hawaii Rev. Stat. § 704-400(1)).

A trial court enjoys broad discretion to limit irrelevant evidence. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125.) Here, the court determined that Dr. Dietz's opinion in the Hawaii case was not relevant. (See *People v. Buffington* (2007) 152 Cal.App.4th 446, 455–456 [psychologist's testimony in prior Sexually Violent Predator Act (Welf. & Inst. Code, § 6600, et seq.) cases regarding other individuals not relevant as impeachment evidence].) Moreover, even assuming Dr. Dietz's opinion in the Hawaii case had some relevance to the instant matter, under Evidence Code section 352, a trial court has discretion to exclude evidence of marginal relevance when its probative value is outweighed by concerns about the consumption of time and confusing the jury. A prior opinion in

a previous case under a different state's law could consume an inordinate amount of trial time as well as cause confusion for the jury.  Accordingly, we conclude the trial court did not abuse its discretion in limiting the cross-examination of Dr. Dietz.

### b. *Earnings*

During cross-examination of Dr. Dietz, defense counsel asked: "[I]s it true, Dr. Dietz, that you might be the highest paid forensic psychiatrist in the country?"  The court sustained the prosecution's objection, saying: "You can ask him his fee in this case.  You can ask him [the] percentage of his income, where it comes from.  But whether he is the highest or lowest or medium is irrelevant, sustained."  Dr. Dietz testified that he would be paid roughly $37,000 for the work he did in the present case.

Defense counsel then asked Dr. Dietz if the government had paid him $50,000 in "the *Broderick* case."  The court sustained the prosecutor's objection, stating counsel could ask what percentage of his income comes from the government or the defense, "[b]ut as to other cases, [if] you interject an amount, that opens up the examination and testimony [about] what he did in those cases.  And we're not going to go there.  It's collateral.  They're [Evidence Code section] 352.  It's time consuming, and it doesn't serve any purpose."  Dr. Dietz testified that in the prior year about 12.5 percent of his income came from work he did for the government in criminal cases.  Counsel asked for the dollar amount, and the court sustained the prosecution's objection.

Defendant argues he should have been "permitted to cross-examine Dr. Dietz to show the thousands of dollars he received from the government in a number of cases, including several high-profile cases."  We disagree.  The court allowed

defense counsel to cross-examine Dr. Dietz on his $500 hourly rate for consulting, his $5,000 daily rate for testifying, the $37,000 he would be paid for his work in this case, and the percentage of his annual income derived from work he did for the government.  The trial court properly determined that Dr. Dietz's annual income and what he charged in other cases were of little relevance to possible financial bias in the present case.  Such an inquiry would necessitate, for purposes of context, testimony regarding whether his other cases were like the present case as to their factual and legal complexity, and the duration of expert trial testimony.  The court did not abuse its discretion in ruling under Evidence Code section 352 that additional testimony on the amount and sources of Dr. Dietz's income would entail an undue consumption of time that outweighed any very slight relevance of such evidence.

    5. *Motion to strike Dr. Dietz's testimony*

During Dr. Dietz's testimony regarding his prior testimony in the Hawaii case (see pt. II.F.4.a., *ante*), the following colloquy occurred:

"Q.  . . . [A]t the last page of your hundred-and-five-page report, did you write that it was your opinion that [defendant] knew and appreciated the nature and quality of his actions?

"A.  Yes.

"Q.  And were you using the word 'appreciated' there to be synonymous with understanding the —

"A.  No.

"Q.  — the nature and quality of his actions?

"A.  No, I wasn't.  I should have written 'knew, understood, and appreciated.'

"Q.  Knew, understood, and appreciated?

"A.  Yes.  I believe he knew, understood, and appreciated the wrongfulness of his actions.  But 'appreciated' is irrelevant in California, of course.

"Q.  And what is that based on?

"A.  Which part?

"Q.  That 'appreciated' is irrelevant in California?

"A.  Based on the standard jury instructions, *People v. Stress*, and *People v. Coddington*.

"Q.  *People* [*v.*] *Coddington*?

"A.  Yes.

"The Court:  Let's not get involved in that.

"The Witness:  The judge will instruct the jury on the law.

"The Court:  Let's not get involved in the legal issues here. That's kind of the part I play in this thing.

"The Witness:  Yes, your honor."

A few days later, outside the presence of the jury, the defense moved to strike Dr. Dietz's testimony, arguing it was a legal opinion, not a medical opinion.  The court recalled that it stopped the proceedings when Dr. Dietz referenced two California cases and said that was a question of law for the court to decide.  The court thought it "made that clear" but offered to "admonish them again."  Defense counsel did not request any further admonition of the jury or otherwise pursue the matter.

Defendant argues "it was improper for Dr. Dietz to provide his own version of the law to the jury," and that the court should have granted the defense's motion to strike the testimony.  We reject the claim.  Although Dr. Dietz briefly discussed the

California sanity standard in response to defense questioning, the court almost immediately interrupted the testimony and stated, both to Dr. Dietz and to the jury, that it was the court's role to instruct on the law.  Dr. Dietz acknowledged the court's admonition, stating, "The judge will instruct the jury on the law."  Thus, Dr. Dietz in effect, withdrew his comment about California law.  The court's remarks made clear to the jury that Dr. Dietz's statements regarding California law was not appropriate and should be disregarded.  Accordingly, the court was not required to strike the testimony.

To the extent defendant is arguing the court should have clarified its admonition a few days later when the defense filed a written motion, the claim is forfeited.  The court explicitly offered to give a further admonition, and the defense chose not to pursue the matter.  (E.g., *People v. Clark* (2016) 63 Cal.4th 522, 574 ["defense counsel did not seek any ruling from the court on the matter, and the failure to do so deprived the court of the opportunity to remedy the asserted problem"].)  Moreover, at the close of the trial, when instructing the jury on the law, the court said:  "You must accept and follow the law *as I state it to you*."  (Italics added.)  Jurors are presumed to follow the court's instructions.  (*People v. Johnson* (2015) 61 Cal.4th 734, 770 (*Johnson*).)

Based on the foregoing, we conclude that the trial court did not err in its handling of Dr. Dietz's brief comment about California law and that the comment did not result in a violation of defendant's state or federal constitutional rights.

6. *Sanity phase special instructions*

The court instructed the jury based on CALJIC No. 4.00 as follows:  "The defendant in this action has been found guilty

of three counts of first-degree murder and one count of kidnapping. You must now determine whether he was legally sane or legally insane at the time of the commission of these crimes. This is the only issue for you to determine in this proceeding. [¶] You may consider evidence of his mental condition before, during, and after the time of the commission of the crimes as tending to show the defendant's mental condition at the time the crimes were committed. [¶] Mental illness and mental abnormality, in whatever form either may appear, are not necessarily the same as legal insanity. A person may be mentally ill or mentally abnormal and yet not be legally insane. [¶] A person is legally insane when, by reasons of mental disease or mental defect, he was incapable of either: one, knowing the nature and quality of his act; or two, understanding the nature and quality of his act; or three, distinguishing right from wrong at the time of the commission of the crimes. [¶] The defendant has the burden of proving legal insanity at the time of the commission of the crimes by a preponderance of the evidence."

The defense proposed six additional instructions, which the court denied. Defendant argues that the court erred by not giving the additional instructions. We find no error.

"[T]he general rule is that a trial court may refuse a proffered instruction if it is an incorrect statement of law, is argumentative, or is duplicative. [Citation.] Instructions should also be refused if they might confuse the jury." (*Gurule*, *supra*, 28 Cal.4th at p. 659.) The instructions the defense proposed were either incorrect statements of the law or argumentative.

### a. *Special instructions Nos. 2, 3, and 4*

Three of the tendered instructions proposed to modify or add to the CALJIC No. 4.00 instruction. First, the defense asked for the following addition to CALJIC No. 4.00: "The word 'knowing' as used in this instruction means *realization or appreciation of the wrongfulness* of seriously harming a human being. Thus, 'knowledge' of the nature or wrongfulness of an act means more than merely a capacity to verbalize the 'right' (that is socially expected) answers to questions put to a person relating to that act." (Italics added.) Second, the defense proposed to replace the phrase "knowing the nature and quality of his act" with the phrase "knowing *and appreciating* the nature and quality of his act." (Italics added.) Third, the defense proposed to replace the phrase "understanding the nature and quality of his act," with the phrase "understanding the nature and character of his action *and its consequences, and that it was a violation of the rights of another*." (Italics added.) The court rejected these proposed instructions, stating that the standard CALJIC No. 4.00 instruction "does express the correct law."

We conclude the court did not err. The language of CALJIC No. 4.00 is drawn directly from the text of section 25, subdivision (b), which states that to establish the insanity defense, "the accused person [must] prove[] by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." Defendant points out that the language he proposed to add to CALJIC No. 4.00 — that knowledge is more than the "capacity to verbalize the 'right' . . . answers" — was taken directly from this court's opinion in *People v. Wolff* (1964)

61 Cal.2d 795 (*Wolff*). But the fact that the defense's proposed instruction included within it a correct legal principle does not mean the court was obligated to instruct the jury with that additional language. In fact, the instruction the trial court gave in *Wolff* was similar to CALJIC No. 4.00; it provided that " '[i]nsanity . . . means a diseased and deranged condition of mind which renders a person incapable of knowing *or understanding* the nature and quality of his act, *or* to distinguish right from wrong in relation to that act.' " (*Wolff*, at p. 801.) We did not find that any further embellishment of that instruction was necessary. (*Id.* at p. 803.) The defense's modifications and additions were unnecessary because CALJIC No. 4.00 — using words that have commonly understood meanings — fully informed the jury of the applicable standard.

Defendant argues that "the refusal to make the requested modifications meant that defense counsel was prevented from informing the jury that the law of insanity permits jurors to find a defendant not guilty by reason of insanity, even if the defendant could state that he knew about the illegality of his acts but did not understand it." Stated another way, the defense wanted to inform the jury that an insanity verdict can be premised on knowledge that falls short of understanding. But the proposed modifications of the instruction were not necessary to allow the defense to make this point. The court instructed the jury that "[a] person is legally insane when, by reasons of mental disease or mental defect, he was incapable of *either*: one, knowing the nature and quality of his act; *or* two, understanding the nature and quality of his act; *or* three, distinguishing right from wrong at the time of the commission of the crimes." (Italics added.) As a matter of logic, if insanity entails being incapable of either mental state one, mental state two, *or* mental state

three, proof of any of the three mental incapacities would be sufficient to prove insanity. Thus, the rejection of the defense's proposed instructions did not prevent counsel from informing the jury that he could be found insane based solely on an incapacity to understand the nature and quality of his actions.

In fact, defense counsel made this very point during closing argument when he emphasized to the jury the difference between superficial knowledge and a deep and full understanding: "Know, understand means to comprehend and to appreciate. For example, I know [$E = mc^2$], okay. . . . I can verbalize it, I can understand the principle. I accept it as a fact. I believe it to be true. However, I do not understand it. I cannot tell you what it means. It has no effective meaning for me. It's there. I can parrot the formula, but I can't explain it, and I don't appreciate what it is, and I don't know it, and I don't understand it. And that's the kind of knowing and understanding that we have here. It connotes a quality of reason, and that's not just intellectual components, but it's emotional components as well." "The words know and understand require a cognition, require an understanding, and an assimilation into the actor. You have to have something more than my telling you [$E = mc^2$]. That is not knowing and understanding within the meaning of the instructions that you are going to receive. You have to comprehend and you have to appreciate it."

Defendant also complains that the court did not allow defense counsel to read to the jury from a dictionary definition of the word "know" and from *Wolff, supra,* 61 Cal.2d at page 800, in which we said that mere verbalization of right answers is not the same as knowing and understanding. As discussed above, these embellishments to CALJIC No. 4.00 were unnecessary because they subtly changed CALJIC No. 4.00, which fully

informed the jury of the applicable standard. The words of CALJIC No. 4.00 have common meanings that do not require further definition, and if the jury sought assistance regarding the meaning of the instruction, the court was prepared to give such assistance. Furthermore, the court had already rejected a proposed instruction that quoted directly from this court's opinion in *Wolff*. Thus, defense counsel's effort to read the same quotation to the jury, identifying the Supreme Court of California as the source of the quotation, was clearly an attempt to circumvent the trial court's earlier ruling. Accordingly, the court acted within its discretion in disallowing this argument. (See *People v. Simon* (2016) 1 Cal.5th 98, 147 ["We review a trial court's decision to limit defense counsel closing argument for abuse of discretion"].)

### b. *Special instructions Nos. 5 and 6*

In addition to the instructions discussed above, the defense also proposed to add the following language to CALJIC No. 4.00: "The defendant must know that the act was inherently, or morally wrong. A person who is incapable of understanding that his act is morally wrong is not criminally liable merely because he knows the act is unlawful." The defense also proposed the following independent instruction: "If a mental illness is manifested in delusions which render the individual incapable of understanding that his act is wrong, he is legally insane. The defendant must know that the act was inherently, or morally wrong. As applied when a defendant suffers from a delusional mental illness, a person who because of mental illness believed that some force commanded and expected him to kill another human being and that therefore the killing was morally justified and was not wrong would be insane." The court rejected both instructions based on this

court's decision in *People v. Coddington* (2000) 23 Cal.4th 529, 609 (*Coddington*), which concluded that a defendant's idiosyncratic subjective moral beliefs do not compel a finding of legal insanity.

Defendant argues the court erred in rejecting the above two instructions. We disagree. " '[M]oral obligation in the context of the insanity defense means generally accepted moral standards and not those standards peculiar to the accused.' " (*Coddington*, *supra*, 23 Cal.4th at p. 608, quoting *People v. Stress* (1988) 205 Cal.App.3d 1259, 1274.) Accordingly, " '[t]he fact that a defendant claims and believes that his acts are justifiable according to his own distorted standards does not *compel* a finding of legal insanity.' " (*Coddington*, at p. 609, italics added, quoting *People v. Rittger* (1960) 54 Cal.2d 720, 734.) Here, both of the defense's proposed instructions implied that defendant's subjective belief that his actions were morally justified would, by itself, be enough to establish his insanity under section 25, subdivision (b). But that is not the law. Many people who commit crimes believe their actions are morally justified, and their belief does not absolve them of criminal liability. The proposed instructions — both of which said that to be held criminally liable, "[t]he defendant must know that the act was . . . morally wrong" — were an improper statement of the law, and therefore the court did not err in denying defense counsel's request to provide these instructions to the jury.

### c. *Special instruction No. 9*

Finally, defendant proposed the following instruction: "In any criminal proceeding in which a plea of not guilty by reason of insanity is entered, the defense shall not be found solely on the basis of [a] personality or adjustment disorder, a seizure

disorder, or an addiction to, or abuse of, intoxicating substances." The instruction tracked the language of section 29.8 (former § 25.5) nearly verbatim, which places a limitation on the insanity defense. (See *People v. Robinson* (1999) 72 Cal.App.4th 421, 425.)[34] In ruling on defendant's proposed instruction, the court noted that ordinarily the request for such an instruction "would not come from the defense; it would come from the People." The defense's response focused on the word "solely" in section 29.8. According to the defense, section 29.8 affirms that "a personality disorder can constitute a mental disease or defect for purposes of insanity if it is coupled with another disorder." The court rejected the proposed instruction as ambiguous and confusing.

We conclude that while the proposed instruction was not wrong, the court did not err in rejecting it. Section 29.8, on which the instruction was based, was not applicable to the facts of this case. (See *People v. Sanchez* (1947) 30 Cal.2d 560, 572 ["a trial judge should be diligent in refraining from burdening the jury and the record with inapplicable instructions"].) The prosecution did not dispute defendant's insanity claim on the grounds listed in section 29.8. Instead, under the prosecution's theory of the case, defendant did not meet the definition of criminal insanity set forth in section 25. Moreover, the defense remained free to argue, and it did, that defendant's purported insanity was rooted, at least in part, in causes not listed in section 29.8. Defense counsel fails to advance any persuasive argument that, absent the proposed instruction, the jury might

---

[34] The defense's proposed instruction is now substantially included in CALCRIM No. 3450, which is CALCRIM's insanity instruction.

wrongly reject the insanity defense because it was barred from returning an insanity verdict in a case in which the defendant happened to have a personality disorder of some kind — in addition to other more serious mental infirmities. The proposed instruction was not itself wrong, but because it would not have assisted the jury, the court did not err in rejecting it.

In sum, we find no error in the court's rejection of the defense's proposed instructions, and for the same reasons, we conclude the court did not violate defendant's state or federal constitutional rights.

### G. Penalty Phase Issues

#### 1. *Separate penalty phase jury*

Before the guilt phase trial, defendant brought a motion to have separate juries for the guilt and penalty phases. The court denied the motion. After the sanity verdict, defendant moved to discharge the jury and empanel a new jury for the penalty phase. The court denied that motion, too. Defendant asserts the court erred, arguing that the process of selecting a jury for a death penalty case leads to a jury panel that is more likely to return a verdict unfavorable to the defense, and that the problem could be cured by having two juries. We conclude, based on settled law, that the court did not abuse its discretion in denying defendant's motions. (See, e.g., *People v. Mendoza* (2016) 62 Cal.4th 856, 915 [noting the United States Supreme Court has repeatedly rejected the claim that separate guilty and penalty phase juries are required because jurors who are selected to serve in a death penalty case are more likely to convict a defendant]; *Davis, supra,* 46 Cal.4th at pp. 625–626 [same]; *Catlin, supra,* 26 Cal.4th at p. 114 [observing the prevailing legislative preference for a single jury to determine

both guilt and penalty].)  For the same reason, we determine that the court's rulings did not violate defendant's state or federal constitutional rights.

### 2. *Admonition on proper use of victim impact evidence*

Prior to the penalty phase, defendant moved for a jury admonition on the appropriate use of victim impact evidence. Defendant requested that the court give the following admonition: "The prosecution will now introduce what is known as victim impact evidence.  Victim impact evidence cannot be a reason by itself to impose the death penalty.  Victim impact evidence is simply another method of informing you about the nature and circumstances of the crime in question.  You may consider this evidence in determining an appropriate punishment.  However, the law does not deem the life of one victim more valuable than another; rather, victim impact evidence shows that the victim, like the defendant, is a unique individual.  Your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence.  The sentence you impose must be in accordance with the law as I instruct you and not based on sympathy, prejudice, emotion or public opinion and not based solely on victim impact."  The court denied the motion.

We have upheld the rejection of proposed instructions nearly identical to the admonition requested here, and we see no reason to reconsider our decisions.  (See *People v. Zamudio* (2008)  43 Cal.4th  327,  369–370;  see also  *Johnson, supra,* 61 Cal.4th at p. 780; *Garcia, supra,* 52 Cal.4th at pp. 762–763; *People v. Famalaro* (2011)  52 Cal.4th 1,  38–39.)   Only one sentence from the defense's proposed admonition has not been addressed by this court in past cases, and that is the sentence

stating that "[v]ictim impact evidence cannot be a reason by itself to impose the death penalty." That sentence is an incorrect statement of the law. Jurors are required to consider all evidence presented at trial, but they are "free to assign whatever moral or sympathetic value [they] deem appropriate to each and all of the various factors [they] are permitted to consider." (CALJIC No. 8.88.) Although it is highly unlikely the jurors in this case voted for death solely because of the victim impact evidence, doing so would not have been a violation of the law. Because defendant's proposed admonition was duplicative and erroneous, the court properly refused it. For the same reason, the court's refusal to give the admonition did not violate defendant's state or federal constitutional rights.

### 3. *Judicial bias during defense opening statement*

Defense counsel's opening statement began with this comment: "I'll tell you it is difficult, really, for me to get back up in front of you at this point in time. And I am not going to pretend that it is not difficult. That would not be something that I couldn't hide if I wanted to. And since the verdict was read on Monday, I have spent a lot of time thinking about, agonizing about what I might say to you, because you've rejected everything else that we've had to say at the guilt phase and the sanity phase. And the issue that I confront when I think about it is: What do I say now? What do I say to you now? And I have to explain that it is difficult for us, because Mr. Burt and I have worked on this case for many months. I've represented [defendant] since August of 1999. So, he is not just the defendant to us. And after so much time and so much effort, a case like this becomes part of the lawyers. We can't help it. So, I hope that you will understand our disappointment."

The prosecutor objected, asserting that defense counsel was making arguments, not summarizing the evidence to be presented at the upcoming penalty phase of the trial. The court stated it agreed that defense counsel was making arguments, but it allowed counsel to proceed "with that thought in mind." Defense counsel later said: "Victim impact evidence is another method of presenting [to] you, the jury, evidence of the nature and circumstances of these crimes. And it's appropriate for you to consider the nature and circumstances of the crimes in deciding punishment. It is not the law, however, that the life of one victim is somehow more important than that of any other victim." The prosecutor again objected, saying: "This is just pure argument." The court then said to defense counsel: "Again, it is comment [and] argument as opposed to what evidence testimony you expect to offer in your case. So kindly give the jury, if you would, your overview of what you expect the testimony to be."

Defense counsel continued: "And I expect that based on the victim impact evidence that you hear, you will get an instruction that this is what you are to consider as circumstances, part of the circumstances of the crime. And just as sympathy for the family of [defendant] or the family — the members of his family is not a matter you can consider in mitigation, the same is true of sympathy for the families of the victims, you cannot consider that — " The prosecutor again interrupted, saying: "She's still arguing." This time, the court stated: "I'm going to give you ample time to make an opening statement, but I would ask you to limit your opening statement as to what you expect the evidence to be, and not draw your inferences from it and not make your argument now. Just what

you expect the testimony to be in the penalty phase trial. With that thought in mind, you may proceed."

A short time later, defense counsel said: "You'll hear what Agent Rinek was told about Miss Armstrong. You will hear what [defendant] said about that. And I expect that you will, after hearing that, disagree with the clinical and I think unfair description — " The prosecutor again objected, and the court agreed, stating: "[Y]ou are arguing your case. And you certainly will have the right to do that at the appropriate time after all the evidence has concluded. I would again ask you to confine this comment now by way of opening statement to what you expect the evidence to be as opposed to your argument and your inferences."

Later, defense counsel said: "Obviously, we will rely on the evidence you heard about [defendant's] brain damage; that he is someone who is born with brain damage. And that his brain damage, that brain damage contributed to where he is today. [¶] We are going to ask you to consider that [defendant] also suffers from mental disorders that you've heard about, and that these mental disorders are genetically based. Again, something that he was born with, something about which he had no choice, something he did not choose, a physical condition as far as brain damage, as far as the mental disorders, a genetic predisposition." The following colloquy then ensued:

"[The prosecutor]: Your honor, at this time — I don't like to object, but she's basically arguing her evidence. If she wants to tell us what new evidence she's going to put on, that would be wonderful.

"[Defense counsel]: Well, your honor, I think I can talk about the evidence that I expect to present, and that's what I'm trying to do.

"The Court: You certainly can. But you can't argue the case now. The opening statement really is just a brief overview, if you will, as to what you expect your evidence to be. It's not evidence — and the jury knows that what counsels say is not the evidence. What you hear from the witness stand, and whatever, that's the evidence. So, this is your opportunity to tell them what you expect the evidence to be that you intend to present as opposed to arguing your case. [¶] So, again, I don't like to continue these comments, and I don't like these interruptions, but there apparently is a legal basis because you are arguing as opposed to making an opening statement.

"[Defense counsel]: I disagree with the court. I think I'm making an opening statement. I'm sorry if the court disagrees. And [the prosecutor], obviously, if he objects, he objects. And we will proceed that way.

"The Court: Well, we will until we get to the point in time where there are repetitive instances of not complying with the order of the court, and then, of course, the court has an alternative to impose. That is to just stop the opening statement and start the evidence. So you may continue."

A few pages later in the reporter's transcript, the court again sustained an objection based on the argumentative nature of defense counsel's statement. Following that ruling, defense counsel continued the opening statement, but after some time, she said: "So . . . this is not a counting process. There is no formula at all to what you consider in this part of the trial. You consider all the evidence that you hear, and you weigh it, and

196

you decide individually what is the most important for you. And nobody can tell you, nobody can tell you that what you think is most important isn't most important. That is your right, and nobody can take that away from you." The prosecutor again objected, saying: "She's arguing again." The court then said: "I think what I'm going to do is set a time frame. Five more minutes for opening statement. Then we will start with the evidence." Defense counsel then quickly completed her opening statement.

Defendant argues that the court's statements to defense counsel establish judicial bias and thus violated his due process right to a fair trial. The argument is without merit.

" 'Although the trial court has both the duty and the discretion to control the conduct of the trial [citation], the court "commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution" [citation]. Nevertheless, "[i]t is well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, *ignores the court's instructions*, or otherwise engages in improper or delaying behavior." [Citation.] Indeed, "[o]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial." ' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 373, italics added (*McWhorter*).)

Here, the court made clear the opening statement should describe the evidence the defense planned to present and should

not be argumentative. That ruling was consistent with our case law (see *People v. Seumanu* (2015) 61 Cal.4th 1293, 1342), but defense counsel repeatedly ignored it. The court did not, so far as the transcript reveals, respond emotionally or angrily. Instead, the court patiently admonished defense counsel at least six times. Finally, after counsel repeatedly disregarded the court's admonitions, the court exercised its discretion to put a time limit on the opening statement. The court handled the situation appropriately, and defendant's claim of judicial bias is unavailing.

Defendant asserts the court "lectured defense counsel in front of the jury and these mini-lectures became increasingly lengthy and disdainful of defense counsel." We reject that characterization of the court's rulings, which were, for the most part, restrained. That said, if the court became marginally more impatient with each of its rulings, it did so only because counsel continued to disregard those rulings. "[T]o the extent the court's comments to [counsel] were a reflection of frustration and irritation at counsel's repeated [refusal to follow the court's rulings], they were not improper. '[S]uch manifestations of friction between court and counsel, while not desirable, are virtually inevitable in a long trial.' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 825 (*Blacksher*), citing *People v. Snow* (2003) 30 Cal.4th 43, 78–79 (*Snow*).) The court's statements and rulings do not suggest judicial bias, and they did not deprive defendant of a fair trial or violate his state or federal constitutional rights.

### 4. *Evidence of defendant's remorse*

The defense proffered the testimony of defendant's cousin, Larry H., who would have testified that defendant telephoned

him from the county jail two or three days after his arrest, and that defendant said he felt sorry about what had happened, although he did not go into any detail about the murders. The court excluded the testimony on hearsay grounds. Defendant argues that the court erred.

Although defendant had a constitutional right to present mitigating evidence to the jury, " 'a capital defendant has no federal constitutional right to the admission of evidence lacking trustworthiness, particularly when the defendant seeks to put his own self-serving statements before the jury without subjecting himself to cross-examination.' [Citation.] Under Evidence Code section 352, a trial court has broad discretion to exclude evidence . . . . In addition, statements by a defendant to a third party regarding the defendant's state of mind can be admissible, but not when made under circumstances that indicate a lack of trustworthiness. (Evid. Code, §§ 1250, 1252.)" (*People v. Peoples* (2016) 62 Cal.4th 718, 757 (*Peoples*).) Here, the proffered evidence was that defendant "told [Larry H.] that he was sorry about what happened," but this statement did not necessarily mean that defendant was sorry for having killed the victims. Defendant might have meant that he was sorry for having caused grief and embarrassment to his family. Because of the ambiguity of the alleged statement, cross-examination of the declarant (i.e., defendant) was particularly important. (See *People v. Smith* (2003) 30 Cal.4th 581, 629 (*Smith*).) Moreover, the alleged statement was made by defendant at a time when he had a strong motive to feign remorse, again making cross-examination regarding the statement particularly important. (See *People v. Livaditis* (1992) 2 Cal.4th 759, 780 [the defendant's "sincerity in telling potential defense witnesses [while in jail awaiting trial] he was sorry was suspect" and "[t]he

need for cross-examination was thus compelling"].) "Under these circumstances, the trial court could reasonably conclude that the hearsay statements could be excluded as unreliable under Evidence Code section 1252." (*Peoples*, at p. 758.)

Defendant contends that even if the evidence was inadmissible on hearsay grounds (see Evid. Code, § 1250), the exclusion of the testimony violated his federal constitutional rights. However, "[w]here evidence of remorse is so unreliable as to be inadmissible under California law, the exclusion of such evidence does not violate the general federal constitutional rule that evidence that is reliable but otherwise inadmissible under state law must be admitted if highly relevant to a critical issue in the punishment phase. [Citations.] 'The court did not prevent defendant from presenting evidence of remorse, but only evidence in the form of inadmissible hearsay not subject to cross-examination.'" (*Peoples*, *supra*, 62 Cal.4th at p. 758; see *People v. McCurdy* (2014) 59 Cal.4th 1063, 1110 ["The federal Constitution, however, does not generally create a code of evidence that supersedes a state's evidentiary rules in capital sentencing proceedings"].)

At the penalty phase, defendant was permitted to present evidence that during his July 24, 1999 FBI interview, he cried when discussing Juli, and that he wrote Juli an apology letter. He also presented a witness who read the transcript of the remorseful statement defendant made during sentencing for the Armstrong murder, and witnesses were allowed to describe defendant's emotional demeanor while giving that statement. And defense counsel argued defendant's remorse during closing argument. Because defendant's statement to Larry H. was not subject to cross-examination and its meaning was ambiguous, the court did not abuse its discretion in excluding the statement,

and the ruling did not violate defendant's state or federal constitutional rights.

### 5. *Limits on the defense's presentation of mitigating evidence*

Defendant argues the court improperly limited the testimony of several defense witnesses, thereby depriving him of his constitutional right to present a full range of mitigating evidence. The proffered evidence related to the severe levels of dysfunction in defendant's immediate and extended family.

#### a. *The defense's offers of proof and the trial court's rulings*

##### i. *Anna J.*

Defendant's paternal aunt, Anna J., testified about defendant's family and, specifically, about the family at the time of Steven's abduction. Defense counsel asked Anna J. whether she "recall[ed] how the children were reacting to the brother being abducted." The prosecutor successfully objected to that question on relevance grounds, and defense counsel then asked Anna J., without objection, what reaction *defendant* had to Steven being abducted. Defense counsel next asked about the effect of Steven's abduction on defendant's father. The prosecution objected, and the defense made an offer of proof that a few years after Steven's abduction, Anna J. "was called to a motel room" where she encountered defendant's father threatening suicide, and she talked him out of it.

The court ruled the evidence was irrelevant unless the witness had "conveyed this to the defendant and he had knowledge of it." The court added that father's character was not at issue in the case.

ii. *Nancy T. and Sandra A.*

According to defense counsel's offer of proof, defendant's maternal aunt Nancy T. would testify that she was repeatedly molested by her father and later learned that defendant's mother Kay was also molested by him. Nancy T. would also testify that her father would criticize Kay and her if they showed emotion; that Kay told her that defendant's father was molesting defendant's sister C.S.; and that Kay knew that defendant's father had also molested defendant's sisters Cy.S. and J.S.

According to defense counsel's offer of proof, family friend Sandra A. would describe the Stayner household when Steven returned home. She would testify that she heard defendant's mother was molested, that defendant's sister Cy.S. ran away because defendant's father molested her, and that defendant's father molested defendant's sisters.

The court excluded the proffered testimony of Nancy T. and Sandra A. under Evidence Code section 352, stating, "This is all cumulative. It's repetitive. It has little or no probative value on the background, character, [or] record of the defendant. [¶] What happened interfamilia with respect to the Stayner family, with respect to the grandparents, with respect to the parents, with respect to molest[ations], some of which weren't even reported, wherein the siblings wouldn't even have knowledge of it is all totally irrelevant. [¶] What's relevant is what, if anything, occurred with respect to this defendant when he was raised in this family, what did he see, what impacted him, what did he have knowledge of, how was he treated . . . ."

iii. *Jane W.*

Jane W., a friend of defendant's maternal grandparents, testified that defendant's mother, Kay, came to live with her when Kay was about 14 years old. The court sustained relevance objections to questions asking Jane W. to describe defendant's grandparents and granduncle and asking whether Kay had come to live with her because she had been molested by her father (defendant's grandfather).[35]

iv. *Frank Hubbell*

Frank Hubbell testified that he was a therapist with Merced County Mental Health from 1976 through 1988, and at that time, he ran a group therapy program for sex offenders. Defense counsel asked Hubbell whether defendant's father, Delbert, had been one of his patients, and the prosecution objected based on relevance. Defense counsel made an offer of proof that after it was disclosed that Delbert molested C.S. (defendant's sister), Hubbell had contact with Delbert in group therapy sessions, in sessions with Delbert and defendant's mother, Kay, and on an individual basis. Hubbell would also testify about his diagnosis of Delbert, which included exhibitionism, post-traumatic stress disorder, and passive-

---

[35] Defendant argues the court erroneously prohibited defense counsel from making an offer of proof as to Jane W.'s testimony. Defendant's argument lacks a factual basis in the record. Defense counsel stated, in passing, that she intended to make an offer of proof regarding Jane W., and the court gave no response one way or another. After a short break, counsel did not request to make the offer of proof, nor did she make any offer of proof later, when the court sustained objections to the questions the defense posed to Jane W.

aggressive personality disorder. The court disallowed the proffered testimony on relevance grounds.

### v. *Defendant's sisters*

Cy.S., defendant's oldest sister, testified about the interaction among the family members after Steven's abduction. Defense counsel asked Cy.S. about a visit to see her grandfather after Steven was abducted. The prosecution interposed a relevance objection, and in a sidebar conference, defense counsel made an offer of proof, saying that Cy.S. would testify that her father suspected her and defendant's maternal grandfather of having abducted Steven.

The court ruled that under Evidence Code section 352, it was not going to permit a "replay" of "the entire family scenario." "We are now almost one week beyond our outside schedule. The evidence will be completed in this trial in the penalty phase by tomorrow, Friday. I've indicated that on several occasions. [¶] Consequently, the court is going to sustain objections to the family dynamics because we've heard it numerous times."

Later, defense counsel made a more detailed offer of proof regarding the proposed testimony of Cy.S., stating she would testify, among other things, that she ran away from home in the ninth grade; that her father had been molesting her; that he gave her the name of a person at Child Protective Services to call; that her mother learned that her father had been molesting his daughters; about what it was like after Steven was abducted; about an incident that occurred when the family was coming home from a trip; that Steven was physically punished two nights before he disappeared; about Steven's behavioral problems after his return; about her religious conviction; and about their uncle's death. Counsel also made an offer of proof

that defendant's other sister, C.S., would testify that she was molested by her father, that she reported it, that her mother took her to Oregon, and about the chaotic nature of the home.

Lastly, the defense made an offer of proof that defendant's sister J.S. would testify that after Steven left, the family kept Christmas presents in a closet in Steven's room and would add presents every Christmas; that her parents would go out on rainy days, chasing ambulances and would come home and describe the bodies they had seen; that the family did not talk to one another; and that on one occasion, her father used force against her brother because of something she had complained about, and she felt bad about it. She would also testify about her father's suicide attempt.

In response to these offers of proof, the court stated that in the penalty phase trial, 53 witnesses had already testified on behalf of defendant about his "life story from start to finish" and about how Steven's abduction, the uncle's death, and Delbert's molestation of his daughters affected the family. "So, in the court's view, . . . it doesn't serve any meaningful purpose to offer repetitive, cumulative evidence. Under [Evidence Code section] 352, the court can still [(i.e., even at a penalty phase trial)] consider judicial economy and time. I stressed the fact that we are one week now, approximately, beyond our outside schedule, and we have a prospect of perhaps losing a juror or jurors. And I indicated that in no uncertain terms we would finish tomorrow as far as the evidence. [¶] . . . [T]hese witnesses were . . . being called . . . to testify as members of the defendant's family, how they feel about him, what they would want the jury to do perhaps, based upon a character trait of the defendant, that they loved the defendant. [¶] And you had unbridled, open license to do all of that, ask as many questions

as you desire along those lines." The court excluded defendant's sisters' proffered testimony on the ground that it would be cumulative.

b. *Analysis*

Defendant asserts the court erred in excluding the testimony of the witnesses described above. He argues that "interrelationships within a family and how they all reacted to Steven's disappearance is relevant mitigation as it provides the jury of a [*sic*] full picture of the circumstances of defendant's childhood." It is well settled, however, that the right of a capital defendant to present mitigating evidence at the penalty phase does not categorically preclude application of the ordinary rules of evidence. (See *McDowell*, *supra*, 54 Cal.4th at p. 434.) Furthermore, "the background of the defendant's family is material if, and to the extent that, it relates to the background of defendant himself"; it "is of no consequence in and of itself." (*People v. Rowland* (1992) 4 Cal.4th 238, 279.)

Here, the defense wanted to present evidence of sexual molestations by defendant's maternal grandfather of his daughters and by defendant's father of defendant's sisters, as well as evidence of how Steven's abduction negatively affected defendant's siblings and his father. This evidence, however, was cumulative of other evidence that had already been presented to the jury.

The jury was already aware that defendant's mother had been molested by her father, that defendant's father had molested defendant's sisters, and that defendant's mother and sister had moved to Oregon because of the molestation of one of defendant's sisters. The jury also heard from numerous witnesses the other details of defendant's dysfunctional home

life, including the dysfunction that followed in the aftermath of Steven's abduction. Duplicating this evidence would have had little probative value and would have necessitated an undue consumption of time. (See Evid. Code, § 352.) Thus, the trial court acted within its broad discretion in excluding the evidence.

Even if we were to find the court abused its discretion in excluding the testimony of these witnesses, we would conclude defendant was not prejudiced. The excluded evidence would merely have corroborated the testimony from other witnesses that defendant's father molested defendant's sisters as well as provided further description of defendant's family dynamic. The corroboration value of the excluded evidence was slight because the prosecutor did not challenge the evidence that defendant's father molested defendant's sisters or evidence regarding defendant's dysfunctional family situation. Accordingly, any error in excluding the testimony was harmless beyond a reasonable doubt as there is no reasonable probability the error would have affected the jury's penalty determination. (*Chapman*, *supra*, 386 U.S. at p. 24.)

### 6. *Evidence of prison conditions*

Dr. Craig Haney testified for the defense concerning defendant's ability to adjust to prison life. Before Dr. Haney's testimony began, however, the court ruled that his testimony could not address the specific conditions of prison confinement that would likely apply to defendant. (See *Ray*, *supra*, 13 Cal.4th at pp. 352–353 ["Evidence concerning the rigors of confinement has no bearing on the character or background of the individual offender or the circumstances of the capital offense"]; *People v. Thompson* (1988) 45 Cal.3d 86, 138 (*Thompson*) [the defendant "sought to introduce evidence as to

how he would be housed to dispel any notion . . . that a sentence of life without possibility of parole was somehow a 'lenient' sentence"]; *id.* at p. 139 [Such evidence "went neither to defendant and his background nor to the nature and circumstances of his crime"].)

On cross-examination, the prosecutor asked Dr. Haney, without objection, whether the Department of Corrections and Rehabilitation "employ[ed] young female staffers . . . as guards or counselors." Dr. Haney agreed that there were some correctional officers who were women but "[t]hey have to be a certain age."

Then, on redirect examination, defense counsel asked Dr. Haney whether "[a]nything about the nature" of defendant's offense "would prevent him from coming into contact with young female correction officers?" The court overruled the prosecution's speculation objection, specifically noting "a question was asked on cross-examination, and certainly inferences could be drawn from that question." Dr. Haney then explained that defendant "would be restricted to having contact only with correctional officers and not with any other employees in the department of corrections who were female as a result of a designated [*sic*] in his classification based on the nature of the crime. So he would be placed in special restrictions. And his movement within the prison would be especially restricted for the term of his confinement as a result of the nature of this conviction, and it would restrict his contact with anyone other than a correctional officer." The court then excused Dr. Haney.

The next day, the defense expressed its intent to recall Dr. Haney to testify about the specific conditions of confinement that would likely apply to defendant, including the security

measures the prison would likely impose. Defense counsel argued that the defense could inquire about that issue on redirect examination because the prosecutor, on cross-examination, had asked about the extent of contact defendant would have with female guards, thus opening the door to the introduction of prison conditions evidence. The court denied the motion, stating: "The court does not feel the prison conditions were opened up on cross-examination on that question."

Defendant argues, based on *People v. Smith* (2015) 61 Cal.4th 18, that the evidence of prison conditions was admissible to rebut the prosecution's evidence regarding future dangerousness (i.e., the risk that defendant posed to female prison staff). We find *People v. Smith* distinguishable.

In *People v. Smith*, the prosecution presented, as part of its penalty phase case-in-chief, evidence of the defendant's numerous acts of in-custody violence and his effort to escape from custody. (*People v. Smith*, *supra*, 61 Cal.4th at pp. 28–31.) In response, the defendant proffered the testimony of an expert on the security conditions imposed on prisoners sentenced to life without parole "to rebut the prosecution's evidence of defendant's violent jail conduct and escape attempts, which raised the issue of his future dangerousness in prison." (*Id.* at p. 54.) The trial court excluded the proffered evidence (*id.* at p. 55), but this court held the trial court had erred. We said that although prison conditions evidence is generally inadmissible at a penalty trial (*id.* at p. 57), "[w]hen . . . the prosecution raises an inference of future dangerous conduct in prison as part of its case in aggravation, the defendant is entitled to respond with evidence that his chances to inflict harm in prison will be limited." (*Id.* at p. 58.) Significantly, the defense's right to rebut

the prosecution's evidence of future dangerousness was central to our analysis. (See *id.* at pp. 57–59.)

Here, in contrast, the prosecution did not present any evidence of in-custody violence by defendant or of any effort by defendant to escape from custody. The prosecution also did not argue future dangerousness as an aggravating factor. Instead, the prosecutor asked a single question on cross-examination: whether the Department of Corrections and Rehabilitation "employ[ed] young female staffers . . . as guards or counselors." This limited question differs from the copious evidence offered in *People v. Smith.*

Although we find *People v. Smith* distinguishable, the prosecutor's manner of questioning about the presence of young female staffers working in the prison, and the prosecutor's suggestion during closing argument that defendant might be a danger to female prison staff,[36] raise some concerns.

Even if we were to find the trial court erred in declining to allow the defense to recall Dr. Haney, on the record before us, we would find defendant suffered no prejudice. (See *Chapman, supra,* 386 U.S. at p. 24.) The evidence offered about defendant's future dangerousness was minimal, consisting of a single question on cross-examination about the possible presence of female prison staff. Also, immediately following Dr. Haney's testimony on cross-examination, the defense was

---

[36] The prosecutor argued, "Knowing what this guy's all about, knowing that he will repeat his crime if he gets a chance, do you 12 people really want to take a chance and mortgage the futures, mortgage the lives of perhaps women correctional officers in the joint, just take a chance and give him the gift of leniency?"

given some opportunity to address the issue, over the prosecution's objection, by asking Dr. Haney about restrictions in the prison that would reduce his contact with female correctional officers.

The concurring and dissenting opinion, however, discounts this opportunity, concluding defendant "was wrongly prevented at the penalty phase trial from offering evidence to rebut the inference that he would pose a danger to female correctional officers." (Conc. & dis. opn. of Evans, J., *post*, at p. 3.) Yet, the concurring and dissenting opinion overlooks that it was not the trial court that limited the defense on this issue on redirect, but the defense itself.

As discussed above, over the prosecutor's objection, defense counsel specifically asked the expert to address defendant's potential contact with female correctional officers: "Anything about the nature of [defendant's] commitment offense which would prevent him from coming into contact with young female correctional officers?" Thus, counsel explicitly requested that Dr. Haney qualify his previous testimony on cross-examination that "[t]here are correctional officers who are women," but in doing so, focused on young, female correctional officers. However, Dr. Haney did not directly answer that question. Rather, he indicated that defendant would have contact with correctional officers but "not with any other employees . . . who were female[.]" Therefore, it was not the trial court that limited Dr. Haney's testimony on redirect. Rather, Dr. Haney did not answer the precise question asked and defense counsel did not follow up to ensure he actually answered the question. In other words, at the very least, the trial court allowed defense the chance, on redirect, to offer some evidence to rebut the inference defendant would be a danger to

female correctional officers, thus blunting the impact, if any, of the trial court denying defendant's request to recall Dr. Haney as a witness the next day.

Our analysis does not change when we consider the prosecutor's closing argument in which the prosecutor made only a single, brief reference to the danger defendant would pose to female correctional officers. The concurring and dissenting opinion claims that the trial court's failure to sustain defense counsel's objection to this comment, under *Gardner v. Florida* (1977) 430 U.S. 349 and *Simmons, supra,* 512 U.S. 154, constituted additional error because defendant was sentenced to death, at least in part, on the basis of information which he had no opportunity to deny or explain. (Conc. & dis. opn. of Evans, J., *post,* at p. 3, quoting *Gardner,* at p. 362.) But the concurring and dissenting opinion overlooks that the trial court permitted defense counsel to explore that very issue during the redirect examination of Dr. Haney. Again, it was not the trial court that prevented Dr. Haney from explaining what contact, if any, defendant would have with female correctional officers.

Furthermore, the evidence in aggravation was overwhelming. The crimes were particularly atrocious, with three people murdered — two of whom were children — and defendant repeatedly sexually assaulted Juli before kidnapping and killing her. Defendant had also killed another victim in a particularly cruel and callous manner. In addition, the prosecution presented extensive evidence regarding the devastating impact that defendant's crimes had on the victims' families.

Accordingly, considering the record before us, we conclude there is no reasonable doubt as to whether the jury would have

returned a verdict of death had the defense been allowed to present more of Dr. Haney's testimony.

> 7. *Instruction that defendant was sentenced to life without the possibility of release for the Armstrong murder*

The court excluded, on relevance grounds, testimony that defendant had been sentenced to "life without the possibility of release" for the Armstrong murder. The defense requested the following special instruction: "You are instructed that in this particular case the defendant has already been sentenced in federal court for the Armstrong killing to a sentence of life imprisonment without possibility of release." The trial court denied the request, stating: "The jury knows this. We have talked about it on the jury voir dire. I mean, this is not an issue. This is not something the People are going to argue didn't happen; it did happen, and the jury is aware of it. So, it's cumulative and doesn't serve any purpose."

Defendant concedes the Armstrong murder sentence was mentioned in voir dire, but he argues the trial court should have given the proposed special instruction because no evidence of it was presented at trial.

We disagree. The instruction was an attempt by the defense to place before the jury a fact that had been excluded as irrelevant at trial. If the evidence was properly excluded at trial, then an instruction that would have highlighted the excluded evidence was also properly rejected. At trial, evidence is admissible if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) At the penalty phase, the facts of consequence are the existence, or not, of the

aggravating and mitigating factors. (§ 190.3.) Defendant's sentence in the Armstrong murder case was therefore not relevant. It did not attenuate the gravity of the murders at issue in the present case, and it did not tend to disprove any aggravating circumstances in the present case. Nor did it suggest any sympathetic or mitigating aspect of defendant's character. Because the evidence regarding defendant's sentence in the Armstrong murder case was irrelevant, the court properly excluded such evidence, and it properly rejected the special instruction that would have stood in the place of such evidence.

Defendant argues that "[t]he jury was entitled to consider the fact that [he] was already serving a life without parole sentence and that any concerns for his future dangerousness in the community would be unfounded." But the jury had no option of imposing a sentence less severe than life without the possibility of parole, so "future dangerousness in the [general] community" was not at issue, and "future dangerousness in the [incarceration] community" would exist regardless of whether defendant was serving a life sentence for the Armstrong murder. Accordingly, the court's ruling was not erroneous, and it did not violate defendant's state or federal constitutional rights.

### 8. *Prosecutorial misconduct at closing argument*

Defendant asserts the prosecutor committed prejudicial misconduct during penalty phase closing arguments. He focuses on four different points in the prosecutor's argument.

First, the prosecutor said: "Now, what do we mean by justice? Well, here, in this particular case, we're talking about justice in a number of different ways. We're talking about doing what's right and doing justice for Carole Sund. We're talking about doing justice for even a person that's not a citizen of our

country but who was over here under our protection, Silvina Pelosso, and we're talking about Juli Sund." At that point, defense counsel objected, stating the prosecutor's argument was improper because it referenced the victim's national origin. The court overruled the objection.

Second, the prosecutor argued: "Does this defendant, what he's done, what we know he's done, does he truly deserve a punishment that is lesser or different from that which he inflicted upon the victims, Carole Sund, Silvina Pelosso, and Juli Sund? We know what he did to these people was done without any concept of due process, none." The court overruled defense counsel's objection, and then the prosecutor continued: "There was no due process involved. He didn't have arrest protections, lawyer protections, jurors, law guiding jurors, none of that. That's not what he did. And that's something you have to think to yourself, did he even accord them a modicum of due process? No."

Third, the prosecutor discussed the possibility that the jurors might feel sympathy for defendant's parents, and in that context pointed out that it was defendant's own conduct that caused his parents "this grief." The prosecutor continued: "Why are all you guys sitting here and being captives of this system for about three months? . . . [¶] . . . [¶] . . . For us it's four because we had to pick this jury. But who brought us here? Did you guys come here by choice? No. Was it your decision? No. My decision? No. The judge — No. It's the defendant's decision to bring us here." The court overruled defense counsel's objection.

Finally, after discussing each of the victims, the prosecutor said: "[T]hat doesn't even begin to express the

impact of what he's done. Look at the impact he even had on his own family. Look at the impact that it has on your lives. [Are you] gonna think about these types of things always the same in the future? Are you going to feel comfortable traveling by yourself, taking your daughters over to Yosemite or [a] remote place like that? Are you literally going to live your life the same?" The court overruled defense counsel's objection.

"[A] prosecutor enjoys wide latitude during closing argument to comment on the evidence or draw reasonable inferences from it; misconduct arises when the prosecution uses deceptive or reprehensible methods to persuade the trier of fact or infects the trial with unfairness sufficient to render the subsequent conviction a denial of due process." (*Parker, supra*, 13 Cal.5th at p. 79.) Forceful argument is not misconduct. " 'A prosecutor may vigorously argue his case, marshalling the facts and arguing inferences to be drawn therefrom.' " (*People v. Sandoval* (1992) 4 Cal.4th 155, 183.) "[T]he question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

Defendant argues the prosecutor's reference to Silvina's status as a visitor to this country constituted misconduct because it was "inflammatory" and implied that " 'we' failed to protect her" from defendant. But the prosecutor's comment merely pointed out that a noncitizen in this country is entitled to the same protections against criminal behavior as a citizen. The comment was true, and nothing about it was deceptive or reprehensible, or infected the trial with such unfairness that defendant was denied due process.

Defendant asserts the prosecutor should not have commented that defendant did not afford "due process" to his victims. The comment, of course, implicitly invoked, by way of contrast, the significant due process protections that defendant enjoyed in the California justice system. Thus, the comment made the point that defendant did not act with justice and fairness, but rather with brutality and cruelty. Such argument is not misconduct so long as the prosecutor is not suggesting that the jury deny the defendant due process. (See *People v. Ervine* (2009) 47 Cal.4th 745, 809 [not misconduct when prosecutor commented that the victim "received 'no due process'"].) The argument merely pointed out to the jury that defendant's actions were not mitigated by reason or compassion.

Additionally, defendant argues the prosecutor committed misconduct by asking the jury: "Are you going to feel comfortable traveling by yourself, taking your daughters over to Yosemite or [a] remote place like that?" Defendant argues the prosecutor was urging the jurors "to make their decision on emotional and irrational grounds and on the impact the case has had on their own lives." However, the prosecutor's comment, asking jurors to consider the impact defendant's crimes had on them, was not deceptive, reprehensible, or unfair, and it was not misconduct. (See *People v. Riggs* (2008) 44 Cal.4th 248, 323 ["the randomness of the crime was a relevant consideration, and the prosecutor's comments, even to the extent that they referred to generalized fears aroused by random violence, were not unduly inflammatory"].)

Although the portions of the prosecutor's closing argument discussed above do not rise to the level of prosecutorial misconduct, the prosecutor's comment regarding defendant being the cause of the jurors "sitting here" as "captives of this

217

system for about three months" is problematic. Right after telling the jurors they were captives, the prosecutor continued: "But who brought us here? Did you guys come here by choice? No. Was it your decision? No. My decision? No. The judge — No. It's the defendant's decision to bring us here." Every defendant has a fundamental right to be tried by a jury. The jury should not be led to believe that defendant was somehow at fault for exercising that right and making the jurors "captives of this system."

Even if we were to find that these last comments constituted prosecutorial misconduct, we would nonetheless conclude any error was harmless. The prosecutor's statements were brief considering the closing argument spanned 65 pages in the record. Further, as we discussed above, the evidence in aggravation was staggering. Considering the entire record before us, we find no reasonable possibility that the prosecutor's comments impacted the outcome, i.e., the jury would have imposed life without the possibility of parole absent the challenged statements. (See *People v. Williams* (2010) 49 Cal.4th 405, 467.)

9. *Penalty phase special instructions*

Defendant argues that the court erred in rejecting five of his proposed special instructions. We disagree.

a. *Special instruction No. 3*

Defendant requested the following instruction: "You are instructed that life imprisonment without possibility of parole means exactly what it says: That the defendant will be imprisoned for the rest of his life. [¶] You are instructed that the death penalty means exactly what it says: That the defendant will be executed. [¶] For you to conclude otherwise

would be to rely on conjecture and speculation and would be a violation of your oath as trial jurors." The court rejected the instruction as unnecessary.

Defendant concedes that this court has repeatedly upheld the rejection of the proposed instruction. (See, e.g., *People v. Marlow* (2004) 34 Cal.4th 131, 153–154; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1159–1160 (*Gutierrez*); *People v. Padilla* (1995) 11 Cal.4th 891, 971–972; *People v. Sanders* (1995) 11 Cal.4th 475, 561–562; *Thompson, supra*, 45 Cal.3d at pp. 130–131.) We decline defendant's invitation to reconsider these decisions.

b. *Special instruction No. 4*

Defendant requested an instruction "that death is qualitatively different from all other punishments and is the ultimate penalty in the sense of the most severe penalty the law can impose." The court rejected the instruction as "redundant."

This court has "repeatedly . . . held . . . that there is no legal requirement that penalty phase jurors be instructed that death is the greater punishment, because the penalty trial itself and the jury instructions given, particularly CALJIC No. 8.88, make clear that the state views death as the most extreme penalty." (*Cowan, supra*, 50 Cal.4th at p. 501; see *People v. Lee* (2011) 51 Cal.4th 620, 655; *People v. Cook* (2007) 40 Cal.4th 1334, 1363; *People v. Ochoa* (1998) 19 Cal.4th 353, 478–479.) We decline defendant's invitation to reconsider these decisions and reject his assertion of error.

c. *Special instruction No. 5*

Defendant requested the following instruction: "In arriving at a proper penalty in this case, you shall not consider the race, color, religious beliefs, national origin, sex, or sexual

orientation of the defendant or any victims, and you may not impose a sentence of death unless you agree unanimously that you would impose a sentence of death for the crimes in question no matter what the race, color, religious beliefs, national origin, sex, or sexual orientation of the defendant, or any victims, may be. [¶] The jury shall return to the court a certificate, signed by each juror and to be provided to you, that consideration of the race, color, religious beliefs, national origin, sex, or sexual orientation of the defendant or any victims was not involved in reaching his or her individual decision and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, sex, or sexual orientation of the defendant, or any victim, may be."

The court rejected the proposed instruction as unnecessary "because CALJIC 8.84.1 specifically instructs the jury that it must not be influenced by bias, prejudice against the defendant." The court later instructed the jury in accordance with CALJIC No. 8.84.1.

The instruction defendant proposed is derived from the federal death penalty statute (see 18 U.S.C. § 3593(f)). We have held that this instruction is not required, particularly when, as here, the jury has been instructed in accordance with CALJIC No. 8.84.1. (See *People v. Williams* (2016) 1 Cal.5th 1166, 1202–1203; *Smith, supra,* 30 Cal.4th at p. 639.) What we stated in *Smith* likewise disposes of defendant's claim of instructional error here: "[T]he jury may not consider the defendant's or victim's race in deciding whether to impose the death penalty. . . . But the court need not interject the issue of race itself and then tell the jury to disregard it, at least absent some

indication the jury might improperly consider race." (*Smith*, at p. 639.)

Defendant argues that the special instruction was necessary in this case because Silvina was from Argentina. But the mere fact that a victim is from a foreign country does not require the proposed special instruction. First, as noted, the jury instructed the jury with CALJIC No. 8.84.1 that it must neither be influenced by bias nor prejudice against the defendant. Second, nothing about the evidence suggested that Silvina's national origin had any bearing on defendant's crimes. The prosecutor mentioned during closing that Silvina was not a United States citizen, but he did so only to urge the jury not to treat Silvina differently based on that fact. The court did not err in rejecting the defense's proposed instruction.

d. *Special instruction No. 12*

Defendant requested the following instruction: "You must not consider as an aggravating factor the existence of any special circumstance if you have already considered the facts of the special circumstance as a circumstance of the crimes for which the defendant has been convicted. In other words, do not consider the same factors more than once in determining the presence of aggravating factors." The trial court rejected the instruction as unnecessary because the jury was not likely to misinterpret the standard instruction as permitting double counting. The court later instructed the jury in accordance with CALJIC No. 8.88 (formerly CALJIC No. 8.84.2), which discusses the weighing of aggravating and mitigating circumstances.

In *People v. Melton* (1988) 44 Cal.3d 713, 768, this court noted that "[t]he literal language of [section 190.3, factor] (a) presents a theoretical problem . . . , since it tells the penalty jury

to consider the 'circumstances' of the capital crime *and* any attendant statutory 'special circumstances.' Since the latter are a subset of the former, a jury given no clarifying instructions might conceivably double-count any 'circumstances' which were also 'special circumstances.' On defendant's request, the trial court should admonish the jury not to do so." Nonetheless, "we have . . . concluded that the standard instructions do not inherently encourage the double counting of aggravating factors," and "that the absence of an instruction cautioning against double counting does not warrant reversal in the absence of any misleading argument by the prosecutor." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1180.) Defendant fails to identify any misleading argument by the prosecutor that would have caused the jury to improperly double count. Thus, as we concluded in *Barnett*, the court did not err in rejecting the proposed instruction.

e. *Special instruction No. 15*

Defendant requested an instruction listing the specific mitigating factors applicable to his case. The court denied the request, stating it was "covered by [CALJIC No.] 8.85."

"[A] defendant is not entitled to instructions that simply highlight facts favorable to him." (*People v. Jackson* (2014) 58 Cal.4th 724, 768.) We have stated that instructions that list only mitigating facts or evidence are "patently argumentative and, among other things . . . usurp[] the jury's proper role as fact finder at the penalty phase. A capital defendant is not entitled to unduly argumentative instructions in the penalty phase." (*Gutierrez, supra,* 28 Cal.4th at p. 1159, fn. omitted; *People v. Jones, supra,* 54 Cal.4th at p. 82; *People v. Benson* (1990)

52 Cal.3d 754, 805–806.) We decline defendant's invitation to reconsider these decisions.

Because the court did not err in rejecting the defense's proposed instructions, it also did not violate defendant's state or federal constitutional rights.

### 10. *Time limit on defendant's right to present a defense*

The jury returned its sanity verdict on Monday, September 16, 2002. The defense then sought to delay the start of the penalty phase trial until Monday, September 23, 2002, or possibly later, noting, among other things, that one of the defense attorneys had recently suffered an ankle injury. The court denied the request, but, at defense counsel's request, instructed the bailiff to ask the jurors the following: "Did any of the jurors plan on a break or a postponement of the penalty phase to start on Monday, 9/23, or is the jury ready to proceed tomorrow on the penalty phase?" The jurors reported back that they preferred to proceed the next day. Further discussion ensued and the prosecution expressed concern that two of its penalty phase witnesses were leaving for Argentina on Friday, September 20, 2002. The penalty phase trial started on Thursday, September 19.

The following Monday, September 23, a juror sent a note to the court expressing concern with the time frame of the trial. The juror said that, relying on assurances made during voir dire, several jurors had nonrefundable vacation plans scheduled for the middle of October.

The guilt phase of the trial continued, and on Wednesday, September 25, the People rested, and the defense began presenting its penalty phase evidence. At the close of the next court session (September 26), the court asked the parties

whether it should "advise the jury something about our scheduling . . . . [¶] So can we get an idea as to where we are by way of the evidence in the case?" Defense counsel estimated that the defense case would be complete, or close to complete, on Monday, October 7, and the court communicated this time estimate to the jury.

The following Monday, September 30, the court informed the parties that, despite its past practice of not holding formal court sessions on Fridays, the court would hear evidence on the coming Friday "because my intent is to finish the evidence this week," thus giving counsel "the weekend to prepare your closing arguments, instructions and whatever." Defense counsel said: "We will do our best. It's just we have experts who are going to be testifying and other witnesses as well."

The next day, before resuming the presentation of evidence, defense counsel informed the court that Dr. James Park, its expert on adjustment to prison life, had been denied permission to meet with defendant "in a normal interview room." The court responded that it had no authority over jail security, adding that Dr. Park might have to conduct the interview through a glass barrier, using a telephonic voice connection. In addition, the court stated: "I just want everybody to understand one thing. If we have to go overtime, if we have to work late, if we have to start early, we are going to finish the evidence in this case this week." Defense counsel did not raise any scheduling concern regarding Dr. Park's testimony.

On Thursday, October 3, the court stated: "We have a very serious time issue in this case. We are now almost one week beyond our outside schedule. The evidence will be completed in this trial in the penalty phase by tomorrow, Friday." Again,

defense counsel did not raise any scheduling concern regarding Dr. Park's testimony.

On Friday October 4, defense counsel, out of the presence of the jury, took up the issue of scheduling. Counsel noted the court had "limit[ed] this day to being the last day" for the presentation of evidence, but stated that the defense had yet to call several witnesses and "we could not possibly get them in." The court responded that if the defense had more witnesses, it should "put them on" because it was only 11:20 a.m. and the rest of the day was still available. Defense counsel explained that Dr. Park was not available until Monday, October 7, and the court responded: "I'm sorry that he's not available. I'm not going to be captive to a witness that's not available the entire afternoon. Get on the phone; get him here. Tell him we're going to finish the evidence. You get him ready this afternoon; put him on. But we're not going to be held captive if he's not ready to go because it's not convenient for him. That's not convenient for the court. Today's the last day for the evidence." Defense counsel explained that Dr. Park was testifying in a different county. The court then asked counsel whether Dr. Park had been unavailable on every day of the past week. The court stated: "Everybody was under the impression and knew and made it definitive we would finish this trial on Friday. And if [Dr. Park] wasn't available because it didn't fit his schedule, he wanted to be elsewhere or you wanted to put other witnesses on, so be it. The case is going to finish today by way of the evidence, and the arguments are going to start Monday morning. So, that's the court's ruling."

Based on the foregoing colloquy between the court and counsel, defendant argues the court erred by imposing an "arbitrary cut-off date for the conclusion of the defense case,"

resulting in the inability of the defense to call Dr. Park as a witness.[37] We reject defendant's claim.

"It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (§ 1044.) "In exercising its discretion under section 1044, a trial court must be impartial and must assure that a defendant is afforded a fair trial. [Citation.] When there is no patent abuse of discretion, a trial court's determinations under section 1044 must be upheld on appeal." (*People v. Cline* (1998) 60 Cal.App.4th 1327, 1334 (*Cline*).)

Initially, we observe that based on this record, we reject defendant's assertion that the court imposed an "arbitrary" deadline for the completion of evidence because the record shows the court adopted defense counsel's own estimate that the defense would conclude its evidentiary presentation on Monday, October 7. Moreover, the parties were aware that trial was exceeding the original time estimate and that jurors had other commitments which necessitated that the trial proceed expeditiously.

The only change the court thereafter made in scheduling was that the parties would present evidence on a Friday — October 4 — instead of the following Monday, October 7, even though Fridays were normally off days for trial. Significantly, this change was announced four days in advance, on

---

[37] Notably, the defense did present evidence of defendant's ability to adjust to prison life through Dr. Haney.

September 30, and the defense did not object. The next day, on October 1, after a discussion between the court and parties regarding Dr. Park's efforts to interview defendant, the court reaffirmed the Friday completion date, but the defense again did not object. The defense also did not object when the court reaffirmed the Friday completion date two days later, on October 3. The defense did not inform the court of a scheduling problem involving Dr. Park until midday on Friday, October 4, the very day the court had set as the last day for the presentation of evidence.

On this record, we conclude that the time limit the court imposed was reasonable, "impartial," and "fair." (*Cline, supra,* 60 Cal.App.4th at p. 1334.) It was certainly not arbitrary or a "patent abuse of discretion." (*Ibid.*) The court worked closely with the parties to meet their needs while considering the jurors' schedules and moving the trial forward as expeditiously as possible. The defense's request to extend the trial to accommodate Dr. Park's schedule was belated and unreasonable. Accordingly, the court did not abuse its discretion in denying the request, and its ruling did not violate defendant's state or federal constitutional rights.[38]

---

[38] Defendant relies on *People v. Blackburn* (1982) 139 Cal.App.3d 761, to support his argument, but the case is easily distinguished. In *Blackburn,* the trial court told the defendant, who was representing himself, to have his witnesses present the next morning. The defendant had one witness present the next morning, but he had arranged for his other witnesses to arrive in the afternoon. When the morning witness refused to testify, the trial court insisted the defendant should immediately bring his other witnesses into court. The defendant was not able to do so, and the trial court then

In addition, we agree with the People that Dr. Park's proffered testimony about defendant's future prison adjustment was cumulative to Dr. Haney's testimony. Dr. Haney testified that defendant had excellent potential for positive prison adjustment and believed that defendant would make a positive contribution to the prison environment. Defendant counters that Dr. Park's testimony would not be cumulative of Dr. Haney's because Dr. Haney did not have daily access to prison conditions like Dr. Park did. Yet, defendant does not explain, besides his knowledge of the San Quentin prison, how Dr. Park's testimony would not be cumulative of Dr. Haney's largely unchallenged testimony. In other words, defendant has not adequately established what specifically Dr. Park would have added other than to echo Dr. Haney's testimony with perhaps some more explicit references to prison.

Thus, even if the trial court abused its discretion in ending the presentation of evidence on October 4, the exclusion of Dr. Park's testimony was harmless under *People v. Brown* (1988) 46 Cal.3d 432, 448 and *Chapman*, *supra*, 386 U.S. at p. 24.

## H. Motion for a New Trial

In November 2002, about a month after the jury returned its verdict of death and was discharged, defense investigators interviewed several jurors, and based on those interviews,

announced that the trial had concluded. (*Id*. at pp. 763–764.) Nothing similar occurred here. As the record reflects, the court provided advance notice that Friday, October 4, was the last day for the presentation of evidence, and defense counsel first lodged his objection midday on the date the trial was scheduled for completion.

defendant moved for a new trial, alleging juror misconduct, among other things. Defendant's motion, which was filed on December 10, 2002, attached three declarations from investigator Sheila J. Klopper and one declaration from Juror No. 3. Klopper's declarations, which described what various jurors had told her, were largely inadmissible hearsay, but the court treated them as an offer of proof regarding what the jurors might say if called to testify.

### 1. *Facts and procedural background*

Klopper's first declaration reported her interview of Juror No. 1, who told her that during deliberations, three jurors spoke about having been molested as children. One of the three jurors said the molestation incidents continued over a couple of years. The other two jurors described isolated incidents of molestation. Juror No. 1 also informed Klopper that two of the jurors mentioned that being the victim of a molestation had not prevented them from functioning in society.

Klopper's second declaration reported her interview of Juror No. 11, who said he was once arrested for misdemeanor embezzlement, although no charges were filed. Juror No. 11 also said he had a son who was "borderline autistic," and he wondered if defendant, too, was "borderline autistic." In addition, Juror No. 11 told Klopper that his coworkers told him he should not bother coming back to work unless the jury returned a verdict of death, a comment that caused Juror No. 11 to call in sick and thus avoid such conversations. And Juror No. 11 told Klopper that two jurors had mentioned during deliberations that they had been molested as children, and they had commented that being a victim of molestation had not caused them to kill people.

Klopper's third declaration reported the statement of Juror No. 10, who told her he had been the victim of molestation as a child. The molestation was an isolated incident that he did not report. He informed Klopper that after another juror described being the victim of child molestation, he related his own experience to the other jurors.

Last, defense counsel submitted a declaration provided by Juror No. 3, who said that during deliberations, Juror No. 7 and Juror No. 10 told the other jurors that they had been molested as children, and that they had also commented that they had not, as a result, gone out and committed murders. In addition, according to Juror No. 3, a few jurors had told the other jurors that defendant might somehow get a parole hearing and could possibly get back on the streets.[39]

Defendant moved for a new trial, asserting that the jurors' "intentional concealment of material information" constituted misconduct. He stated that the three jurors who had personal molestation experiences had been untruthful when they answered "no" to juror questionnaire question 45, which asked whether they had "been a witness to or victim of a crime," and question 46, which asked whether they had "ever been the victim of a violent crime (i.e., assault, murder, rape, molestation, domestic violence, etc.)." Defendant further claimed that Juror No. 11, who was arrested for misdemeanor embezzlement, had a son who was "borderline autistic," and had coworkers who let their feelings about the case known to him, had disregarded the

---

[39] Because Juror No. 3 was a direct witness to these statements made by other jurors, the statements were admissible to impeach the verdict as evidence of statements made in the jury room.

court's admonition not to talk to anyone about the case, and had been untruthful in response to question 49, which asked whether he or any relative had "sought the assistance of a psychologist, psychiatrist, sociologist . . . or other mental health professional," and question 47, which asked whether he had "ever been arrested, accused, or convicted of a crime, or, to your knowledge been a suspect in a crime or crimes."

The trial court denied defendant's motion for a new trial, finding the questions were "ambiguous in lay person's terms." "Many people can take the position that if they had been inappropriately fondled or touched by a stranger or a relative, but it has not given rise to an arrest . . . [or] a prosecution . . . it might very well mean in the mind of the person that it's not really a criminal offense. And the same is true of a question which asks whether or not you've ever been the victim of a violent crime, in the minds of many people, if they have been . . . sexually fondled, and it isn't violent in nature, the response to that question, which would be ambiguous, would be no. [¶] The court also finds that based upon the totality of the circumstances in this case, the time in which the questions were asked, the manner in which they are framed, and the answers given, the fact that the questions would call for and do call for ambiguous responses — that that conduct is not jury misconduct. The fact that a juror was approached at work by co-employees and resisted those persons . . . to the point where he took steps not to go in to work, is not jury misconduct. . . . [T]he person was conscientious enough to actually call in sick on those occasions when co-employees did in fact pester him. [¶] Further, the court finds that the fact that a juror had opined that his son was borderline autistic is not in the court's view misconduct. It doesn't indicate in the court's mind that there was any type of

professional psychiatric or psychological therapy, or diagnosis, or treatment, or whatever. It just was an opinion that the juror recited. [¶] So based upon this offer of proof, the court does not find based upon the totality of the circumstances in this case that that constituted misconduct."

Defendant argues the court erred in denying his motion for mistrial based on juror misconduct. We disagree.

### 2. *Legal principles*

" 'When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are admissible. [Citation.] If the evidence is admissible, the court must then consider whether the facts establish misconduct. [Citation.] Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial. [Citations.] A trial court has broad discretion in ruling on each of these questions and its rulings will not be disturbed absent a clear abuse of discretion.' " (*People v. Bryant* (2011) 191 Cal.App.4th 1457, 1467, quoting *People v. Perez* (1992) 4 Cal.App.4th 893, 905–906.) "When the motion [for new trial] is based upon juror misconduct, the reviewing court should accept the trial court's factual findings and credibility determinations if they are supported by substantial evidence, but [the reviewing court] must exercise its independent judgment to determine whether any misconduct was prejudicial." (*Dykes, supra,* 46 Cal.4th at p. 809.) "Juror misconduct gives rise to a presumption of prejudice [citation][, which] the prosecution must rebut . . . by demonstrating 'there is no substantial likelihood that any juror was improperly

influenced to the defendant's detriment.'" (*People v. Gamache* (2010) 48 Cal.4th 347, 397.)

### 3. *Defendant's evidence of juror misconduct is largely inadmissible hearsay*

Klopper's declarations contain hearsay. In addition, to the extent that defendant offered Juror No. 3's declaration to establish that Jurors Nos. 7 and 10 had been molested as children based on statements that Juror No. 3 heard, then those statements would be hearsay as well. "Hearsay evidence offered in support of a new trial motion that is based on alleged jury misconduct ordinarily is insufficient to establish an abuse of discretion in either denying the motion or declining to conduct an evidentiary hearing." (*People v. Manibusan* (2013) 58 Cal.4th 40, 55 (*Manibusan*); see *Dykes*, *supra*, 46 Cal.4th at p. 810.) And "[d]efendant offers no persuasive basis for deviating from this general rule." (*Manibusan*, at p. 55; see *Dykes*, at p. 811.) Thus, the trial court would not have erred if it had denied defendant's motion on the grounds that the declarations consisted predominantly of inadmissible hearsay. Yet, the trial court did not do so and treated the declarations as offers of proof. We take the same approach here and agree with the court that a new trial was not warranted as we discuss below.

### 4. *Juror comments about personal molestation experiences*

Defendant argues, as he did below, that the jurors' personal molestation experiences show they were untruthful in response to questions 45 and 46 of the juror questionnaire. Assuming, without deciding, the truth of the jurors' statements, we conclude the court reasonably determined the jurors might not have thought of their molestation experience as involving a

"crime" that the questionnaire was concerned with. Questions 45 and 46 asked the jurors whether they had ever been the *victim of a crime*, and as the court explained, the jurors might have thought the questions did not encompass unwanted sexual contact that never resulted in an arrest or a prosecution. Moreover, question 46 asked whether the juror had ever been a victim of a *violent* crime. We agree with the trial court that a victim may have been confused by this question, and understandably answered "no" despite the fact that this question listed molestation as an example of a violent crime. Indeed, the way the question was worded might have given the impression that it was not inquiring about any act of molestation, just one that was accompanied by an additional act of violence. Therefore, the jurors' statements were not necessarily inconsistent with a "no" answer to questions 45 and 46 on the juror questionnaire and were insufficient to show juror misconduct.

The record also supports the court's ruling that the jurors' failure to disclose their childhood molestation experiences was unintentional. Indeed, it seems unlikely these jurors concealed their experiences because they hoped to be chosen as a juror despite harboring a bias against defendant. It is much more likely that they did not believe that questions 45 and 46 applied to them. Thus, we agree with the trial court that the jurors did not act with any purpose of concealment. What we stated above in connection with Juror No. 5's failure to disclose his citation for public intoxication is relevant here. (See pt. II.E.7., *ante*.) "Although intentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal [citations], mere inadvertent or unintentional failures to disclose are not accorded the same

234

effect." (*McPeters*, *supra*, 2 Cal.4th at p. 1175.) Accordingly, even if some jurors were the victims of childhood molestation, we agree with the trial court that the jurors' respective answers to questions 45 and 46 were not juror misconduct and do not establish bias.

Defendant also argues that the jurors improperly relied on their personal experiences of childhood molestation to draw conclusions about how childhood molestation affected defendant. Our prior decisions do not support this argument. "Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated." (*People v. Marshall* (1990) 50 Cal.3d 907, 950; see *Peoples*, *supra*, 62 Cal.4th at p. 777 [" ' "[J]urors cannot be expected to shed their backgrounds and experiences at the door of the deliberation room" ' "].)

Here, if it is true that some jurors briefly referred, during deliberations, to their personal experiences with childhood molestation, that merely shows they were undertaking a commonsense evaluation of the evidence. The exercise of common sense, grounded in one's personal experience, is fundamental to the jury system. (See, e.g., *People v. Keenan* (1988) 46 Cal.3d 478, 510 [jury expected to "apply[] its common sense and life experience"].) Anecdotal references to personal experience are also an integral part of how human beings communicate with one another when discussing an important question. And these jurors' comments appear to be a reflection

of their "subjective reasoning processes" (*Manibusan, supra,* 58 Cal.4th at p. 59), which is not admissible "to show the effect of such statement[s] . . . upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined" (Evid. Code, § 1150, subd. (a)).  In sum, there is no indication that the jurors were biased because of their childhood molestation experiences, and therefore the jurors did not commit misconduct, and the court did not abuse its discretion in so concluding.

5.  *Juror No. 11's comments about being arrested, his son being autistic, and his coworkers' harassment*

Defendant argues that Juror No. 11 committed misconduct by failing to disclose his arrest, failing to disclose that his son is autistic, and by discussing the case with his coworkers.  Regarding the arrest and the son, defendant asserts, as he did below, that Juror No. 11's admissions conflicted with his questionnaire responses to question 49, which asked whether he or any relative had "sought the assistance of a psychologist, psychiatrist, sociologist . . . or other mental health professional," and to question 47, which asked whether he had "ever been arrested, accused, or convicted of a crime, or, to your knowledge been a suspect in a crime or crimes."

Juror No. 11 told his fellow jurors that his son's autism was "borderline"; there was no indication the son ever received professional treatment.  Thus, defendant has not presented evidence showing that Juror No. 11 was inaccurate in his answer to question 49.  As for his arrest, his statement during deliberations is technically inconsistent with a "no" answer to question 47, but the arrest was minor (relating to a misdemeanor that was never charged) and he may have simply forgotten about it when answering the question.  In all events,

there is no indication that Juror No. 11 intentionally concealed the arrest, or that the arrest, which bore no relation to the facts of this case, biased him against defendant. We thus conclude that the court did not err in its determination that no misconduct occurred.

As for the assertion that Juror No. 11 discussed this case with his coworkers, it is unfortunate, but not surprising — given that the trial was widely covered in the news — that the coworkers let their views be known. But there is no indication that Juror No. 11 discussed the case with his coworkers or otherwise violated the court's admonition regarding speaking about the case with others. On the contrary, Klopper's declaration suggests that Juror No. 11 tried to *avoid* hearing his coworkers' views by calling in sick. Thus, there is no evidence that Juror No. 11 committed misconduct. Moreover, there is no indication that he was biased by the comments of his coworkers or that the comments led him to decide the case based on anything other than the evidence presented in the courtroom and the court's instructions on the law. We therefore conclude the court did not err in determining no misconduct occurred.

### 6. *Juror comments about the possibility that defendant might be released*

Defendant draws our attention to comments some jurors allegedly made during deliberations concerning whether defendant might eventually be released from prison. Defendant argues these comments establish juror misconduct. In addressing this claim, we first note that Juror No. 3's declaration, which is the basis of defendant's claim of error, offers no detail about the comments, and no other declaration mentions the comments. In *Mendoza,* we addressed similar juror comments and said: "[T]he challenged discussion on the

possibility of release on parole is similar to jurors' comments during the penalty phase deliberations about the absence of executions in California. *Such comments are not jury misconduct.*" (*People v. Mendoza* (2000) 24 Cal.4th 130, 195, italics added; see also *People v. Yeoman* (2003) 31 Cal.4th 93, 163 ["We have recognized that jurors cannot always be effectively precluded from discussing such topics of general awareness and concern as the possibility of parole [citation], escape [citation], and the infrequent nature of executions"].) Absent any submission that provides further detail concerning the comments at issue here, we find that the court did not err in rejecting defendant's juror misconduct claim. Likewise, none of the juror misconduct claims establishes a violation of his state or federal constitutional rights.

### 7. *Failure to hold an evidentiary hearing on the alleged juror misconduct*

Defense counsel requested an evidentiary hearing on all of the allegations of juror misconduct, but the court denied the request, stating, "[B]ased upon the totality of the facts in this case, . . . there is no possibility that a hearing would reveal any type of prejudicial misconduct." And the court only made this determination *after* it concluded and explained in great detail why it found that no juror committed misconduct. Nevertheless, defendant contends the court erred by denying his juror misconduct claim without first holding an evidentiary hearing. We reject this contention.

An evidentiary hearing on the issue of juror misconduct " ' "should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. . . ." ' [Citation.] The trial court's decision whether to conduct an evidentiary hearing . . . will be

reversed only if the defendant can demonstrate an abuse of discretion." (*Dykes*, *supra*, 46 Cal.4th at pp. 809–810, fn. omitted.)

There was no abuse of discretion here, and no violation of defendant's state or federal constitutional rights. The circumstances before the trial court, as described above, did not give rise to a strong possibility of prejudicial misconduct. The trial court reasonably concluded that any failure by jurors to disclose previous molestation owed to ambiguity in the relevant questions within the questionnaire, not to deception on their part, and that the facts were not sufficiently suggestive of misconduct as to call for an evidentiary hearing. Nor do we perceive error in the trial court's failure to order an evidentiary hearing to probe the allegations involving Juror No. 11, none of which demonstrated a strong possibility of prejudicial misconduct.

Moreover, when pressed by the court, defense counsel did not assert any specific examples of *other* juror misconduct that would have been shown at an evidentiary hearing. It is true that counsel argued that an evidentiary hearing would allow further inquiry into matters raised in the declarations, but the same clarifications of the matters raised in the declarations could have been pursued by defendant's investigator. This was not done. The court was not required to summon the jurors for a hearing so that defense counsel could probe the details of their deliberations, searching for misconduct the defense investigator failed to uncover.

The concurring and dissenting opinion, however, believes the trial court should have further investigated the allegations that at least two seated jurors failed to disclose their prior

molestation. (Conc. & dis. opn. of Evans, J., *post*, at p. 7.) The concurring and dissenting opinion emphasizes that question 45 asked not only whether the prospective juror or anyone they knew had "been a witness to or victim of a crime," but also, if the answer to that question was yes, whether they were interviewed by the police. The concurring and dissenting opinion then posits that this follow-up question should have made clear to jurors that the questionnaire was "contemplating scenarios in which the prospective juror was the victim of a crime yet may not have reported it and no arrest or prosecution resulted." (Conc. & dis. opn. of Evans, J., *post*, at p. 9.) The concurring and dissenting opinion's analysis rests on a faulty premise. Contrary to the concurring and dissenting opinion's position, the reference to police interviews could serve to reinforce the belief that question 45 (and question 46) was not related to unwanted touching that had never resulted in any type of police involvement or arrest.[40] Thus, instead of clarifying the call of questions 45 and 46, the reference to police involvement only further added to the questions' ambiguity.

Similarly, the concurring and dissenting opinion relies on the fact that 12 prospective jurors "disclosed in their questionnaires the molestation they had suffered, despite the fact that *seven* of them had never reported the crimes to the police." (Conc. & dis. opn. of Evans, J., *post*, at p. 9.) Yet the fact that some prospective jurors apparently construed questions 45 and 46 as concerned with unreported molestation does not render the questions unambiguous as they pertain to this conduct. The very nature of an ambiguous question is that

---

[40] The same is true of another inquiry within question 45, which asked whether the prospective juror had testified in court.

it could be reasonably interpreted in different ways. That some prospective jurors answered questions 45 and 46 by identifying incidents in which they were molested does not establish that every juror understood those questions similarly and intentionally provided a false answer by failing to disclose prior molestation. On the contrary, as we have explained, the trial court reasonably determined that the framing of the questions was sufficiently ambiguous that a prospective juror could have regarded the questions as unconcerned with uncharged conduct.

For these reasons, we conclude the trial court did not abuse its discretion by declining defendant's request to hold an evidentiary hearing.

## I. Judicial Bias

Defendant asserts that judicial bias infected all three phases of his trial, in violation of his due process rights. Because only one of the alleged instances of judicial bias was raised below, most of defendant's bias claims have been forfeited. (See *McWhorter*, *supra*, 47 Cal.4th at p. 373; *Snow*, *supra*, 30 Cal.4th at p. 78.)[41]  In any event, having examined defendant's contentions, we conclude they lack merit. Defendant's allegations fall into two categories: (1) assertedly unfair application of the rules of evidence; and (2) allegedly demeaning or derogatory comments made by the court.

### 1. *Unfair application of the rules of evidence*

Defendant claims "the trial court . . . applied state evidentiary rules in a manner which prevented [him] from fully

---

[41]  As we discuss below, the defense moved for a mistrial based on one of the instances of alleged judicial bias. That motion was denied.

presenting his case at each phase of the trial."  He raises three arguments in this respect.  First, defendant argues that the court sustained the prosecutor's many hearsay objections to the testimony of defense witness Dr. McInnes.  By contrast, the court overruled defense counsel's hearsay objections to the testimony of prosecution witnesses Dr. Waxman and Dr. Dietz.  Second, defendant notes the court admitted into evidence four letters defendant wrote from jail to a woman in Illinois, describing fantasies involving sexual sadism, mob rape, and the rape of virgin princesses.  Defendant complains that the court excluded numerous other letters he wrote to the same woman, despite the letters being offered as context evidence under Evidence Code section 356.[42]  Finally, defendant contends that the court unfairly denied his request, during the guilt phase, to permit Dr. Wu to be present in the courtroom during the testimony of Dr. Gur, and to permit Dr. Buchsbaum to be present during the testimony of Dr. Wu.  By contrast, defendant argues, the court denied a defense motion to exclude witnesses at the penalty phase, thus allowing the victim impact witnesses to be together in the courtroom, hearing one another's testimony.

---

[42]  Evidence Code section 356 allows a party to offer evidence regarding the context of certain types of evidence offered by an adverse party.  It provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

We disagree with defendant that the above rulings are sufficient to establish judicial bias. "[A] trial court's numerous rulings against a party — even when erroneous — do not establish a charge of judicial bias, especially when they are subject to review." (*Guerra, supra,* 37 Cal.4th at p. 1112; see *People v. Pearson* (2013) 56 Cal.4th 393, 447 [same].) Here, defendant does not claim that any of these rulings were, in themselves, erroneous. Moreover, while defendant identifies several evidentiary rulings that favored the prosecution, he does not account for the numerous evidentiary rulings that were favorable to the defense. (See *Pearson,* at p. 447 ["the fact that on appeal we discuss only rulings against defendant does not mean the court's rulings were other than evenhanded"].) We conclude that defendant has failed to show that the court's rulings were so biased against him that they "deprived [him] of ' "a fair, as opposed to a perfect, trial." ' " (*Guerra,* at p. 1112.)[43]

---

[43] Defendant also claims the court engaged in misconduct by permitting its "law clerk" to assist the prosecutor in preparing the jury instructions. The sole support for this assertion is the prosecutor's comment that he added certain language to the standard CALJIC instruction "over the lunch hour, with your clerk's help." The day before, when speaking about the preparation of the jury instructions, the court offered the administrative assistance of the "clerk of the court," stating, "somebody has to work together to pattern these instructions for the court. If you want the assistance of the clerk of the court to call upon our staff downtown to get some of these through our computer, we can maybe accommodate you." Thus, the "clerk" likely refers to the staff of the "clerk of the court," whose assistance appears to have been purely administrative in nature, using the cut-and-paste functions of a word processing program to add certain language to the text of the CALJIC instruction.

Defendant relies on *Washington v. Texas* (1967) 388 U.S. 14, *Chambers, supra,* 410 U.S. 284, and *Rock, supra,* 483 U.S. 44 to support his claim that the trial court's evidentiary rulings violated his federal due process rights. But in those cases, the high court addressed the application of state evidentiary rules that, on their face, treated criminal defendants unfairly. (See *Washington v. Texas*, at pp. 16–17 ["Two Texas statutes provided at the time of the trial in this case that persons charged or convicted as coparticipants in the same crime could not testify for one another, although there was no bar to their testifying for the State" (fn. omitted)]; *Chambers*, at pp. 295, 296 ["In this case, petitioner's request to cross-examine [a witness] was denied on the basis of a Mississippi common-law rule that a party may not impeach his own witness." "But in modern criminal trials, defendants are rarely able to select their witnesses: they must take them where they find them"]; *Rock*, at p. 53 ["The question now before the Court is whether a criminal defendant's right to testify may be restricted by a state rule that excludes her posthypnosis testimony"].) Defendant does not identify the evidentiary rules the court applied that were facially unfair to criminal defendants. Accordingly, the high court cases he cites are inapposite. (See, e.g., *Lightsey, supra,* 54 Cal.4th at p. 717; *McDowell, supra,* 54 Cal.4th at p. 434; *People v. Prince* (2007) 40 Cal.4th 1179, 1243.)[44]

---

[44] Defendant also relies on *Webb v. Texas* (1972) 409 U.S. 95, 98. *Webb* is easily distinguished since it involved a trial court that admonished a defense witness at length. (See *ibid.* ["the judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment"].) Nothing similar occurred here.

In summary, the fact that the court enforced ordinary rules of evidence and trial procedure — prohibiting the defense from introducing hearsay evidence and preventing certain defense witnesses from hearing the testimony of other witnesses — does not demonstrate judicial bias. Nor has defendant demonstrated that the application of these ordinary rules of evidence and trial procedure improperly infringed upon his state or federal constitutional rights.

### 2. *Demeaning or derogatory comments*

Defendant identifies several instances in which, from his perspective, the court made demeaning or derogatory comments directed at defense counsel. These comments must be evaluated in accordance with the standard we set forth in *McWhorter* and *Snow* (see pt. II.G.3., *ante*): " 'Although the trial court has both the duty and the discretion to control the conduct of the trial [citation], the court "commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution" [citation]. Nevertheless, "[i]t is well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior." [Citation.] Indeed, "[o]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial." ' " (*McWhorter*, *supra*, 47 Cal.4th at p. 373; see also *Snow*, *supra*, 30 Cal.4th at p. 78.) When read in context, the court's comments as discussed more fully below, were in response to counsel's

undue persistence in the face of an adverse ruling from the court.

a. *Dr. Waxman's testimony*

Dr. Waxman testified for the People at the guilt phase. During cross-examination, defense counsel asked Dr. Waxman a question to which counsel wanted a yes or no answer. Nonetheless, Dr. Waxman explained his answer at some length. The following colloquy then occurred:

"[Defense counsel (to Dr. Waxman):] You made that point. Are you ready now to answer the question I asked you?

"[The prosecutor]: I object.

"The witness: I thought I answered it.

"The Court: That question is not proper. Ask your next question.

"[Defense Counsel]: I move to strike his comment about rocket scientists. It's nonresponsive. It's argumentative. It's advocacy.

"The Court: Your request is denied. Ask your next question.

"[Defense counsel (to Dr. Waxman):] Now, doctor, let me ask the question again, if I can —

"The Court: Don't ask it again. He just answered it. Ask another question. He just answered your question. There is no reason to repeat a question. It's cumulative."

The next day, the following colloquy occurred:

"[Defense counsel (to Dr. Waxman):] And, doctor, let me ask you this: Is the main thrust of that statement, 'uses an old

scanner,' to indicate that the resolution on his scanner is not as good as the state-of-the-art PET scanners?

"A.  We went over that very carefully yesterday.  I'll repeat it if you'd like.  And —

"Q.  Would you just answer the question, sir?

"The Court:  You see the problem is you've asked that question; he answered it.  And now you said — Do you want the answer — do you want it again?

"[Defense counsel]:  Well, he can give me the answer without a lecture, your honor.  It's nonresponsive.  I move to strike.

"The Court:  Counsel, he's not giving a lecture.  He was responsive to your question.  It was asked and answered yesterday.  The objection is sustained.  You don't want to hear his answer.  You won't hear it.  Ask your next question.

"[Defense counsel]:  Could you answer the question.

"The Court:  No.  Ask your next question.  That question is — The objection is sustained."

Shortly thereafter, Dr. Waxman clarified his earlier testimony, and defense counsel asked:  "Are you finished, doctor?"  The prosecutor objected, and the court told defense counsel to ask his next question. Counsel asked again: "Are you finished?"  The court then said: "Well, he's not saying anything, counsel.  He's responded to your question.  I'm not sure what you're getting at.  [¶] . . . [¶] . . .  If you have another question, ask it.  If not, then sit down."

Later, defense counsel told Dr. Waxman that he (Dr. Waxman) had been "ordered last night to hand over" certain exhibits.  The prosecution objected, and the court noted

it had not ordered the doctor to do anything. Rather, the prosecution had indicated it had received certain exhibits and had offered to make copies for the defense. Defense counsel then asked Dr. Waxman: "In any event, you released those exhibits . . . to the defense last night, correct?" The prosecutor again objected, saying: "That's not true either." The court agreed, saying: "It's not. [The prosecutor] last night indicated how he obtained [the exhibits] . . . and he indicated he would make copies for you, and I assume he did. And that has nothing to do with this witness, so ask your next question."

Sometime later, the following colloquy occurred (concerning the use of a diagnostic tool called "statistical parametric mapping"):

"[Defense counsel (to Dr. Waxman):] Okay. Now, you recommend that you — Your preference, or you advocate that Dr. Wu should have used this S.P.M. program, right?

"A. Well, I think S.P.M. is the standard. It's still being looked upon as experimental with regard to diagnosing an individual. S.P.M. — and I said this yesterday; I will repeat it if you'd like. Is best for —

"Q. I wouldn't, but if you feel you have to, go ahead.

"The Court: Well, you asked for —

"[Defense counsel]: I know what S.P.M. is, but that's wasting time. He's already explained that.

"The Court: No. I can tell you what's wasting time. Go ahead and answer the question."

Later, Dr. Waxman answered defense counsel's questions about whether he would change his opinion if he knew that Dr. Wu's methodology "had been rigorously peer-reviewed."

When Dr. Waxman finished his answer, defense counsel asked: "Is there any other hearsay you'd like to add to your — " At that point, the court interrupted, saying: "Oh, no, no, no. That wasn't proper, [counsel]."

Near the conclusion of Dr. Waxman's cross-examination, the following colloquy occurred:

"[Defense counsel (to Dr. Waxman):] You mentioned this morning that in terms of peer review, if Dr. Wood came in here and said he had peer reviewed Dr. Wu's method, that you would want some Ph.D. sitting in the room, right?

"[The prosecutor]: I'm going to object. That's been asked and answered many times.

"[Defense counsel]: It's limited to the next question.

"The Court: It has been asked and answered. Ask your question. Sustained.

"[Defense counsel (to Dr. Waxman):] Would it be your preference that that person be Dr. O'Brien, someone of your choosing, or could it be anybody?

"[The prosecutor]: I'm going to object. He's asked and answered this several times.

"The Court: Sustained.

"[Defense counsel (to Dr. Waxman):] Now, doctor, you mentioned in your direct testimony, . . . in reference to Dr. Wu using what's called activation; do you recall?[45]

---

[45]    As discussed, the "activation" method used by Dr. Wu and Dr. Buchsbaum involved the brain being in an active state when administering a PET scan.

"A.  I don't recall the exact words, but I know we did discuss activation at least three or four times.

"Q.  And you were asked the question:  [¶] 'Do you activate your patients?'  [¶]  And you said:  [¶]  'We don't activate our patients.'

"[The prosecutor]:  I'm going to object.  His testimony speaks for itself.

"[Defense counsel]:  It's, again, preliminary to a question I'd like to ask.

"The Court:  Just ask the question.  The objection is sustained.

"[Defense counsel (to Dr. Waxman):]  And do you recall that after you testified that you don't activate your patients, that you immediately thereafter went on to describe a case where in fact you had activated a patient?

"[The prosecutor]:  I'm going to object.  His testimony speaks for itself.

"The Court: It does.  The phraseology of the question tends to be somewhat argumentative.  But again, his testimony does speak for itself.  We have his testimony.  The jury has heard it.  Ask your next question."

Defense counsel then brought a motion for a mistrial, which the court deferred until the recess.  Defense counsel resumed his examination and, a short time later, he asked Dr. Waxman why he had said, in response to a question, that he was being careful about his phrasing.  Dr. Waxman answered: "One is, is that worst of all, I don't want to incur your ire."

During the recess, outside the presence of the jury, counsel explained the basis for his motion for mistrial:  "The motion for

mistrial is premised on the court's response to the interchange with myself and Dr. Waxman, . . . in the sense that the court is making derogatory comments, in my view, and raising its voice and generally, I believe, conveying to the jury that the court has some displeasure with the cross-examination. And, specifically, this morning the court stated that — in an interchange between the doctor and myself, when I indicated that allowing the doctor to ramble on was going to waste time — and the court interjected with a comment that: I'll tell you what's wasting time. And I can tell the court, from the reaction from the members of my staff and others in the audience, that the clear impression conveyed by a comment such as that is that the court is somehow commenting on the credibility of the cross-examination and with the interchange between yourself and myself during the examination of this witness has become heated."

The court denied the motion, stating: "With all due respect, I'm not going to respond, except to say it's totally lacking of merit. My comments speak for themselves. [¶] . . . [¶] I can say that you were becoming a little combative with the witness. I think that caused the witness to say on one occasion he didn't want to incur your ire because of the manner in which you were cross-examining him. That was said in the presence of the jury by the witness based upon what I perceive to be, I assume, your combative conduct. [¶] But as far as my comments, they speak for themselves. They are on the record. Your motion is totally frivolous. It lacks merit. The motion is denied."

Defendant contends that the court's treatment of defense counsel was "disparaging," evidencing judicial bias. The record shows, however, that defense counsel engaged in further

colloquy with the court regarding the court's explicit rulings, made flippant remarks during his examination of Dr. Waxman, and occasionally lost his temper. Counsel's questions included, "You made that point. Are you ready now to answer the question I asked you?" "Are you finished, doctor?" and "Is there any other hearsay you'd like to add . . . ." In fact, Dr. Waxman commented that he wished to avoid defense counsel's ire. The court responded to these incidents in a restrained, albeit firm, manner. It is true that several of the court's statements evidenced some frustration with defense counsel. However, having considered the court's comments, in the context of defense counsel's examination — including the repetitious nature of questions previously asked and answered — we conclude that the court's comments did not rise to the level of judicial bias.

Defense counsel also asserted in his motion that the court "rais[ed] its voice" and conveyed "displeasure" during the exchanges, and defendant makes the same point on appeal. "It can be difficult to ascertain the emotional content of such exchanges from a cold record. However, to the extent the court's comments to [defense counsel] were a reflection of frustration and irritation at counsel's repeated [refusal to follow the court's rulings], they were not improper. '[S]uch manifestations of friction between court and counsel, while not desirable, are virtually inevitable in a long trial.' " (*Blacksher*, *supra*, 52 Cal.4th at p. 825; see also *Snow*, *supra*, 30 Cal.4th at p. 79.)

We conclude the court did not exhibit judicial bias in any of the rulings and comments the court made during the cross-examination of Dr. Waxman. (See *Snow*, *supra*, 30 Cal.4th at p. 78.)

b. *Dr. Lynn Alison McInnes's testimony*

Dr. McInnes testified for the defense at the sanity phase. During redirect examination of Dr. McInnes, she said she had read and considered defense expert Dr. Woods's report in forming her opinion.[46]  Defense counsel then asked whether Dr. McInnes based her opinion that defendant was psychotic at the time of his crimes on the report of Dr. Woods, but the court sustained a hearsay objection.  Defense counsel next asked whether Dr. McInnes knew Dr. Woods "to be an experienced forensic psychiatrist?"  The prosecutor again objected, arguing that the answer was irrelevant "unless [Dr.] Woods is going to testify."  The court again sustained the prosecutor's objection. Defense counsel then said:  "As [the prosecutor] knows, Dr. Woods can't testify."  The court responded:  "What's the point of making a comment like that, [counsel]?  If you have a question, [counsel], ask a question of the witness.  If you finish asking questions, you can sit down.  But don't make comments in front of the jury."

The court's admonition ("What's the point of making a comment like that, [counsel]?") does not, contrary to defendant's claim, demonstrate judicial bias.  Rather, the court appropriately criticized counsel for implying that the prosecutor was somehow trying to obtain an unfair advantage.  (See *Snow*, *supra*, 30 Cal.4th at p. 78 [" '[i]t is well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's

---

[46]    As discussed, Dr. Woods did not testify because of a family emergency.

instructions, or otherwise engages in improper or delaying behavior' "].)

        c. *Sandra A.'s testimony*

Sandra A. testified for the defense at the penalty phase. During direct examination, defense counsel asked Sandra A. if she knew defendant's maternal grandfather, and he also asked Sandra A. to describe him. The following colloquy then occurred:

      "[The prosecutor]: Objection, relevance.

      "[Defense counsel]: Well, I'll —

      "[The prosecutor]: It's cumulative at this point in time.

      "[Defense counsel]: If there's a stipulation as to the nature of [defendant's] father — [47]

      "[The prosecutor]: Your honor, it's improper to ask for stipulations.

      "The Court: There's no — There's no stipulation, and it's not proper to make an offer of a stipulation in the presence of the jury. If you have one, that's fine. You can recite it, but don't make the offer in the presence of the jury. Now, there is an objection that it's not relevant.

      "[The prosecutor]: And cumulative.

      "The Court: And I'm inclined to agree that it is cumulative, and it's not relevant. We've had extensive testimony about the family, the makeup, the family tree, the —

---

[47]    It appears that defense counsel misspoke. Counsel seems to have been referring to defendant's maternal grandfather.

Et cetera, et cetera. So, there comes a point where it simply is cumulative testimony as opposed to new testimony."

Defendant asserts that the court's rebuke of defense counsel ("it's not proper to make an offer of a stipulation in the presence of the jury") constitutes judicial bias. We conclude the court was justified in admonishing counsel regarding his improper request, in front of the jury, for a stipulation by the prosecution. (See *Snow, supra,* 30 Cal.4th at p. 78.)

d. *Wendy R.*

Wendy R., defendant's grade school classmate, testified for the defense at the penalty phase that defendant was never aggressive or obnoxious. The following colloquy occurred during her direct examination:

"[Defense counsel (to Wendy R.):] Okay. Now, you at some point have learned of the charges for which [defendant] has been convicted?

"A. Yes.

"Q. And based on your knowledge of those charges, . . . would it be consistent or inconsistent with the person that you knew for [defendant] to have committed those offenses?

"[The prosecutor]: Objection, it's irrelevant.

"The Court: Sustained.

"[Defense counsel (to Wendy R.):] Do you have an opinion as to whether or not [defendant], based on your knowledge of him, is the type of person to engage in aggressive acts against women?

"[The prosecutor]: Same objection.

"The Court: Same ruling. She can testify as to her impressions of the defendant during that time frame where she had contact with him, from first grade through high school. But as to her opinion now, the jury's already found him guilty of these offenses, so her opinion now as to whether he would do or not do something is irrelevant.

"[Defense counsel]: Her opinion as to — Any opinion as to character evidence?

"The Court: I didn't say that, counsel. My comments speak for themselves. My comments speak for themselves. You've heard them; they're on the record. Ask your next question."

Defendant asserts that the court's comment ("I didn't say that, counsel") demonstrates judicial bias. We disagree. The court's comment was a corrective one, made in response to counsel's apparent unwillingness to accept the court's earlier ruling limiting Wendy R.'s testimony. (See *Snow*, *supra*, 30 Cal.4th at p. 78.) The trial court did not err.

e. *Wendy H.'s testimony*

Wendy H. testified for the defense at the penalty phase. Wendy H. stated that she and defendant were friends and that their friendship included using a hot tub at Cedar Lodge nude. Defense counsel asked whether Wendy H. flirted with defendant, and the trial court sustained a relevance objection. Defense counsel asked: "Did you encourage [defendant] to be interested in you in any way, without telling us what you did?" The prosecutor again objected on relevance grounds, and counsel stated: "It goes to aggressiveness towards women." The court responded: "Well, apparently if [any]body is being aggressive, it's the witness as opposed to the defendant,

[according to] the way you are framing the question. So, on that basis, the objection is sustained." Defense counsel then said: "Your honor, I think it's unfair to characterize this witness as aggressive." The court responded: "I'm sorry you think it's unfair, [counsel]. That's unfortunate for you. Ask your next question." Wendy H. then testified that defendant never responded to her sexually, and that she was not sexually aggressive toward him.

Next, Wendy H. testified that she and defendant talked about his hair-pulling habit. When defense counsel asked whether defendant cut his hair short because of this habit, and whether Wendy H. teased him about his short hair, the court sustained objections that the evidence was cumulative. Defense counsel then asked whether Wendy H. had ever seen defendant pulling hair from his body (not his head), and the prosecutor again objected. The court responded: "That's a new one. I haven't heard that before. [¶] Go ahead. You may answer that."

The court's rulings and comments do not, contrary to defendant's claim, demonstrate judicial bias. The court's comment — "I'm sorry you think it's unfair, [counsel]. That's unfortunate for you. Ask your next question" — reflects the court's continued frustration with counsel. We acknowledge the trial court could have been more judicious in its comments, especially in front of the jury. But we also recognize that the comment came after defense counsel repeatedly asked whether Wendy H. tried to get defendant to be interested in her, and after counsel suggested the court was saying Wendy H. was aggressive. Under these circumstances, and in the context of the overall exchanges between the court and counsel, the way the court expressed its frustration was not ideal, but it fails to establish judicial bias. (See *Snow*, *supra*, 30 Cal.4th at p. 78.)

The court's comment in response to defense counsel's question about whether defendant pulled his body hair ("That's a new one. I haven't heard that before"), when viewed in context, was proper. The court was explaining why it overruled the prosecution's objection, i.e., that defense counsel's questions about defendant's habit of pulling his head hair were cumulative, but his question about pulling *body* hair was new. The comment does not indicate judicial bias. (See *Snow*, *supra*, 30 Cal.4th at p. 78.)

f. *Howard Davies's testimony*

Howard Davies, an assistant sheriff assigned to Mariposa County jail, testified for the defense at the penalty phase. Defense counsel asked Davies to describe the "Mariposa County Jail for us in terms of what kind of facility it is, say, in comparison to a maximum security prison." The court sustained a relevance objection by the prosecutor, to which defense counsel replied: "Well, this goes to the conditions under which he is housed and the issue of adjustment under — ." The court responded: "The jail has nothing to do with the character and background of the defendant. It's irrelevant. Every jail is different; every prison is different. Conditions have nothing to do with the defendant's background or his character. It's irrelevant." Defense counsel then asked to make an offer of proof outside the presence of the jury, and the court agreed. Out of the presence of the jury, counsel argued that the question related to defendant's future adjustment to prison, and the court responded that the conditions at the jail were irrelevant to defendant's future adjustment to prison.

Defendant's assertion of error focuses on the court's statement, "The jail has nothing to do with the character and

background of the defendant." We conclude, contrary to defendant's claim, that the statement does not demonstrate judicial bias. Rather, the court merely made the point that every jail and prison is different, and therefore defendant's adjustment to conditions at the jail was not relevant to the question of his adjustment to the conditions at the prison. (See *Snow*, *supra*, 30 Cal.4th at p. 78.)

### g. *Dr. Silva's testimony*

During cross-examination of Dr. Silva, who testified for the defense at the penalty phase, the prosecutor asked Dr. Silva whether defendant "had enough sense at the time he's doing these acts to know that society, civilized normal folks, would say, 'That's wrong.'" The prosecutor added: "He knew that, didn't he?" The following colloquy then occurred:

"[Defense counsel]: I'm going to object; excuse me. I'm going to object to these questions. They're getting into sanity, and the court prevented me from getting —

"[The prosecutor]: Goes to his appreciation of the criminality of his act.

"The Court: I'm not sure what you're talking about where the court prevented anything.

"[Defense counsel]: I asked Dr. Silva —

"The Court: [Counsel], I rule when an objection is made. We don't revisit past rulings. If you want to revisit a past ruling and bring up something where you claimed that you were precluded from doing something, do it at the sidebar and not in the presence of the jury. It's not appropriate."

Defendant argues these comments establish judicial bias. Here again, we disagree. Counsel's comments, made before the

jury, implied that the court's ruling was inconsistent with a prior ruling, thus calling into question the validity of the prior ruling and the court's impartiality. The court therefore briefly rebuked counsel. Doing so does not demonstrate judicial bias. (See *Snow*, *supra*, 30 Cal.4th at p. 78.)

### h. *Cy.S.'s testimony*

Defendant's oldest sister Cy.S. testified for the defense at the penalty phase. The court ruled at a sidebar conference that she could testify about her love for defendant and his character, but further evidence about family dynamics would be excluded under Evidence Code section 352.

Defense counsel asked Cy.S. about Steven's return to the family after his abduction, and the court sustained objections on the ground that the elicited evidence was irrelevant or cumulative. Counsel then asked whether Cy.S. recalled seeing an ambulance outside her uncle's home. The court sustained an objection, stating the testimony was cumulative. The court then added, "And, [counsel], if you want to continue along that line, contrary to the court's ruling, which I thought was fairly clear, we will stop the examination of the witness. [¶] You certainly can use the witness in the fashion I've described, which is — which was the reason as to why I thought she was called. . . . But you can't continually ask questions which are violative of the court order, which I thought was fairly clear." Counsel continued to ask about the family dynamics, and the court sustained another objection and reiterated its ruling.

Defendant asserts that the court's rebuke of defense counsel demonstrates judicial bias. We disagree. The record reflects that counsel ignored the court's clear ruling limiting the testimony of this witness in the manner described above. As

such, the court attempted to express its ruling in more forceful terms which, in turn, reflects a degree of frustration. Even after the court did so, counsel continued to ignore the court's ruling and push the same prohibited line of questioning. The court's rebuke was understandable in light of counsel's unwillingness to accept the court's ruling and did not rise to the level of judicial bias. (See *Snow*, *supra*, 30 Cal.4th at p. 78.)

### 3. *Defendant's supplemental opening brief*

Defendant filed a supplemental opening brief in which he claimed that new authority (*Nieves*, *supra*, 11 Cal.5th 404) supports his claim of judicial bias. To this end, defendant argues *Nieves* (1) established that a pattern of disparaging a defense counsel and conveying favoritism toward the prosecutor constitutes misconduct and (2) directs appellate courts to consider the cumulative effect of a trial court's misconduct. Defendant's supplemental opening brief groups what he describes as instances of judicial bias and misconduct in this case into four categories: (1) misconduct discrediting and minimizing the defense mitigation case; (2) comments demeaning defense counsel; (3) misconduct demonstrating the court's bias in favor of the prosecution and against the defense; and (4) bias exhibited by the trial court's legal errors and misstatements of the record when denying defense arguments. Although defendant reiterates some of the same allegations he presented in his original brief on the merits, he also offers a few new instances that, he asserts, likewise evince judicial bias.

As a threshold matter, we agree with the Attorney General that defendant's reliance on *Nieves* as new law is misplaced. Indeed, the two points on which defendant claims *Nieves* established new law (that a pattern of disparaging a

defense counsel and conveying favoritism toward the prosecutor constitutes misconduct and that appellate courts should consider the cumulative effect of a trial court's misconduct) are not new. We made these same points more than 10 years before defendant filed his original opening brief. (See *People v. Sturm* (2006) 37 Cal.4th 1218, 1238, 1243; see also *Nieves*, *supra*, 11 Cal.5th at pp. 478–479, 499 [citing *Sturm*].) Moreover, as the Attorney General points out, in *Nieves*, this court merely applied well-settled principles of judicial misconduct and concluded on the facts before us that the trial judge "made inappropriately disparaging and sarcastic remarks to defense counsel, impugning his performance, chastising him for improper behavior, and sanctioning and citing him for contempt in front of the jury." (*Nieves*, at p. 477.) At most *Nieves*, and *Sturm*, another case involving judicial misconduct on which defendant relies, offer examples of instances in which we concluded that judicial bias or misconduct existed on the specific records before us and was prejudicial, at least at the penalty phase. To the extent that defendant is offering "new" allegations of judicial bias that he did not raise in his original opening briefs on the merits, we find defendant's argument based on those allegations forfeited. (See *Tully*, *supra*, 54 Cal.4th at p. 1075; cf. Cal. Rules of Court, rule 8.520(d)(1) ["A party may file a supplemental brief limited to new authorities, new legislation, or other matters that were not available in time to be included in the party's brief on the merits"].)

Even if we were to address these new arguments on the merits, they would fail. All of defendant's claims of judicial bias are similar to instances that we considered above and concluded did not constitute judicial bias.

For example, defendant claims the trial court exhibited bias during cross-examination of the arson expert. After the arson expert opined that the vehicle fire was intentionally set, defense counsel asked whether he had any expertise in determining someone's mental state. The court sustained an objection, stating: "He is an arson investigator. He is not a psychiatrist, not a psychologist, not a medical doctor. He is an arson investigator. His opinion was this fire was intentionally started." Defense counsel responded, "That's the point, your honor. Since he is none of those things, his opinion lacks merit." The court responded, "We have gone over this ground numerous times. We went over it initially yesterday. We have done it again today. It's consistent with my rulings. The way you are posturing this and asking questions is irrelevant. He can give an opinion as to the origin of the fire and you can cross-examine him at length about [it]." Defense counsel continued to question the witness about whether he had expertise in determining an individual's mental state. The prosecution objected, and the court explained, "The way you are framing the question, you are framing the questions in the context of his giving an opinion as to a specific person. He is not doing that. He is giving an opinion based upon an evaluation of the situs, the fire, the vehicle in question; that this fire was not accidental; this fire was set intentionally. And please limit your cross-examination to that area."

Defense counsel asked three more questions, and the court sustained relevance objections to each of them. At that point, the court stated: "I have discretion to curtail the scope of the cross-examination if you persist in asking questions which are repetitive and irrelevant." Defense counsel asked another question, to which the court sustained the objection and stated,

"I am going to curtail the examination if this continues." Defense counsel requested a sidebar conference, which the court denied, stating, "No. I think my position is clear as to the scope of the examination, and sidebar couldn't serve any purpose." Defense counsel then moved on to a different subject.

Later during the cross-examination, the arson expert affirmed that he had co-authored an article about the "psychiatric aspects of arsonists." Defense counsel started to ask about the content of the article, and the following colloquy occurred:

"[The prosecutor]: I am going to object to any further examination. I think we have been pretty lenient here.

"[Defense counsel]: That's outrageous, that statement. The court has not allowed any cross-examination of this witness, and I ask the court to instruct counsel not to give his opinions about what the court — whether the court is being lenient or not.

"The Court: Can I instruct counsels, every counsel, that we are not going to put up with what's just happened. We are not going to get personal. We are not going to react the way you reacted. It's not proper, it's not professional, and it's below your dignity.

"Now, I am going to rule when there is an objection. I don't want colloquy back and forth. I don't want comment on what the court has done or not done. If there is an objection, I will rule on it. That question, there was an objection to it. It's sustained.

"Ask your next question.

"[Defense counsel]: Thank you very much, your Honor."

Defendant asserts that the court's rulings on the objections were examples of judicial misconduct. However, none of the court's statements was disparaging or sarcastic, and its warning that it would stop defense counsel's cross-examination was reasonable considering defense counsel's repeated attempts to elicit irrelevant evidence. Notably, defendant does not argue that the court's rulings on the numerous objections were erroneous.

Also, as defendant recognizes in his supplemental opening brief, during the final colloquy, the court "reprimanded both counsel for getting personal." We view this exchange as a reflection of the " ' "friction" ' " between the court and both counsel that is " ' "virtually inevitable in a long trial." ' " (*Nieves*, *supra*, 11 Cal.5th at p. 482.) Therefore, the court's response to the conflict between the prosecutor and defense counsel evidenced its commitment to "the high standards of fairness" demanded of trial courts. (*Id.* at p. 477; accord, *People v. Ramirez* (2022) 13 Cal.5th 997, 1083 ["A complete review of this record shows that the court's intervention was directed at both counsel and appropriately focused on maintaining professionalism and courtesy"].) In short, the interaction between the defense counsel and the trial court during the cross-examination of the arson expert does not establish judicial basis.

For all these reasons, we conclude defendant has not established judicial bias. Similarly, he has not shown that the court violated his state or federal constitutional rights.

### J. Constitutionality of California's Death Penalty Law

Defendant acknowledges that we have previously rejected his federal constitutional challenges to California's death

penalty law, and he presents his challenges to urge reconsideration of our decisions and to preserve the issues for federal review. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 303–304.) We decline to depart from our settled precedents.

"Because the jury's penalty choice is a normative decision, not a factual one (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 670), California's death penalty scheme does not violate the federal Constitution for failing to require written findings (*People v. Camacho* (2022) 14 Cal.5th 77, 150 (*Camacho*)) or unanimous findings as to the existence of aggravating factors, prior convictions, or unadjudicated criminal activity (*People v. Tran* (2022) 13 Cal.5th 1169, 1235 (*Tran*); *People v. McDaniel* (2021) 12 Cal.5th 97, 142–145, 156 (*McDaniel*)). Nor is the scheme deficient because it does not require findings be made beyond a reasonable doubt as to the existence of aggravating factors (other than § 190.3, factor (b) or (c) evidence), that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty ([*Thomas, supra,*] 14 Cal.5th [at p.] 408; *Mataele, supra,* 13 Cal.5th at p. 435). The high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and *Hurst v. Florida* (2016) 577 U.S. 92 do not alter these conclusions. (*Thomas,* at p. 408; [*Ng, supra,*] 13 Cal.5th [at p.] 572.)

"The class of death-eligible offenders is not impermissibly broad, and special circumstances are not so numerous or expansive as to defeat their constitutionally required narrowing function. (*People v. Parker*[, *supra,*] 13 Cal.5th [at pp.] 89–90; *People v. Pineda* (2022) 13 Cal.5th 186, 257 (*Pineda*).) [¶] Section 190.3, factor (a), which permits aggravation based on the circumstances of the crime, does not result in arbitrary and capricious imposition of the death penalty. (*Mataele, supra,*

13 Cal.5th at pp. 434–435; *Pineda*, *supra*, 13 Cal.5th at p. 257.) . . . The trial court is not constitutionally required to instruct on whether a sentencing factor, including consideration of the defendant's age under section 190.3, factor (i), is aggravating or mitigating. (*Camacho*, *supra*, 14 Cal.5th at p. 149; *Tran*, [*supra*, 13 Cal.5th] at p. 1235.)

"The sentencing factors listed in CALJIC No. 8.85 are not unconstitutionally vague, and the trial court is not required to delete inapplicable factors. (*Mataele*, *supra*, 13 Cal.5th at p. 435; *Pineda*, *supra*, 13 Cal.5th at p. 258.) The instruction's use of the words 'extreme' and 'substantial' does not unduly constrain the jury's consideration of mitigating circumstances. (*Parker*, *supra*, 13 Cal.5th at p. 91.) CALJIC No. 8.88's instruction that death may be imposed only if the jury finds aggravating factors 'so substantial' compared to mitigating factors that death is warranted is not unconstitutionally vague. (*Mataele*, at p. 435; *Pineda*, at pp. 257–258.) The court was not required to instruct the jury to return a sentence of life imprisonment without parole if it found mitigation outweighed aggravation. ([*Thomas*], *supra*, 14 Cal.5th at p. 409; *Camacho*, *supra*, 14 Cal.5th at p. 149.)

"The federal Constitution does not require intercase proportionality review. (*Mataele*, *supra*, 13 Cal.5th at p. 436; *McDaniel*, *supra*, 12 Cal.5th at p. 157.) . . . [And] California's capital sentencing scheme does not violate international law or the Eighth Amendment. (*Camacho*, *supra*, 14 Cal.5th at p. 150; *McDaniel*, at p. 157.)" (*People v. Nadey* (2024) 16 Cal.5th 102, 191–192.) "There was also no requirement to instruct the jury regarding the lack of a burden of proof. [¶] . . . [¶] . . . There is no presumption in favor of a life term. ([*People v.*] *Wilson* [(2021)] 11 Cal.5th [259,] 317–318; [*People v.*] *Chhoun* [(2021)]

11 Cal.5th [1,] 54; *People v. Ramirez* (2021) 10 Cal.5th 983, 1039 . . . .) [¶] . . . [¶] . . . The death penalty scheme does not violate equal protection principles 'by providing significantly fewer procedural protections for persons facing a death sentence than are afforded persons charged with noncapital crimes.' (See *Wilson, supra,* 11 Cal.5th at p. 318; *Chhoun, supra,* 11 Cal.5th at p. 55; [*People v.*] *Bell* [(2019)] 7 Cal.5th [70,] 131.)" (*People v. Bracamontes* (2022) 12 Cal.5th 977, 1005–1007.)

"The federal Constitution [also] does not require an instruction that life is the presumptive penalty." (*People v. Chhoun* (2021) 11 Cal.5th 1, 54.) And " '[t]he trial court was not required to instruct the jury that . . . the beyond-a-reasonable-doubt standard and requirement of jury unanimity do not apply to mitigating factors.' " (*People v. Delgado* (2017) 2 Cal.5th 544, 591.)

"Finally, 'considering the arguments in combination, and viewing the death penalty law as a whole, it is not constitutionally defective. Defendant's challenges to California's death penalty scheme "are no more persuasive when considered together," than when considered separately. [Citation.] "California's capital sentencing scheme as a whole provides adequate safeguards against the imposition of arbitrary or unreliable death judgments." ' (*People v. Anderson* (2018) 5 Cal.5th 372, 426; see *Mataele, supra,* 13 Cal.5th at p. 436.)" (*Nadey, supra,* 16 Cal.5th at pp. 192–193.)

### K. Cumulative Error

Defendant asserts the cumulative effect of the trial court's errors requires reversal. We have assumed error, but found no prejudice, regarding: defendant's claim that he invoked his *Miranda* rights before he was transported to Sacramento; the

impeachment of Dr. McInnes; the trial court's refusal to allow the defense to recall Dr. Haney; prosecutorial misconduct regarding a single portion of the prosecutor's closing argument; and the trial's court's decision to end the presentation of defense evidence. We conclude that the cumulative effect of these assumed errors does not warrant reversal. (*Silveria and Travis*, *supra*, 10 Cal.5th at p. 328.)

## III. DISPOSITION

The judgment is affirmed in its entirety.

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**ADAMS, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. STAYNER

S112146


Concurring and Dissenting Opinion by Justice Evans


Defendant Cary Anthony Stayner was found to have committed three murders with five special circumstances after a fair trial. I therefore concur in the judgment affirming the jury's guilt verdicts as well as the jury's finding that Stayner was sane at the time he committed these crimes. Unfortunately, his sentence of death was the product of a penalty phase trial that was not, under our precedents, fair. I therefore dissent as to the penalty verdict.

## I.

When the prosecution "raises an inference of future dangerous conduct in prison" as an aggravating factor supporting a judgment of death, "the defendant is entitled to respond with evidence that his chances to inflict harm in prison will be limited." (*People v. Smith* (2015) 61 Cal.4th 18, 58 (*Smith*).) If the trial court instead prevents the defendant from "informing the jury about security measures imposed on life prisoners" — thus providing the prosecution with "an unfair advantage on the critical question of penalty" — the court "offends the fundamental principles of due process." (*Ibid.*)

That violation of fundamental due process happened in this case. It relates to the testimony of Dr. Craig Haney, a psychology professor called by the defense as an expert on adjustment to prison life. Dr. Haney testified that Stayner had an "excellent" potential for making a positive adjustment to

prison life, pointing to his limited criminal history, his deference to authority figures, his respectful manner, his experience and adaptability in a structured environment and in confinement, his work ethic, and his acceptance of responsibility and insight into his mental problems. The expert believed Stayner could and would make a positive contribution to the prison system.

Dr. Haney's testimony, as the majority concedes, went "largely unchallenged" by the prosecution (maj. opn., *ante*, at p. 228), who merely elicited the fact of the expert's general opposition to the death penalty and the number of capital inmates for whom he had previously testified. But then the prosecutor posed a question designed to trigger a particular scenario in the jurors' minds: Did the Department of Corrections and Rehabilitation "employ young female staffers either as guards or counselors?" Dr. Haney replied, "Yes. There are correctional officers who are women."

Outside the presence of the jury, the defense argued that the prosecutor's question about Stayner's contact with female guards "opened up the conditions of confinement because he suggested by that question that there is a danger in prison" to those guards. Accordingly, the defense asked the court for the opportunity to inquire of Dr. Haney about "the kinds of security measures that Mr. Stayner would be housed in." The court denied the request because it did "not feel the prison conditions were opened up on cross-examination on that question."

This was error. The fact that women work as correctional officers had relevance at the penalty phase only to the extent they might be at risk by being in proximity to Stayner, who had committed violent crimes against four women or girls. Indeed, future dangerousness was precisely the inference the

2

prosecutor, near the end of his closing argument, asked the jury to draw: "Beware of any alternative — any insinuation or argument that you should give him a gift of life without parole verdict because that all by itself is enough to protect society, and he won't be a danger in the future. Sure, they could put on evidence that he may perform well if he's in the prison, like this jail stuff. Or he may classify out as some type of a model prisoner. But think about this. Knowing what this guy's all about, knowing that he will repeat his crime if he gets a chance, do you 12 people really want to take a chance and mortgage the futures, mortgage the lives of perhaps women correctional officers in the joint, just take a chance and give him the gift of leniency?"

And here's where the trial court again erred. Defense counsel objected, citing *Gardner v. Florida* (1977) 430 U.S. 349 and *Simmons v. South Carolina* (1994) 512 U.S. 154 for the proposition that a defendant is "denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." (*Gardner*, at p. 362; accord, *Smith*, *supra*, 61 Cal.4th at pp. 57–58.) Yet the trial court, having already precluded Stayner from offering responsive evidence about the security measures to which he would be subject in prison, overruled the objection.

In short, Stayner was wrongly prevented at the penalty phase trial from offering evidence to rebut the inference that he would pose a danger to female correctional officers, and then he was wrongly left defenseless when the prosecutor relied on that inference near the end of his closing argument to urge a verdict of death. These circumstances, fairly read, should do more than "raise some concerns." (Maj. opn., *ante*, at p. 210.) Under *Smith*

and binding precedent from the United States Supreme Court, these circumstances constitute a violation of due process.

## II.

Under our precedent, "[t]he error is reversible unless it is harmless beyond a reasonable doubt." (*Smith, supra*, 61 Cal.4th at p. 60.) The majority opinion deems the error harmless on the ground the evidence of future dangerousness consisted "of a single question" and the prosecutor's argument included "only a single, brief reference to the danger defendant would pose to female correctional officers." (Maj. opn., *ante*, at pp. 210, 212.) But the prejudicial effect of the due process violation here turns not on whether it could be characterized as brief but on whether there was a reasonable possibility the violation, however brief, might have been *effective* in swaying the jury. I fear this one-sided presentation might've been effective.

What the majority's abbreviated analysis of prejudice overlooks is that a defendant's future dangerousness is one of the most significant (if not *the* most significant) of the factors juries consider in deciding whether to sentence a defendant to death. (See, e.g., Blume et al., *Future Dangerousness in Capital Cases: Always "At Issue"* (2001) 86 Cornell L.Rev. 397, 404 ["future dangerousness plays a highly prominent role in the jury's discussions during the penalty phase"]; Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* (1998) 98 Colum. L.Rev. 1538, 1560 ["These results comport with prior studies that emphasize the pervasive role future dangerousness plays in and on the minds of capital sentencing jurors"]; *ibid.* ["Of white jurors, 61.7% responded that the fact that the 'defendant might be a danger to society in the future' would make them more likely to impose a death

sentence, while only 36.5% said it would make them just as likely"]; Eisenberg & Wells, *Deadly Confusion: Juror Instructions in Capital Cases* (1993) 79 Cornell L.Rev. 1, 4 ["Expectations about future dangerousness play a substantial role in juror deliberations"].)

The prosecutor's presentation was designed to play on that fear by inviting the jurors to imagine the risk to "women correctional officers" if Stayner were sentenced to prison *and* to acknowledge the responsibility they would bear if anything went wrong: "Knowing what this guy's all about, knowing that he will repeat his crime if he gets a chance, do you 12 people really want to take a chance and mortgage the futures, mortgage the lives of perhaps women correctional officers in the joint, just take a chance and give him the gift of leniency?" This is not a scenario that needs elaboration or repetition to be effective. It vividly calls to mind a potential risk of a life sentence. And it may well have been a legitimate argument *if* Stayner had been afforded his "elemental due process" right to offer evidence in rebuttal and describe the kinds of security measures that would constrain him in prison. (*Skipper v. South Carolina* (1986) 476 U.S. 1, 5, fn. 1.) But that did not happen here.[1] Notably, neither

---

[1] The majority opinion discounts the effect of the trial court's error in barring Stayner from presenting evidence of prison security measures on the ground that counsel had "some opportunity" (maj. opn., *ante*, at pp. 210–211) to ask Dr. Haney a *different* question — i.e., whether Stayner's commitment offense "would prevent him from coming into contact with young female correctional officers." But Dr. Haney did not offer assurances on that particular point, perhaps because he could not or because he was unaware of potential options, which only exacerbated the court's error in barring testimony about "the

the majority opinion nor the Attorney General argues that the exclusion of this evidence would have had no effect on the jury's assessment of his future dangerousness.

Moreover, there was at least a reasonable possibility that the prosecutor's argument about future dangerousness overwhelmed what even the majority opinion concedes was otherwise "largely unchallenged testimony" (maj. opn., *ante*, at p. 228) about Stayner's prospects for a successful adaptation to prison. Certainly that was the prosecutor's intent; his invocation of the risk to female correctional officers immediately followed his acknowledgement of the defense "evidence that he may perform well if he's in the prison" or may be "some type of model prisoner." Had the defense been allowed to rebut the prosecutor's claim of future dangerousness, there is at least a reasonable possibility Dr. Haney's "largely unchallenged testimony" — in conjunction with a substantial case in mitigation consisting of the evidence of Stayner's mental health problems, his difficult childhood and experience of molestation, his good character, and remorse for his crimes — could have persuaded at least one juror to spare Stayner's life.

## III.

The effect of the due process violation was exacerbated by the trial court's failure to investigate credible allegations that at least two seated jurors failed to disclose, in response to questions

_____

security measures under which [Stayner] would be housed." What's worse, the trial court likewise did not allow the defense to call James Park, a former associate warden at San Quentin State Prison, to "address[] the issue of [Stayner]'s access to female guards" or even to present an offer of proof of his testimony.

on the jury questionnaire as to whether they had ever been the "victim of a crime" such as "molestation," that *they had been molested*. During penalty phase deliberations, these jurors relied on their previously undisclosed experiences to discount evidence in the mitigation case that Stayner had been molested as a child.

Many of these allegations were presented in declarations by a defense investigator, who recounted statements several jurors made during interviews. The trial court treated these declarations as an offer of proof regarding what the jurors would say if called to testify. In addition, Juror No. 3's own declaration stated that Juror No. 7 and Juror No. 10 told the other jurors that they had been molested as children but had not, as a result, murdered anyone. The defense asked the court to order an evidentiary hearing, which would "allow the presentation of testimony," "the cross-examination of witnesses," and "a chance to evaluate the[ir] credibility." The court denied the request on the ground Stayner could not have been prejudiced by any misconduct: "[I]f there was a substantial showing, to be quite frank, that it could have been prejudicial, the court would hold an evidentiary hearing. The court is not holding an evidentiary hearing for that reason, because the court finds that based upon the totality of the facts in this case, that there is no possibility that a hearing would reveal any type of prejudicial misconduct," given the "overwhelming proof to support the verdicts of the jury, and in the court's view there is no substantial likelihood of any prejudice that inured to the defendant from the jurors' activities."

The majority opinion wisely does not rely on the trial court's erroneous theory that Stayner could not have suffered prejudice from any juror misconduct because the "proof" at trial

was so "overwhelming." As we have previously explained, the test for prejudice in the context of juror misconduct "is different from, and indeed less tolerant than, 'harmless-error analysis' for ordinary error at trial. . . . Any deficiency that undermines the integrity of a trial — which requires a proceeding at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury — introduces the taint of fundamental unfairness and calls for reversal without consideration of actual prejudice. [Citation.] Such a deficiency is threatened by jury misconduct. When the misconduct in question supports a finding that there is a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment, we are compelled to conclude that the integrity of the trial was undermined: under such circumstances, we cannot conclude that the jury was impartial." (*People v. Marshall* (1990) 50 Cal.3d 907, 951.)

The majority opinion nonetheless goes astray by speculating that "the jurors might not have thought of their molestation experience as involving a 'crime' that the questionnaire was concerned with," in that the jury questionnaire "asked the jurors whether they had ever been the *victim of a crime*, and as the court explained, the jurors might have thought the questions did not encompass unwanted sexual contact that never resulted in an arrest or a prosecution. . . . Therefore, the jurors' statements were not necessarily inconsistent with a 'no' answer to questions 45 and 46 on the juror questionnaire and were insufficient to show juror misconduct." (Maj. opn., *ante*, at pp. 233–234.)

The scenario hypothesized by the majority seems difficult to reconcile with the actual questions the prospective jurors were asked. Question 45, for example, inquired not only "Have

8

you or anyone you know been a witness to or a victim of a crime," but also whether the prospective juror had been "interviewed by the police" — thus contemplating scenarios in which the prospective juror was the victim of a crime yet may not have reported it to police and no arrest or prosecution resulted. Question 46 asked whether the prospective juror had "ever been the victim of a violent crime (i.e., assault, murder, rape, *molestation*, domestic violence, etc.)" — thus making it unmistakably clear that molestation was included in the question. (Italics added.) Only a strained reading could lead one to hypothesize that the seated jurors might have thought being " 'inappropriately fondled or touched by a stranger or a relative' " that " 'has not given rise to an arrest . . . [or] a prosecution . . . might very well mean in the mind of the person that it's not really a criminal offense.' " (Maj. opn., *ante*, at p. 231.)

Indeed, the majority's speculation is refuted by the simple fact that 12 prospective jurors gave questions 45 and 46 a natural reading and disclosed in their questionnaires the molestation they had suffered, despite the fact that *seven* of them had never reported the crimes to the police. Although it's possible there may have been other reasons for excusal or disqualification, not a single prospective juror who disclosed molestation was selected to serve on the jury. To assume *without further investigation* that the seated jurors must have had a distinctly different reading, in defiance of the actual text of the questions themselves and the responses of many other prospective jurors, blinks reality.

In addition, the trial court's failure to order an evidentiary hearing undercuts the majority opinion's characterization of the seated jurors' nondisclosure as "unintentional." (Maj. opn., *ante*,

at p. 234.)  The majority opinion deems "Juror No. 5's failure to disclose his citation for public intoxication" to be "relevant here" (*ibid*.), but the trial court actually questioned Juror No. 5 about his nondisclosure before concluding it was unintentional and inadvertent.  (*Id*. at p. 158.)  No such questioning occurred here.

The majority opinion also uses faulty reasoning to support its conjecture that the seated jurors' nondisclosure was unintentional.  Their reasoning goes like this:  "it seems unlikely these jurors concealed their experiences because they hoped to be chosen as a juror despite harboring a bias against defendant," therefore "[i]t is much more likely that they did not believe that questions 45 and 46 applied to them."  (Maj. opn., *ante*, at p. 234.)  This is a false choice.  Stayner's claim of misconduct does not depend on a theory that these individuals connived to serve on the jury.  What's "much more likely" is that the jurors were reluctant to write down that they had been molested and disclose it to the court because of their feelings of shame and embarrassment.  (See *Commonwealth v. Reavis* (Mass. 2013) 992 N.E.2d 304, 316.)  Unfortunately, it was precisely those feelings of shame and embarrassment about their molestation that created a "strong possibility" they would be biased against Stayner, who had likewise been molested — and should have led the trial court to conduct an inquiry into the nondisclosure.  (See *People v. Hedgecock* (1990) 51 Cal.3d 395, 419.)

The majority opinion's conclusion that "none of the juror misconduct claims establishes a violation of his state or federal constitutional rights" (maj. opn., *ante*, at p. 238) thus rests entirely on the trial court's failure to investigate the very real

possibility of juror misconduct and bias.  That omission further undermines confidence in the penalty judgment.[2]

## IV.

For the foregoing reasons, I would affirm the guilt and sanity verdicts but reverse the death judgment and remand for further proceedings.  To the extent the majority opinion fails to recognize the prejudicial error that occurred at the penalty phase trial, however, I respectfully dissent.

**EVANS, J.**

---

[2]    The majority opinion contends that certain declarations offered in support of the new trial motion constituted hearsay but correctly declines to rely on that ground because "the trial court did not do so and treated the declarations as offers of proof."  (Maj. opn., *ante*, at p. 233.)  A reviewing court "may not affirm a discretionary ruling on a ground the trial court did not rely on and had discretion to reject."  (*In re L.C.* (D.C. 2014) 92 A.3d 290, 297; see generally *Cutter v. Wilkinson* (2005) 544 U.S. 709, 718, fn. 7 ["we are a court of review, not of first view"].)

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Stayner

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S112146
**Date Filed:** April 30, 2026

_____

**Court:** Superior
**County:** Santa Clara
**Judge:** Thomas C. Hastings

_____

**Counsel:**

Andrew Parnes, under appointment by the Supreme Court, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Charles C. Ragland, Chief Assistant Attorneys General, Ronald S. Matthias and James William Bilderback II, Assistant Attorneys General, Glenn R. Pruden, Sarah J. Farhat and Bridget Billeter, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Andrew Parnes
Attorney at Law
671 First Avenue North
P.O. Box 5988
Ketchum, ID 83340
(208) 726-1010

Bridget Billeter
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3763